# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
## 2014-1514

AD HOC SHRIMP TRADE ACTION COMMITTEE,

Plaintiff-Appellee,

v.

UNITED STATES

Defendant-Appellee,

and

HILLTOP INTERNATIONAL and OCEAN DUKE CORP.,

Defendants-Appellants.

---

Appeal from the United States Court of International Trade in
case no. 11-cv-00335, Judge Donald C. Pogue

---

## BRIEF OF PLAINTIFFS-APPELLANTS HILLTOP INTERNATIONAL AND OCEAN DUKE CORP.

### NON-CONFIDENTIAL VERSION - CORRECTED

Mark E. Pardo
Andrew T. Schutz

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005
Tel: (202) 783-6881

Date: September 22, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## AD HOC SHRIMP TRADE ACTION COMM. v US, 2014-1514

## CERTIFICATE OF INTEREST

Pursuant to Rule 47.4 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Appellants, Hilltop International and Ocean Duke Corp., certifies the following:

1.    The full name of every party or *amicus* represented by me is:

Hilltop International and Ocean Duke Corp.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest)

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

Not applicable.

4.    The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Mark E. Pardo and Andrew T. Schutz of the law firm Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP appeared in the trial court below and are expected to appear in this court.

Date: September 22, 2014

_/s/Mark E. Pardo
Mark E. Pardo
Counsel for Appellant

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES..................................................................1

JURISDICTIONAL STATEMENT......................................................................2

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT............................................................................17

ARGUMENT .........................................................................................................18

    I.      STANDARD OF REVIEW .............................................................18

    II.     COMMERCE'S DECISION TO REJECT ALL
            INFORMATION SUBMITTED BY HILLTOP AND RESORT
            TO TOTAL AFA WAS UNSUPPORTED BY SUBSTANTIAL
            EVIDENCE AND OTHERWISE CONTRARY TO LAW ..........20

          A.    SINCE THE INFORMATION REGARDING THE OCEAN KING
                 AFFILIATION WAS NOT PERTINENT TO COMMERCE'S
                 MARGIN CALCULATION IN AR 5, THERE WAS NO
                 LEGITIMATE BASIS TO APPLY FACTS AVAILABLE OR AN
                 ADVERSE INFERENCE FOR ITS OMISSION ..............................21

               1.    The Statutory Requirements For Application of
                     AFA ........................................................................................21

               2.    Record Evidence From This AR And Other
                     Precedent Confirm That Third Country Affiliates
                     Were Not Pertinent To The Calculation Of
                     Hilltop's Margin ............................................................25

               3.    There Can Be No "Gap" With Respect To The
                     Ocean King Affiliation Because Commerce Added
                     All Information Regarding Ocean King To The AR
                     5 Record ........................................................................31

          B.    THE OMISSION OF OCEAN KING FROM HILLTOP'S
                 AFFILIATION CHARTS WAS NOT "CORE" INFORMATION
                 THAT COULD JUSTIFY APPLICATION OF TOTAL AFA ..........35

C.     It Was Improper for Commerce to Consider
Transshipment or Circumvention Allegations
within Its AR 5 Proceeding ................................................43

III.   IT WAS IMPROPER TO TREAT HILLTOP AS PART OF
THE PRC-WIDE ENTITY BECAUSE INDEPENDENT
RECORD EVIDENCE CONFIRMS HILLTOP IS A HONG
KONG EXPORTER EXEMPT FROM THE SEPARATE
RATE TEST ..........................................................................48

IV.    THE DEPARTMENT'S CORROBORATION OF THE AFA
RATE APPLIED TO HILLTOP AS PART OF THE PRC-
WIDE ENTITY WAS UNSUPPORTED BY SUBANTIAL
EVIDENCE AND CONTRARY TO LAW ...................................58

A.     The Corroboration Framework .......................................58

B.     The Department failed to Offer Adequate and
Lawful Corroboration for the 112.81% Petition
Rate Assigned to the PRC-Wide Entity .........................60

1.     The AFA Rate and Corroboration Information
Commerce Used Are Outdated and Not Relevant to
the Current Review Proceeding ...................................61

2.     Commerce Improperly Ignored the Record
Evidence of All Calculated Margins That
Confirmed the 112.81% AFA Rate Was
Aberrational ................................................................63

3.     The Small Percentage of Sales Data Used by
Commerce Cannot Corroborate the Excessively
High AFA Margin ........................................................66

C.     The Trial Court Erred in Concluding that Previous
Calculated Rates Are Irrelevant to the
Corroboration Requirement in this Case .....................69

D.     Commerce Unreasonably Denied Access to
Information Demonstratinig The Aberrational

NATURE OF THE CHERRY-PICKED RED GARDEN
DATA............................71

CONCLUSION.................................................................................75

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)5 AND (7)

The material omitted in this non-confidential version all is, or relates to, material subject to a protective order. The material omitted on pages 16, 67, and 68 identifies business proprietary information that the U.S. Department of Commerce placed on the record of the underlying remand proceeding.  This confidential information    consists of antidumping duty margin information for a company that is not subject to this appeal.

# TABLE OF AUTHORITIES

## Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012) ....................................41

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
882 F. Supp. 2d 1366 (Ct. Int'l Trade 2012)........................................5

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
882 F. Supp. 2d 1377 (Ct. Int'l Trade 2013)........................................6

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013).............................*passim*

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
2014 Ct. Intl. Trade LEXIS 74 (2014).......................................*passim*

*Advanced Tech. & Materials Co. v. United States*,
885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012)......................................49

*AMS Assocs. v. United States*,
719 F.3d 1376 (Fed. Cir 2013) ........................................................57

*China Kingdom Import & Exp. Co. v. United States*,
31 CIT 1329 (2007) ......................................................................56

*Decca Hospitality Furnishings, LLC v. United States*,
30 C.I.T. 357(2006) ……………………………………………………..42

*Dongbu Steel Co., Ltd. v. United States*,
635 F.3d 1363 (Fed. Cir. 2011) ......................................................31

*Dongguan Sunrise Furniture Co., Ltd. v. United States*,
904 F. Supp. 2d 1359 (Ct. Int'l Trade 2013)......................................67

*Ferro Union, Inc. v. United States*,
23 CIT 713 (1999) ..................................................................*passim*

*F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
   216 F.3d 1027 (Fed. Cir. 2000) ............................................ 18-19, 59

*Foshan Shunde Yongjian Housewares & Hardware Co.,*
   35 CIT __, 2011 Ct. Intl. Trade LEXIS 123 ....................................36

*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States,*
   991 F. Supp. 2d 1322 (Ct. Int'l Trade 2014)................................58, 72

*Gallant Ocean (Thail.) Co. v. United States,*
   602 F.3d 1319 (Fed. Cir. 2010) ................................................*passim*

*Gerald Metals, Inc. v. United States,*
   132 F.3d 716 (Fed. Cir. 1997) ...................................................19, 66

*Gerber Food (Yunnan) Co. v. United States,*
   29 CIT 753 (2005) .................................................................. 38-39

*Globe Metallurgical Inc. v. United States,*
   722 F. Supp. 2d 1372 (Ct. Int'l Trade 2010)................................ 44-45

*GPX Int'l Tire Corp. v. United States,*
   893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013)....................................34

*Luoyang Bearing Corp. v. United States,*
   29 CIT 24 (2005) .......................................................................49

*Jiangsu Changbao Steel Tube Co., Ltd. v. United States,*
   884 F. Supp. 2d 1295 (Ct Int'l. Trade 2012) ...................................36

*Home Prods. Int'l v. United States,*
   633 F3d 1369 (Fed. Cir.2011) .......................................................37

*Krupp Thyssen Nirosta GMBH v. United States,*
   24 CIT 666 (2000) ......................................................................35

*Lifestyle Enterprise, Inc. v. United States,*
   768 F. Supp. 2d 1286 (2011) ...............................................59, 62, 70

*Lifestyle Enter. v. United States,*

ii

751 F.3d 1371 (Fed. Cir. 2014) ...................................................... 62

*Mitsubishi Elec. Corp. v. United States*,
    16 CIT 730 (1992) ................................................................ 46

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) ............................................ 23

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ............................................ 23

*NSK Ltd. v. United States*,
    358 F. Supp. 2d 1276 (Ct. Int'l Trade 2005) ...................... 24

*NTN Bearing Corp. v. United States*,
    73 F.3d 1204 (Fed. Cir. 1995) .............................................. 47

*NTN Bearing Corp. of America v. United States*,
    368 F.3d 1369 (Fed. Cir. 2004) ............................................ 24

*PAM, S.p.A. v. United States*,
    31 CIT 1008 (2007) ................................................................ 4

*Peer Bearing Co.-Changshan v. United States*,
    587 F. Supp. 2d 1319 (2008) .......................................... 40, 70

*Qingdao Taifa Group Co. v. United States*,
    33 CIT 1090 (Ct. Intl Trade 2009) ...................................... 37

*Qingdao Taifa Group Co. v. United States*,
    760 F. Supp. 2d 1379 (Ct. Int'l Trade 2010) ...................... 70

*Qingdao Taifa Group Co. v. United States*,
    760 F. Supp. 2d 1379 (Ct. Int'l Trade 2010) .................. 59, 67

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ............................................ 65

*Save Domestic Oil, Inc. v. United States*,
    357 F.3d 1278 (Fed. Cir. 2004) ............................................ 38

*Shandong Huarong Mach. Co. v. United States*,
  30 CIT 1269 (2006) ................................................................ 22-23, 26

*Shandong Mach. Imp. & Exp. Co. v. United States*,
  33 C.I.T. 810 (2009) ......................................................................70

*Shanghai Taoen Int'l Trading Co. v. United States*,
  29 CIT 189 (2005) .................................................................... 35-36

*Since Hardware (Guangzhou) Co. v. United States*,
  34 CIT __, 2010 Ct. Intl. Trade LEXIS 119 ......................................36

*Ta Chen Stainless Steel Pipe Co. v. United States*,
  31 CIT 794 (2007) .....................................................................28, 31

*Taian Ziyang Food Co. v. United States*,
  783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011)  ...................................40

*Timken Co. v. United States*,
  354 F.3d 1334 (Fed. Cir. 2004) .......................................................60

*Tokyo Kikai Seisakushu Ltd. v. United States*,
  529 F.3d 1352 (Fed. Cir. 2008) .......................................................37

Thai Pineapple Canning Industry Corp. v. United States,
  273 F.3d 1077 (Fed. Cir. 2001) .......................................................19

*Washington Int'l Ins. Co. v. United States*,
  2010 Ct. Intl. Trade LEXIS 13 (2010)..............................................72

*Zhejiang Dunan Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) .........................................23, 35, 38

## Statutes and Regulations

19 U.S.C. § 1516a (b)(1)(B)(i).............................................................18

19 U.S.C. § 1675(a) .......................................................................43, 47

19 U.S.C. § 1677(33) ...........................................................................10

19 U.S.C. § 1677e(a) ....................................................................*passim*

19 U.S.C. § 1677e(b) ....................................................................*passim*

19 U.S.C. 1677e(c) ..............................................................13, 58, 69

19 U.S.C. § 1677j ...................................................................43, 45

19 U.S.C. § 1677j(d) ...........................................................................47

19 U.S.C. § 1677m(e) ....................................................................*passim*

19 U.S.C. § 3538(b) ...........................................................................13

28 U.S.C. § 1295(a)(5) ...........................................................................2

28 U.S.C. § 1581(c) ...........................................................................2

28 U.S.C. § 2107(b) ...........................................................................2

19 C.F.R. § 351.222(b) ...........................................................................10

19 C.F.R. § 351.222(b)(2) ...........................................................................7

19 C.F.R. § 351.225(j) ...........................................................................47

19 C.F.R. § 351.308(c)(1) ...........................................................................58

19 C.F.R. § 351.308(d) ...........................................................................72

## **Administrative Decisions**

*Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 Fed. Reg. 51,940 (August 19, 2011) ...................5, 53

*Application of U.S. Antidumping and Countervailing Duty Laws to Hong Kong*, 62 Fed. Reg. 42965 (Dep't of Commerce Aug. 11, 1997). .....................................50

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part,* 76 Fed. Reg. 23,978 (April 29, 2011) ................................44

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 24,892 (May 6, 2010) ..............................................................................................................49

*Certain Frozen Warmwater Shrimp From the People's Republic of China: Preliminary Results and Preliminary Partial Rescission of Fifth Antidumping Duty Administrative Review,*75 Fed. Reg. 8338 (Feb. 14, 2011) ...................4, 53

*Certain Frozen Warmwater Shrimp From the People's Republic of China and Diamond Sawblades and Parts Thereof From the People's Republic of China: Notice of Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Orders*, 78 Fed. Reg. 18,958 (March 28, 2013) .........................................*passim*

*Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 77 Fed. Reg.  21,734 (April 11, 2012) .........................44

*Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan,* 70 Fed. Reg. 1870 (January 11, 2005) .................................................................................... 26-27

*De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries*, 78 Fed. Reg. 40,430 (July 5, 2013) ........................................................................................... 51-52

*Final Determination of Sales at Less Than Fair Value: Silicon  Carbide from the People's Republic of China,* 59 Fed. Reg. 22585 (May 2, 1994) (" *Silicon Carbide"*). ........................................................................................................48

*Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China, 56 Fed. Reg. 20588* (May 6, 1991)......................................48

*Fresh Garlic From the People's Republic of China: Preliminary Results of New Shipper Review of Shijiazhuang Goodman Trading Co.,* Ltd., 78 Fed. Reg. 67,112 (November 8, 2013) ...............................................................................50

*Laminated Woven Sacks Comm. v. United States*, 716 F. Supp. 2d 1316, 1328 (Ct. Int'l Trade 2010) ................................................................................................46

*Laminated Woven Sacks From the People's Republic of China: Negative Final Determination of Circumvention*, 78 Fed. Reg. 12,716 (February 25, 2013) ....43

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Review and Intent To Revoke Antidumping Duty Order in Part*, 61 Fed. Reg. 40,610 (August 5, 1996) ............................................................................ 49-50

*Third Administrative Review of Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg. 46,565 (September 10, 2009)..................63

## <u>Others</u>

Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 U.S.C.C.A.N. at 4198-99...............................................*passim*

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiffs-Appellants Hilltop International and Ocean Duke Corp. (collectively, "Hilltop") states:

1.     Counsel is not aware of there any other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

2.     This case is currently designated as a companion case to *Ad Hoc Shrimp Trade Action Committee v. United States*, 14-1647.   The United States requested voluntary remands in both cases to place the same information from subsequent administrative reviews of the frozen warmwater shrimp from China antidumping duty order indicating that Hilltop may have made misrepresentations in the administrative reviews that were the subject of these two appeals.  The U.S. Department of Commerce ("Commerce" or the "Department") then used this information to justify the application of adverse facts available ("AFA") to Hilltop in both remand proceedings.  The use of that information and the Department's AFA determination as a result is the subject of both appeals before this Court.

The use of this information in later administrative reviews against Hilltop is also the subject of two appeals before the Court of International Trade ("CIT" or

NON-CONFIDENTIAL VERSION

"trial court"), Court Nos. 12-289 and 13-358, which are currently stayed pending the outcome of Court Nos. 14-1647 and 14-1514.

## JURISDICTIONAL STATEMENT

The CIT had exclusive subject matter jurisdiction over this action under 28 U.S.C. § 1581(c). The U.S. Court of Appeals for the Federal Circuit has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(5). This appeal was timely filed on May 30, 2014, *i.e.*, within 60 days of the CIT's final opinion and judgment of May 20, 2014. 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

(1)      Whether the Department lawfully rejected all information submitted by Hilltop International and included the company in the China-wide entity in light of certain alleged misrepresentations regarding third party affiliates; and

(2)      Whether the Department's corroboration of the adverse facts available rate applied to Hilltop was reasonable or otherwise in accordance with law.

## STATEMENT OF THE CASE

This appeal is a challenge of the U.S. Department of Commerce's ("Commerce" or "the Department") final redetermination on remand of the fifth administrative review ("AR 5") of the antidumping duty order covering Certain Frozen Warmwater Shrimp from the People's Republic of China.

**NON-CONFIDENTIAL VERSION**

<u>The AR 5 Review</u>

On April 9, 2010, Commerce published its initiation of AR 5. This review covered entries of subject shrimp made between February 1, 2009 and January 31, 2010. Commerce selected Hilltop International ("Hilltop") as the sole mandatory respondent in AR 5.

On June 15, 2010, Hilltop submitted its response to Section A of the AR 5 antidumping questionnaire.[1] This response informed Commerce that all sales during AR 5 to the United States were made through Hilltop's U.S. affiliate, Ocean Duke. Hilltop Section A Response at 1 (July 15, 2010) (**JA0000086**). The Section A Response also provided a narrative discussion of all the Hilltop affiliates involved in the production or sale of subject merchandise, and it included as Exhibit A-2 a chart of all Hilltop affiliates, including third country affiliates. *Id*. at 15-22 and Exh. A-2 (**JA0000087-100**). The Section A Response also confirmed that Hilltop was located in Hong Kong, and it provided copies of Hilltop's Hong Kong Business Registration and Hong Kong Business License. *Id*. at Exhs A-5 and A-6 (**JA00000101-139**).

On October 27, 2010, Hilltop responded to Commerce's Third Supplemental Questionnaire regarding the company's previous Section A and C responses. The

---

[1] Antidumping questionnaires are divided into lettered sections:  Section A provides general corporate information, Section B provides home market sales data, section C provides U.S. sales data and Section D provides production data.

NON-CONFIDENTIAL VERSION

first question in this supplemental noted that Hilltop's affiliation chart in its

Section A Response had omitted to report a Vietnamese company that had been

mentioned in a verification in an earlier review.  In response to this question,

Hilltop amended its list of affiliates to include the Vietnamese company and noted

that the Vietnamese company was not involved with the production or sale of

subject merchandise.  Hilltop Third Supp. Response at p. 1 and Ex. S3-1 (Oct. 27,

2010) (**JA0000161, JA0000168-173**).   Commerce asked no further questions

regarding the Vietnamese affiliate, and Hilltop made no changes to its reported

sales and production data as a result of this addition to its affiliation chart.

On February 14, 2011, Commerce published the preliminary results for AR

5. *Certain Frozen Warmwater Shrimp From the People's Republic of China:*

*Preliminary Results and Preliminary Partial Rescission of Fifth Antidumping Duty*

*Administrative Review,*75 Fed. Reg. 8338 (Feb. 14, 2011) ("Preliminary Results").

As part of its Preliminary Results, Commerce found (in accordance with its

established practice) that Hilltop was independent from the PRC Government and

entitled to receive its own "separate rate" dumping margin in this review solely

because Hilltop was located in Hong Kong.   *Id*. at 8340-41. (**JA0000205-208**).   In

the Preliminary Results, Commerce also found that Hilltop had a *de minimis*

dumping margin based on the calculations it had performed using Hilltop's

reported sales and production data.

4

NON-CONFIDENTIAL VERSION

On August 19, 2011, Commerce published the final results for AR 5.

*Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 Fed. Reg. 51,940 (August 19, 2011) ("Final Results"). Commerce made no change to its preliminary decision that Hilltop was entitled to its own independent dumping margin, and Commerce continued to find Hilltop's margin to be *de minimis*. *Id*. at 51,942 (**JA0000230**).

### The AR 5 Appeal

On September 1, 2011, Ad Hoc Shrimp Trade Action Committee ("Petitioner" or "AHSTAC") filed an appeal of AR 5 in the U.S. Court of International Trade ("CIT") challenging Commerce's findings with respect to its selection of mandatory respondents, its valuation of packing tape, its selection of the primary surrogate country and its calculation of the surrogate labor cost. AHSTAC Complaint (Sept. 1, 2011) (**JA0000267-JA0000275**).

On November 30, 2012, the CIT issued an opinion sustaining all of Commerce's findings with the exception of the selection of India as the primary surrogate country.  The court remanded this issue to Commerce for further consideration.  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366, 1377 (Ct. Int'l Trade 2012) (Slip Op. 12-145) (**JA0000276-JA0000299**). On December 6, 2012, the Government filed a partial consent motion to expand the

**NON-CONFIDENTIAL VERSION**

scope of the remand ordered by the court in Slip Op 12-145.  Specifically, the

Government moved to expand the scope of the remand to reconsider the final

margin for Hilltop in light of allegations arising from recently concluded sixth

administrative review ("AR 6") that Hilltop had provided "false and incomplete

information regarding its affiliates in previous administrative reviews." DOJ

Motion to Expand Remand at 2 (Dec. 6, 2012) (**JA0000303**).  On January 9, 2013

the trial court granted the Government's motion to expand the scope of the remand.

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1377, 1382

(Ct. Int'l Trade 2013) (Slip Op. 13-4)  (**JA0000305-JA0000314**).  On January 29,

2013, the trial court further granted a motion to extend the due date of the

expanded remand until April 1, 2013.  CIT Court Order, Docket Entry 72 (Jan. 29,

2013) (**JA0000306-JA0000314**).

On February 14, 2013, Commerce issued a File Memo in the AR 5 Remand

record in which it added numerous filings made in AR 6 regarding the allegations

of Hilltop's undisclosed affiliate to the AR 5 record.  DOC Memo to File Placing

Documents on the Record of the Fifth Administrative Review (Feb. 14, 2013)[2]

(**JA0000317-320, JA0002268-69**).

---

[2] The Department placed two File Memos on the record containing this
information.  One Memo contained BPI documents and the other contained Public
documents.

NON-CONFIDENTIAL VERSION

## The AR 6 Material

Hilltop had also been selected as a mandatory respondent in AR 6, and it had

received another *de minimis* result in the preliminary results on March 2, 2012.  On

March 12, 2012, AHSTAC filed a one thousand-page submission in that review

asking Commerce to investigate an alleged circumvention scheme by Ocean Duke

and other Hilltop affiliates which AHSTAC claimed had occurred during first and

second administrative reviews ("AR 1" and "AR 2") between May 2004 and July

2005.  AHSTAC AR 6 Comments on the Department's Preliminary Determination

to Grant Hilltop's Request for Company-Specific Revocation Pursuant to 19

C.F.R. § 351.222(b)(2) and Comments in Anticipation of Hilltop's Forthcoming

Verification (March 12, 2012) (**JA0000321-344**).  Much of the supporting

materials AHSTAC provided in this submission were obtained from the public

record of a criminal investigation against Mr. Lin (a principal of Hilltop's U.S.

affiliate, Ocean Duke) and other entities in 2006.  In or about March 2011, Mr. Lin

and the government executed a written plea agreement that required Mr. Lin to

enter a plea of guilty to two misdemeanor counts with respect to the misbranding

of *pangasius* (a type of fish, not shrimp) between July 2005 and February 2006 as

a consequence of using brand names that contained the word "grouper."  This plea

agreement was the culmination of a five-year long international investigation by

the U.S. government.  No charges were ever brought against Mr. Lin (or any other

**NON-CONFIDENTIAL VERSION**

individual or entity) for any offense involving antidumping duty evasion on shrimp or fish fillets.

As part of the standard sentencing process for Mr. Lin after his plea agreement, both the government and the defense were entitled to supply the U.S. Probation Office with a "Sentencing Report" containing materials that each party believed should be considered for sentencing.  As part of its Sentencing Report, the government attempted to convince the Probation Office that Mr. Lin should be held responsible not only for the allegations that were the subject of the plea agreement, but also with respect to uncharged allegations involving the transshipment of shrimp.  To support its position, the government culled together selected materials from its five-year investigation of Ocean Duke and other entities. [3]  Included in these materials (and in the AHSTAC submission to Commerce) were emails from 2004 between Ocean Duke personnel and others purporting to discuss the establishment of a Cambodian shrimp processing factory

---

[3] The Sentencing Report was <u>not</u> a finding by the court with respect to the circumvention of shrimp.  It was merely a series of unproven allegations advanced by the government in an effort to seek a more punitive sentence against Mr. Lin for the inaccurate labeling misdemeanor offenses. Significantly, the Probation Department and District Court Judge Anderson of the U.S. District Court for the Central District of California were not persuaded by the "evidence" offered by the government, and the mislabeling infraction for which Mr. Lin plead guilty resulted in a sentence of probation and a fine.  *See* Hilltop's AR 6 Response to Petitioner's March 12, 2012 Filing at pp. 2-10 and Attachment 2 (March 29, 2012) (**JA0001325-1477**).

NON-CONFIDENTIAL VERSION

and the movement of shrimp from Vietnam to Cambodia.  Attachment 19 of

Sentencing Report  (**JA0001090-91**).

On May 17, 2012, in response to AHSTAC's submission, Commerce placed

on the AR 6 record U.S. Customs and Board Protection ("CBP") import data for

shrimp from Cambodia to the United States.  DOC AR 6 Memo To File, Customs

Data of U.S. Imports of Certain Frozen Warmwater Shrimp from Cambodia (May

17, 2012) (**JA0003229-3230j**).  On May 24, 2012, Hilltop submitted comments on

this CBP import data, noting that it plainly showed that there were no imports of

shrimp from Cambodia to the US whatsoever in ARs 4, 5 or 6.  Hilltop's AR 6

Response to CBP Import Data (May 24, 2012) (**JA0003300-3304**).

In further response to the AHSTAC submission, Commerce issued Hilltop

a supplemental questionnaire seeking additional information related to these

allegations of transshipment in ARs 1 and 2.  Hilltop filed a response, arguing in

part that there was no valid basis to be making inquiries of allegations regarding

AR 1 and AR 2 activities in the context of the AR 6 proceeding, and that it was

improper for Commerce to investigate allegations of transshipment in the context

of an administrative dumping review.  Hilltop AR 6 Response to June 1, 2012

Supplemental Questionnaire at 1-9 (June 15, 2012) (**JA0003524-3537**).  Hilltop

provided information in response to Commerce's questions with respect to ARs 4,

5 and 6, but declined to answer questions from earlier periods, citing Commerce's

NON-CONFIDENTIAL VERSION

prior statements that any earlier activity would not be relevant to the AR 6 proceeding.[4]  *Id.* at 9-14 (**JA0003537-3542**).  As part of its responses, Hilltop did state that it had no affiliation with any Cambodian company in ARs 4, 5 or 6.  *Id.*

On June 19, 2012, Commerce issued another Memo to the File submitting public registration documents for Ocean King (Cambodia), a Cambodian shrimp processor.  These documents listed one of Hilltop's owners, Mr. To, as a board member of Ocean King until September 28, 2010.  DOC AR 6 Memo to File, Public Registration Documents for Ocean King (Cambodia) Co., Ltd. (June 19, 2012) (**JA0001927-1935**) (hereinafter "Cambodia Data File").   Commerce subsequently issued Hilltop another supplemental in which it asked Hilltop to reconcile its prior responses that it had no affiliation with any Cambodian companies with these registration documents.  On June 27, 2012, Hilltop filed a timely response to this supplemental in which it acknowledged that its prior statements had been in error and acknowledging that Hilltop was affiliated with Ocean King within the meaning of 19 U.S.C. § 1677(33) until September 28, 2010 (approximately half way through AR 6).  In response to Commerce's other questions soliciting additional documentation regarding Ocean King, Hilltop

---

[4]  Information regarding ARs 4, 5 and 6 were relevant to the AR 6 proceeding because Hilltop had received a *de minimis* or zero margin in ARs 4 and 5 and was seeking a three-zero revocation from the AD Order in AR 6.  *See* 19 C.F.R. § 351.222(b).

**NON-CONFIDENTIAL VERSION**

engaged a local Cambodian firm to obtain over 90 pages of corporate documents

regarding Ocean King.  Hilltop AR 6 Seventh Supplemental Response at 1-3 and

Exh. 1 (June 27, 2012) (**JA0003621-3623, 3625-3682**).  One fact demonstrated by

this documentation was that Ocean King had been established in July of 2005.  *Id*.

at Exh. 1 (**JA0003625-3682**).

On September 4, 2012, Commerce published its final results for AR 6,

revising Hilltop's antidumping margin from 0% to 112.81% based on total adverse

facts available.[5]   Commerce determined that Hilltop's failure to report the

affiliation with Ocean King earlier rendered all information submitted by Hilltop

unreliable.  Consequently, Commerce determined that Hilltop had failed to rebut

the presumption that it was part of the PRC-wide entity and assigned Hilltop the

112.81% adverse facts available ("AFA") rate previously given to the PRC-wide

entity.  AR 6 I&D Memo at p. 7  (**JA0002192**).

<u>AR 5 Expanded Remand</u>

On the basis of the AR 6 information discussed above, Commerce

determined in its expanded remand redetermination that Hilltop "provided false

and incomplete information regarding its affiliates in AR 5" due to its omission of

---

[5] *Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not to Revoke in Part,* 77 Fed. Reg. 53,856 (September 4, 2012) and accompanying Issues and Decision Memo ("AR 6 I&D Memo").

NON-CONFIDENTIAL VERSION

Ocean King from its list of third country affiliates in its original AR 5 submissions. DOC Results of Redetermination Pursuant to Court Order at 2 (April 1, 2013) (**JA0003800-JA0003850**) (hereinafter "1st Remand").  Commerce further determined that the omission of Ocean King from Hilltop's list of affiliates rendered all other information submitted by Hilltop unreliable, and it consequently found that Hilltop had not rebutted the presumption that it was part of the PRC-wide entity.  *Id*.  As a result, Hilltop's 0.00% margin was changed to the total adverse facts available ("AFA") rate of 112.81% that had been assigned to the PRC-wide entity.  *Id*.

Hilltop argued before the trial court that Commerce's remand determination should not be sustained in part because (1) there was no basis to reject all of Hilltop's reported data due to the failure to report a third country affiliate, (2) it was improper to treat Hilltop as part of the PRC wide entity because Commerce's established policy automatically grants exporters located in Hong Kong with separate rate status and (3) the 112.81% AFA rate taken from the original petition was improper because it was aberrational and Commerce had failed to provide adequate corroboration for this margin.  *See* Hilltop's Comments on Remand Redetermination (April 15, 2013) (**JA0003851-JA0003909**).

On July 23, 2013, the trial court sustained Commerce's determination to reject all of Hilltop's reported information and to treat Hilltop as part of the PRC-

wide entity. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1326-27 (Ct. Int'l Trade 2013) (hereinafter "Ad Hoc I") (**JA0000018-JA0000045**).  However, the court found that Commerce had failed to offer adequate corroboration for the 112.81% AFA rate assigned to the PRC-wide entity since its corroboration was based upon margin rates that were later invalidated on appeal. *Id.* at 1326-1327 (**JA0000044-45**).  The trial court remanded this issue back to Commerce with instructions to "either adequately corroborate the 112.81 percent PRC-wide rate and explain how its corroboration satisfies the requirements of 19 U.S.C. 1677e(c), or calculate or chose a different countrywide rate that better reflects commercial reality, as supported by substantial evidence." *Id*. at 1327 (**JA0000045**).

<u>The 2nd AR 5 Remand</u>

In response to this second remand order, the Department placed certain information on the AR 5 record from the original antidumping duty investigation and the Section 129 Proceeding that had followed China's appeal of the original investigation to the WTO Dispute Settlement Body.[6]  Memorandum to File,

---

[6] "Section 129" refers to proceedings undertaken in response to a decision by the World Trade Organization's Dispute Settlement Body that a determination by a U.S. trade agency was not consistent with the United States' obligations as a Member of the WTO's Antidumping and/or Subsidies and Countervailing Measures Agreements. *See* 19 U.S.C. § 3538(b).  The Section 129 determination at issue here is *Certain Frozen Warmwater Shrimp From the People's Republic of China and Diamond Sawblades and Parts Thereof From the People's Republic of*

NON-CONFIDENTIAL VERSION

Placing Documents on the Record of the Fifth Administrative Review at

Attachment II (August 5, 2013) (**JA00004112-4114**).  Among other things, this

information contained CONNUM-specific margin data for the mandatory

respondent Shantou Red Garden Foodstuff Co., Ltd. ("Red Garden") from the

original investigation, as recalculated pursuant to the Section 129 Determination.

*Id*.  (**JA0004168-4170**).  Red Garden received a 0.00% margin in the Section 129

Determination and the AD order was revoked as to this company.  *See Section 129*

*Determination*, 78 Fed. Reg. at 18,959.

On August 9, 2013, Hilltop provided comments on this new information,

requesting that the Department place on the record all margin information from all

mandatory respondents involved in the Section 129 Determination (Allied Pacific

Group, Yelin HK., and Red Garden) rather than only select information from Red

Garden.  *See* Hilltop Comments on New Information (Aug. 9, 2013) (**JA0004171-**

**JA0004191**).  In response to Hilltop's comments, the Department placed additional

information for Red Garden from the 129 Determination on the record on August

14, 2013, but refused to place information regarding the margin calculations for

Allied Pacific Group or Yelin HK.  *See* Memo to File, Placing Section 129

Documents on the Record of the Fifth Administrative Review (Aug. 14, 2013)

---

*China: Notice of Implementation of Determinations Under Section 129 of the*
*Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty*
*Orders*, 78 Fed. Reg. 18,958 (March 28, 2013) ("Section 129 Determination").

NON-CONFIDENTIAL VERSION

(**JA0004192-JA0004245**).  The Department also declined to place on the record all disclosure materials for Red Garden, which would include transaction-specific margin data.   On August 16, 2013, Hilltop again submitted comments arguing that this new information was deficient and should have included margin data from the other respondents.  *See* Hilltop Comments on Additional Information (Aug. 16, 2013) (**JA0004246-JA0004254**).

On November 4, 2013, the Department issued its second remand determination continuing to use the 112.81% rate from the original antidumping petition.  *See* Final Results of Redetermination Pursuant to Court Remand (Nov. 7, 2013) (**JA0004262-JA0004286**) (hereinafter "2nd Remand"). The Department first explained the origin of this rate:

> In the Initiation Notice, the Department described how the calculation of export price ("EP") and normal value ("NV") was carried out in the Petition, noting that EP was based on official U.S. import statistics during the period of investigation ("POI") and that NV was based on the factors of production ("FOPs") provided by several significant producers in the United States of the domestic like product. We further noted that those FOPs were valued using surrogate values from India. The Department conducted a thorough examination of the methodology employed in the Petition, which included a discussion with the foreign market researcher contracted by Petitioner to obtain cost data for the primary input, raw warmwater shrimp, and making adjustments to Petitioner's methodology, where appropriate.10 Upon confirmation that the methodology employed in the Petition conformed to the Department's rules and regulations, this investigation was initiated with estimated recalculated dumping margins from 112.81 percent to 263.68 percent.

*Id*. at 3 (**JA0004265**).  The Department then noted that it used the rate from the petition as AFA because this rate was higher than any of the calculated rates for the mandatory respondents.  *Id*. at 4 (**JA0004266**).

To corroborate this 112.81% rate, the Department turned to the CONNUM specific margins for Red Garden from the Section 129 Determination.  Despite this company receiving a 0.00% antidumping margin, the Department noted that [   ] of the [     ] CONNUMs for Red Garden, accounting for [      ] of its sales data, had margins between at or above the 112.81% AFA rate. *Id*. at 6-7 (**JA0004268-4269**); *see also* Red Garden Memo[7] (**JA0004255-JA0004261**).  The Department found this [     ] volume in excess of the 112% margin rate to represent a "significant volume".  *Id*. (**JA0004269**).  The Department concluded that "the Petition rate continues to be relevant to this investigation, even after taking into account subsequent changes to the original calculations pursuant to remand redetermination, and the rate to be corroborated" and that "the margin of 112.81 percent . . . has probative value." *Id*.

On May 20, 2014, the trial court affirmed the Department's Second Remand Results and the use of the Red Garden data to corroborate the 112.81% applied to the PRC-wide entity, including Hilltop. *Ad Hoc Shrimp Trade Action Comm. v.*

---

[7] This memorandum was placed on the record by the Department upon the issuance of its draft remand results and was relied upon by the Department in its 2nd Remand.

NON-CONFIDENTIAL VERSION

*United States*, 2014 Ct. Intl. Trade LEXIS 74 (2014) (Slip Op. 14-55) ("*Ad Hoc II*") (**JA0000046-JA0000082**).

## SUMMARY OF ARGUMENT

1.    Hilltop's failure to mention Ocean King, a Cambodian shrimp processor, in its Section A affiliation chart in AR 5 does not justify Commerce's decision to disregard all information submitted by Hilltop and to treat Hilltop as part of the PRC-wide entity as total AFA.  The record confirms that Ocean King was not involved in any way with the production or sale of subject merchandise during the POR, so information regarding Ocean King was not pertinent to Commerce's AR 5 determination.  Both Commerce and the courts have previously found that there is no valid basis for applying an adverse inference against a respondent who fails to report an affiliate that is not involved in the production or sale of subject merchandise.  It is also improper for Commerce to treat the failure to mention Ocean King as the omission of "core" data that would justify the rejection of all of Hilltop's reported information.  Commerce's decision to do so violates the plain language of the statute and numerous court decisions clarifying the limits of Commerce's authority to resort to facts otherwise available and adverse inferences.

2.    Commerce's decision to treat Hilltop as part of the PRC-wide entity would be improper under any circumstances because the record contains

NON-CONFIDENTIAL VERSION

independent information confirming that Hilltop is a Hong Kong based exporter that is exempt from Commerce's separate rate analysis for non-market economy exporters. This independent information demonstrating that Hilltop is a Hong Kong based exporter, its Hong Kong Business License and Hong Kong Business Registration, were timely filed and satisfy all other requirements of 19 U.S.C. § 1677m(e). Thus, as a matter of law, Commerce could not decline to consider this information.

3.      The application of a 112.81% margin to Hilltop as part of the PRC-wide entity was also improper. Commerce failed to demonstrate how this rate remains lawfully corroborated in AR 5 given the history of margins in over the life of this order below 10%. Instead of using data contemporaneous to this review, the Department used outdated data from the investigation in an attempt to corroborate this 112.81% rate from the original antidumping duty petition. Consequently, this rate therefore fails to reflect commercial reality for the Chinese shrimp industry during AR 5 and cannot be used as AFA for the PRC-wide entity.

## ARGUMENT

## I.      STANDARD OF REVIEW

When reviewing antidumping determinations made by Commerce, "{the Federal Circuit} applies anew the standard of review applied by the Court of International Trade in its review of the administrative record. . . . In doing so, {the

**NON-CONFIDENTIAL VERSION**

Court will} uphold Commerce's determination unless it is unsupported by Substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a (b)(1)(B)(i) (1994)." *F.Lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000). "{T}he substantial evidence standard requires more than mere assertion of  evidence which in and of itself justified the . . . determination, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn. . . . Rather {t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . . In sum, the question before this court on review is whether "the administrative record contains substantial evidence to support the determination and was it a rational decision?" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (internal citations deleted).

"{S}tatutory interpretations articulated by Commerce in antidumping determinations qualify for Chevron deference;" however, "if the Government's position is unreasonable, deference does the agency no good." *Thai Pineapple Canning Industry Corp. v. United States*, 273 F.3d 1077, 1083 (Fed. Cir. 2001). "While various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available and has been used in similar cases." *Id.*

NON-CONFIDENTIAL VERSION

## II.   COMMERCE'S DECISION TO REJECT ALL INFORMATION SUBMITTED BY HILLTOP AND RESORT TO TOTAL AFA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW

Commerce's decision in the 1st Remand to reject all of Hilltop's reported data and to treat Hilltop as part of the PRC-wide entity as total adverse facts available ("AFA") is predicated upon a single finding: that Hilltop had omitted in its AR 5 questionnaire responses to report an affiliation with Ocean King (Cambodia) Co., Ltd. ("Ocean King"), a Cambodian shrimp processor. As a consequence of this omission from its affiliation charts, Commerce found that Hilltop "provided false and misleading information regarding its affiliates in AR5." 1st Remand at 2 (**JA0003803**). Commerce then offered the following explanation to support its decision to reject all of Hilltop's reported data due to this omission:

> {W}e have reconsidered our determination, taking into account record evidence obtained over the course of the subsequent sixth administrative review ("AR 6") of this proceeding, and determined that Hilltop International ("Hilltop") provided false and incomplete information regarding its affiliates in AR 5 of this proceeding. Because we cannot determine whether any other misrepresentations exist on the record with regard to Hilltop's full universe of affiliates, corporate structure and sales process, or whether other information may be missing from the record, we are unable to rely upon any of Hilltop's submissions in this segment. Accordingly, Hilltop has failed to rebut the presumption that it is part of the People's Republic of China ("PRC")-wide entity.

*Id*. Commerce's determination is unsupported by substantial evidence and contrary to law.

Significantly, the CBP entry data on the record shows that during AR 5 there were no imports into the U.S. of shrimp from Cambodia, and the record shows that Hilltop and its U.S. affiliate made no sales of Cambodian origin shrimp during AR 5.  AR 6 Cambodia Data File (**JA0003229-3230j**).  There is also no record evidence, or even a credible allegation, that Ocean King was involved in any manner with the production or sale of subject PRC shrimp during AR 5.   On the basis of this record evidence, Commerce's decision to apply total AFA to all of Hilltop's reported data in AR 5, and its decision to consider Hilltop part of the China-wide entity, cannot be sustained.

### A.    SINCE THE INFORMATION REGARDING THE OCEAN KING AFFILIATION WAS NOT PERTINENT TO COMMERCE'S MARGIN CALCULATION IN AR 5, THERE WAS NO LEGITIMATE BASIS TO APPLY FACTS AVAILABLE OR AN ADVERSE INFERENCE FOR ITS OMISSION

### 1.    The Statutory Requirements For Application of AFA

The statutory provisions for application of facts otherwise available and for application of adverse inferences are separate but related.  19 U.S.C. § 1677e(a) governs the use of facts otherwise available and states as follows:

(a) In general

If-
(1) necessary information is not available on the record, or
(2) an interested party or any other person-
(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

**NON-CONFIDENTIAL VERSION**

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title, the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

The use of adverse inferences is governed by 19 U.S.C. § 1677e(b), and provides as follows:

(b) Adverse inferences. If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from—

(1) the petition,

(2) a final determination in the investigation under this title,

(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or

(4) any other information placed on the record.

While these two provisions require separate findings, they are related because a prerequisite for the use of any adverse inference is the requirement that it must first be appropriate to use facts otherwise available. *See, e.g.*, *Shandong*

NON-CONFIDENTIAL VERSION

*Huarong Mach. Co. v. United States*, 30 CIT 1269, 1301 (2006) ("Absent a valid decision to use facts otherwise available, Commerce may not use an adverse inference").  Furthermore, this Court and the CIT have repeatedly stated that the use of facts otherwise available is only appropriate to "fill gaps" in the record of missing information required for the Department to complete its antidumping duty calculation.  *See, e.g.*, *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (confirming that the statute only authorizes Commerce to use facts otherwise available to fill gaps in the record and that it cannot do so in disregard of information that is not deficient or missing);  *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003) (stating that the use of facts otherwise available is to "fill in the gaps" when "Commerce has received less than the full and complete facts needed to make a determination"); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1255 (Fed. Cir. 2009**)** (noting that "{t}he legislative history of the URAA thus reveals that Congress intended § 1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the antidumping laws").

The intended purpose of section 1677e(a) is further confirmed from explicit language within the legislative history.  The Statement of Administrative Action for the implementation of the Uruguay Round Antidumping Agreement

NON-CONFIDENTIAL VERSION

(hereinafter "SAA") includes the following discussion about the use of facts otherwise available:

> New section 776(a) requires Commerce or the Commission to make determinations on the basis of facts available where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information. … The agencies will be required, consistent with new section 782(e) to consider information requested from interested parties that: (1) is on the record; (2) was filed within the applicable deadlines; and (3) can be verified. … Section 776(a) generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or other causes.[8]

Thus, the prerequisite for the use of facts otherwise available pursuant to section 1677e(a) is a "gap" on the record resulting from missing information. *Id*.; *see also NTN Bearing Corp. of America v. United States*, 368 F.3d 1369, 1377 (Fed. Cir. 2004) (noting that the "post-1994 version of the statute permits the use of facts available when necessary information is not available on the record"); *NSK Ltd. v. United States*, 358 F. Supp. 2d 1276, 1290 (Ct. Int'l Trade 2005) (noting that, "{b}y its nature, a 'facts available' analysis necessarily implies that Commerce used facts where the actual facts are an insufficient basis for a complete analysis").

As the analysis above shows, the threshold question in considering the application of an adverse inference is whether there is a "gap" in the record that

---

[8] Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 U.S.C.C.A.N. at 4198-99.

**NON-CONFIDENTIAL VERSION**

must be filled using facts otherwise available.  Absent such a "gap" in the record, the Department lacks the authority to apply facts otherwise available pursuant to section 1677e(a) or any adverse inference under section 1677e(b).  *See Zhejiang Dunan,* 652 F.3d at 1348 (stating that "under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record").

In this instance, Commerce has failed to establish how Hilltop's omission of Ocean King from its list of third country affiliates in its initial AR 5 submissions has caused a "gap" of necessary information in the record.  To the contrary, the record shows that this information was not at all pertinent to Hilltop's AR 5 dumping margin calculation or to the separate rate analysis for Hilltop.

**2.      Record Evidence From This AR And Other Precedent Confirm That Third Country Affiliates Were Not Pertinent To The Calculation Of Hilltop's Margin**

It is Commerce's contention that Hilltop's omission of Ocean King from its list of third country affiliates during AR 5 resulted in Commerce being deprived of necessary information required to make a proper determination of Hilltop's dumping margin for AR 5.  1st Remand at 13-15 (JA0003814-3816).  However, record evidence from AR 5, as well as court and agency precedent, directly contradict Commerce's position and establish that the omission of Ocean King

**NON-CONFIDENTIAL VERSION**

from Hilltop's affiliation chart did not deprive Commerce from considering any necessary information to calculate Hilltop's AR 5 margin.

As discussed above, the application of facts otherwise available and an adverse inference requires that there be a "gap" of necessary information missing from the record. If the unreported information is not necessary, then there is no valid basis for application of any adverse inference. *See, e.g.*, *Shandong Huarong*, 30 CIT at 1297 (explaining that "the statute does not require Commerce to use an adverse inference in every instance where a respondent has not supplied information"). Under this principle, Commerce has previously determined that the failure to disclose an affiliate does not require an adverse inference unless the affiliate was involved in the production or sale of the subject merchandise during the period under review.

In *Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan,* Commerce found that the respondent, Ta Chen, had failed to disclose affiliations with four separate "Emerdex" companies, but it also determined that three of these four companies were not involved with the production or sale of subject merchandise during the POR. *Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan,* 70 Fed. Reg. 1870 (January 11, 2005), and accompanying Issues & Decision Memo at Cmt. 1. Consequently, Commerce found it could only apply an adverse inference

against the one affiliate that was involved in sales or production of subject

merchandise:

> Ta Chen failed to act to the best of its ability by not promptly disclosing its affiliation with Emerdex 1, Emerdex 2, Emerdex 3 and Emerdex 4, despite three repeated requests by the Department throughout this administrative review. Based on the information eventually obtained from Ta Chen, the Department found in the Preliminary Results that, with regard to Emerdex 1, Emerdex 2, Emerdex 3 and Emerdex 4, these companies are affiliated with Ta Chen. See Preliminary Results at 40862. Although record evidence suggests that Emerdex1, Emerdex 3 and Emerdex 4 did not have production or sales of subject merchandise during the POR, the Department continues to find that Ta Chen failed to cooperate with the Department to the best of its ability by not disclosing its affiliation with Emerdex 1, Emerdex 2, Emerdex 3 and Emerdex 4. See Preliminary Results at 40862. ***However, an adverse inference can only be applied to Emerdex 2***.

*Id.* (emphasis added).

Commerce argues in its 1st Remand that Hilltop's reliance on *Butt-Weld Pipe*

*Fittings From Taiwan* is "misplaced" because Commerce did not apply total AFA

to the respondent.  1st Remand at 33 (**JA0003834**).  Commerce, however, misses

the point and the relevance of this decision.  The decision in *Butt-Weld Pipe*

*Fittings From Taiwan* is apposite because it demonstrates that there is no basis for

applying an adverse inference for the failure to disclose an affiliate that is not

involved in the production or sale of subject merchandise.  Thus, while the Issues

and Decision Memo addresses four undisclosed affiliates, Commerce plainly states

that it can only apply an adverse inference with respect to the one affiliate

(Emerdex 2) that was involved in the production or sale of subject merchandise

because only the information from *this affiliate* was necessary information for the

dumping analysis.

The CIT has also recognized this principle that the failure to report an

affiliate with no involvement in subject merchandise during the review is of no

consequence.  In *Ta Chen Stainless Steel Pipe Co.*, the court noted that it would be

"futile" to instruct Commerce on remand to consider unreported affiliates that were

uninvolved with the production or sale of subject merchandise because this

information would have no effect on the results:

> If, as the plaintiff and the defendant assert, the entities allegedly
> affiliated with Ta Chen within the meaning of 19 U.S.C. §
> 1677(33)(A) - (E)  were in fact uninvolved with the subject
> merchandise, <u>a finding on remand of affiliation would not have
> any impact thereon</u>. And a court need not require an agency
> redetermination if doing so "would be 'futile' by virtue of having
> no effect on the result of the case." E.g., Ammex, Inc. v. United
> States, 28 CIT    ,    , 341 F.Supp.2d 1308, 1314 n. 12 (2004).

*Ta Chen Stainless Steel Pipe Co. v. United States*, 31 CIT 794, 821-22 (2007)

(emphasis added).

Notably, in this case, the AR 5 record shows that Commerce did not view

information regarding Hilltop's third country affiliates as meaningful to its AR 5

margin calculation.  Hilltop's initial affiliation chart provided to Commerce

included a third country shrimp producer in Thailand (a country with significant

28

**NON-CONFIDENTIAL VERSION**

export volumes into the U.S. during AR 5).  *See* Hilltop's Section A Response at

Exhibit A-2 (**JA0000095-100**).    However, Commerce asked no follow-up

questions regarding this affiliate.  Moreover, in its third supplemental

questionnaire to Hilltop, Commerce determined that Hilltop had failed to include

an affiliated shrimp producer in Vietnam on its affiliation chart, but Hilltop merely

update its affiliation chart to correct for this omission.  *See* Hilltop Third

Supplemental Response at p. 1 and Ex. S3-1 (Oct. 27, 2010) (**JA0000161, 168-**

**173**).  At no time did Commerce seek additional information regarding any third

country affiliates or utilize this information in any manner when it calculated a 0%

margin for Hilltop in the Preliminary Results.[9]  In particular, the Department did

not request changes to Hilltop's sales or production databases or seek additional

information on the impact of this relationship.   This fact is not surprising because

(as discussed above) information regarding a third country affiliate that is not

involved in the production, sale or distribution of subject merchandise is of no

consequence in the calculation of a dumping margin.

---

[9] *See* Memorandum to File, Antidumping Duty Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Preliminary Determination of Affiliation/Single Entity Treatment of Hilltop International, Yelin Enterprise Co., Ltd., Ocean Beauty Corporation and Ever Hope International Co., Ltd. (Feb. 7, 2011) (**JA0000174-JA0000183**);  Antidumping Duty Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Analysis for the Preliminary Results of  Hilltop International (Feb. 7, 2011) (**JA0000184-JA0000195**).

NON-CONFIDENTIAL VERSION

Commerce acknowledges that in the 1st Remand there were no shipments at all of shrimp from Cambodia during AR 5 and that Hilltop had no sales of Cambodian shrimp in AR 5, so there is no plausible way that a Cambodian company could have been involved in the production or sale of subject merchandise during the POR.  Hilltop's questionnaire responses also confirm that all subject shrimp produced and sold during the POR were processed by its affiliated Chinese producers using farm-raised shrimp, and that none of these processors exported shrimp to other companies.  *See* Hilltop's Supp. Section A Response at questions 18, 19 & 20, narrative pp. 9-10 (July 29, 2010 ) (**JA0000151-JA0000155**).  Hilltop further provided a complete reconciliation of its shrimp production sold during the POR demonstrating that the shrimp sold came solely from self-raised shrimp thereby further establishing that no other entity (either within China or in a third country) was involved in the production of the subject merchandise.  *See* Hilltop Initial Section D Response at Exhibit D-F-9 and Exhibit D-H-9 (July 15, 2010) (**JA0000140-JA0000150**).  Consequently, had Hilltop's original questionnaire response included Ocean King in its list of third country affiliates, the record confirms that this information would likewise have had *no impact on Commerce's margin calculation*.

In sum, both agency and court precedent, as well as Commerce's treatment of Hilltop's other third country affiliates within this very proceeding, all confirm

that the failure to report an affiliate that is not involved with the production or sale of subject merchandise during the period of review is not an omission that affects the dumping margin and, consequently, not an event that warrants any adverse inference. *Ta Chen Stainless Steel Pipe Co.*, 31 CIT at 821-22.  In light of this past practice and Commerce's own actions with respect to Hilltop's other third country affiliates in AR 5, Commerce has failed to offer a reasonable justification for applying total AFA to Hilltop for omitting to disclose the Ocean King affiliation.  *See Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").

**3.    There Can Be No "Gap" With Respect To The Ocean King Affiliation Because Commerce Added All Information Regarding Ocean King To The AR 5 Record**

Even if one assumes that the Ocean King affiliation was a fact that could have an impact on Hilltop's AR 5 dumping margin, Commerce has still failed to provide a reasonable explanation for applying total AFA to Hilltop.  In its 1st Remand, Commerce repeatedly argues that it was justified in applying AFA to Hilltop because it *lacked the time* to consider the implications of the affiliation with Ocean King:

> Because the fact that an affiliation existed between Hilltop and Ocean King throughout this POR was not revealed until 313 days after the publication of the Department's final results in this review, the Department was precluded from determining to

NON-CONFIDENTIAL VERSION

> what extent Hilltop's responses failed to comply with our requests for information and requesting further information in the form of supplemental questionnaires.

1st Remand at 20 (**JA0003821**). This is a disingenuous argument that ignores the sequence of events in this AR 5 appeal.

The AR 6 Final Results were published by Commerce on September 4, 2012. On December 6, 2012, the Government filed its Motion to Expand the Scope of the November 30, 2012 Remand Order in this appeal specifically to give Commerce the opportunity to consider the implications of the unreported affiliation with Ocean King in the context of this AR 5 proceeding. DOJ Motion to Expand (**JA0000300-JA0000304**). The CIT granted the motion, noting that "Commerce argues that expanding the scope of remand is necessary because newly discovered information has the potential to undermine the accuracy of Commerce's calculations in the administrative review at issue,"[10] and it provided Commerce almost _three months_ to consider this new information from AR 6 (_i.e._, the Ocean King affiliation) and determine its impact on this AR 5 proceeding.

As part of its expanded remand, Commerce added to the record in AR 5 all information from AR 6 relevant to Ocean King. One of the AR 6 documents that Commerce added to the AR 5 record was Hilltop's June 26, 2012 Seventh Supplemental Response. In this submission, Hilltop acknowledged the affiliation

---

[10] Slip Op. 13-4 at 6 (**JA0000305-JA0000314**).

NON-CONFIDENTIAL VERSION

with Ocean King and provided _over 90 pages_ of documentation regarding Ocean

King, including its corporate registration documents, articles of association and a

complete list of all shareholders and a history of all share transfers.  *See* Hilltop

POR 6 Seventh Supplemental Response at Ex. 1 and "Additional Documents"

(June 27, 2010) (**JA0003621-3717).**  In addition to providing all information

regarding Ocean King that Commerce had requested, Hilltop once again stated

unequivocally in this submission that the affiliation with Ocean King did not affect

any of its reported sales or FOP data.  *Id*. at 2 (**JA0003622**) ("we also note that

CBP data on the record confirms that Hilltop made no shipments of shrimp from

Cambodia during the fourth, fifth or sixth AR periods {and} the only sales of

Cambodian origin shrimp made during the fourth, fifth or sixth AR periods

occurred in the fourth AR and consisted of {a de minimis amount of} product sold

by Ocean Duke from pre-existing inventory.")

    In sum, Commerce's claim that the information regarding Ocean King

"came too late for the Department and interested parties to fully examine the

impact this relationship may have had on the sale and production of subject

merchandise in AR 5" is without merit.  1st Remand at 17 (**JA0003818**).

Commerce was aware of the Ocean King affiliation at the time it requested the

voluntary remand in AR 5, and it was given three months to consider this issue

NON-CONFIDENTIAL VERSION

further but failed to solicit any additional information from Hilltop about Ocean King's involvement in any AR 5 activities.

Furthermore, the supplemental materials that Commerce requested in AR 6 and then added to the AR 5 record already contained a wealth of information about Ocean King and confirmed again that the company had nothing to do with the production or sale of subject shrimp in this review. Having initially requested this information in AR 6 and then having placed it on the record in AR 5, Commerce cannot ignore this record evidence and claim it has "insufficient information" regarding Ocean King. *See GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1333 (Ct. Int'l Trade 2013) (explaining that when "Commerce decided to solicit information . . . it could not arbitrarily reject relevant information that is then provided . . . simply because it does not like the relevant information submitted").

All record evidence supports Hilltop's repeated assertions that Ocean King was uninvolved with the production and sale of subject merchandise during the review. Indeed, Commerce acknowledges that there were no shipments of shrimp from Cambodia to the U.S. during either AR 4 or 5. Consequently, the disclosure of Ocean King should be treated no differently than the disclosure of other affiliated third-country shrimp producers, which (as discussed above) was not pertinent information to Hilltop's margin calculation.

NON-CONFIDENTIAL VERSION

## B.   THE OMISSION OF OCEAN KING FROM HILLTOP'S AFFILIATION CHARTS WAS NOT "CORE" INFORMATION THAT COULD JUSTIFY APPLICATION OF TOTAL AFA

Commerce also cannot support its use of total AFA against Hilltop by claiming that the omission of Ocean King from the list of third country affiliates justifies the rejection of all of Hilltop's reported data.  *See* 1st Remand at 2 (**JA0003803**).  This Court and the CIT have fully considered the question of when Commerce may resort to total AFA rather than partial AFA and have repeatedly stated that a resort to total AFA is only permissible if the missing or unusable information is "core" rather than "tangential" to Commerce's dumping determination or where the deficiencies are so pervasive that they permeate all aspects of the reported data.  *See, e.g.*, *Zhejiang Dunan*, 652 F.3d at 1348 (stating that total AFA is appropriate "where none of the reported data is reliable or usable" because, for example, the "submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data");  *Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT 189, 199 n.13 (2005) (discussing the difference between the absence of "core" data that requires Commerce to resort to total AFA and "tangential" data that would only require a partial facts available to fill a gap in the record); *Krupp Thyssen Nirosta GMBH v. United States*, 24 CIT 666, 670-672 (2000) (rejecting Commerce's decision to apply total AFA to USR because the identified errors only affected USR's further manufacturing data); *Ferro Union,*

NON-CONFIDENTIAL VERSION

*Inc. v. United States*, 23 CIT 713, 714-16 (1999) (rejecting Commerce's initial decision to apply total AFA to a respondent that failed to report affiliated home market resellers, but accepting the use of partial AFA for the missing home market sales data).

The cases in which the CIT has affirmed Commerce's rejection of all a respondent's reported data have involved situations in which the respondent provided false or deficient information that had a *direct and material impact* on the data necessary for the dumping margin calculation.  *See, e.g., Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp. 2d 1295, 1305-06 (Ct Int'l. Trade 2012) (sustaining the application of total AFA because of the discovery of false statements and altered production and accounting records that impeached the reliability of all reported data);  *Shanghai Taoen,* 29 CIT at 199 n. 13 (finding the use of total facts available appropriate because the deficient information left Commerce with no reliable data to calculate a margin); *Foshan Shunde Yongjian Housewares & Hardware Co.*, 35 CIT __, 2011 Ct. Intl. Trade LEXIS 123 at *36-*42 (sustaining the rejection of all production and sales data because Foshan's misleading responses affected a substantial portion of the necessary data);  *Since Hardware (Guangzhou) Co. v. United States*, 34 CIT __, 2010 Ct. Intl. Trade LEXIS 119 at *26  (sustaining the rejection of all of respondent's reported data because "the missing information on production inputs goes to the core of the

NON-CONFIDENTIAL VERSION

antidumping duty rate determination"); *Qingdao Taifa Group Co. v. United States*, 33 CIT 1090, 1097 (Ct. Intl Trade 2009) (sustaining the rejection of all reported data because the company's incomplete and unreliable information affected all production data such that "no information on the record could be used to calculate an accurate dumping margin for Taifa").   Likewise, the cases Commerce cites to for its authority to "cleanse its proceedings of potential fraud" involve instances where the respondent admitted to submitting falsified documents that had a direct and material impact upon the dumping margin calculation. *See Tokyo Kikai Seisakushu Ltd. v. United States,* 529 F.3d 1352, 1357 (Fed. Cir. 2008) (noting that TKS had provided a "secret rebate" to its U.S. customers to inflate its reported U.S. sales prices); *Home Prods. Int'l v. United States*, 633 F3d 1369, 1374 (Fed. Cir.2011) (noting that Home Products acknowledged its submissions contained falsified mill certificates to obtain a lower surrogate value).

In contrast to the cases noted above, in the instant appeal Commerce has failed to demonstrate how the missing affiliation information for Ocean King would cause all of Hilltop's reported sales and production data to be treated as unusable.  Instead, Commerce simply relies upon conclusory statements:

> Because Hilltop submitted material misrepresentations with regard to its affiliations, and certified to the accuracy of such false information, we find that we cannot rely on any of the information submitted by Hilltop in this review.

NON-CONFIDENTIAL VERSION

1st Remand at 16 (**JA0003817**).  Commerce's reasoning is unpersuasive.

Information regarding third country affiliates is a very discreet and narrow

category of information, and Commerce has failed to show a rational connection

between a deficiency in this narrow category and all reported data submitted by

Hilltop.  *See, e.g., Save Domestic Oil, Inc. v. United States,* 357 F.3d 1278, 1282,

(Fed. Cir. 2004) (internal quotation omitted) (Commerce must "articulate a

satisfactory explanation for its action including a rational connection between the

facts found and the choice made").   Absent a showing supported by substantial

evidence that <u>all</u> information is unusable, it is improper for Commerce to disregard

such information as an adverse inference for the deficient affiliation information.

*See Zhejiang Dunan*, 652 F.3d at 1348 (citing *Gerber Food (Yunnan) Co. v. United*

*States*, 29 CIT 753 (2005)).

In *Gerber Foods*, which this Court cited with approval in *Zhejiang Dunan*,

the CIT rejected a similar argument by Commerce that it could simply reject all of

a respondent's reported data and apply the China-wide rate as an "adverse

inference."  In rejecting this theory, the court noted the following:

> The statute does not permit Commerce to choose an antidumping
> duty assessment rate as an "adverse inference" without making
> factual findings, supported by substantial evidence, justifying a
> conclusion that the body of record information necessary to the
> calculation of that assessment rate is to be rejected for reasons
> consistent with the statutory scheme, including in particular §
> 1677e(b) when read in conjunction with § 1677e(a) and §
> 1677m(e).

**NON-CONFIDENTIAL VERSION**

*Gerber Foods*, 29 CIT at 770.  Commerce's decision in the 1st Remand to reject all

of Hilltop's reported data and apply total AFA lacks this necessary factual finding

supported by substantial evidence.  *Id.*

Commerce in its 1st Remand, and the trial court in *Ad Hoc I* assert that the

failure to report the Ocean King affiliation undermines the credibility of all of

Hilltop's affiliation and corporate structure information, which therefore justifies

Commerce's decision to treat Hilltop as part of the PRC-wide entity:

> In particular, Commerce concluded that the credibility of
> Hilltop's statements regarding its affiliations, corporate
> structure, and ownership – which had formed the basis for
> Hilltop's separate rate status in this review – was undermined
> by Hilltop's withholding of critical information and repeated
> misrepresentation of the scope of its affiliates.  {1st}Remand
> Results at 14-15.

*Ad Hoc I*, 925 F. Supp. 2d at 1322-23 (**JA0000034**).

However, this is a flawed argument.  As discussed in Part II of this brief,

below, Commerce has a well-established policy of automatically granting separate

rate status to all exporters located in Hong Kong (such as Hilltop), and the record

confirms that *none* of Hilltop's affiliation or corporate structure information was

the basis for its separate rate eligibility.  The claims by Commerce and the trial

court that Hilltop's reported affiliations were in any way related to its eligibility for

separate rate status are directly contradicted by Commerce's own established

**NON-CONFIDENTIAL VERSION**

policy and by the record evidence showing the basis of the preliminary separate rate finding for Hilltop.

Equally without merit is Commerce's theory that Hilltop's AR 5 sales data can be disregarded because of unsubstantiated allegations that there were unreported entries in AR 1 and AR 2.  *See* 1st Remand at 13-14 (**JA0003814-3815**).  It is well settled that each administrative review has its own record with unique facts and that the results of each review should be based upon this segment-specific record.  *See, e.g., Peer Bearing Co.-Changshan v. United States*, 587 F. Supp. 2d 1319, 1325 (2008) (explaining that "each administrative review is a separate segment of proceedings with its own unique facts" ); *Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1317 (Ct. Int'l Trade 2011)  ("the rule of law . . .  requires that Commerce take pains to ensure that each issue in each case is decided on the specific facts on the record of that case."); *PAM, S.p.A. v. United States*, 31 CIT 1008, 1021 (2007) ("this Court recognizes that previous dumping margins are not necessarily indicative of current margins as 'each review stands on its own'").

Notwithstanding this well-settled tenet, Commerce seeks to penalize Hilltop in AR 5 for activities that it alleges occurred in AR 1 and AR 2.[11]  Notably, the

---

[11] Beyond the immediate problem of linking alleged circumvention or transshipment in AR 1 or AR 2 to a dumping margin calculation in AR 5, the "evidence" Commerce repeatedly points to raises other problems with Commerce's

NON-CONFIDENTIAL VERSION

CIT rejected a similar argument that a respondent's actions in a prior review could justify an adverse inference in subsequent reviews in an appeal of AR 4 for Shrimp from the PRC.  In *Ad Hoc Shrimp Trade Action Comm. v. United States*, 828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012), the trial court rejected an argument by Petitioner that misclassifications of entries in AR 3 should result in the presumption that entry data in AR 4 were also unreliable:

> The record shows that in the third administrative review, the Type 03 CBP Data for Regal was inaccurate; however, in the fourth administrative review that inaccuracy was not present. Though it is true that the "determination of data inaccuracies in a separate review of the same producer/exporter, subject to the same antidumping duty order, casts doubt on similar data regarding such producer/exporter in an adjacent review," Ad Hoc I, CIT at , 791 F. Supp. 2d at 1333 (construing *Home Products Int'l, Inc. v. United States*, 633 F.3d 1369, 1380-81 (Fed. Cir. 2011)), evidence from the latter review showing that the inaccuracy no longer exists resolves such doubt. Thus, evidence that an importer inaccurately completed Form 7501 in a prior review *but did not perpetuate similar inaccuracies in the review*

---

attempts to categorize the affiliation with Ocean King as "core" information in this review.  Commerce repeatedly refers to the fact that Ocean Duke imported 6.8 million kilograms of shrimp from Cambodia between May 2004 and July 2005. 1st Remand at 10 (**JA0003811**).  However, the record shows that Ocean King was not established until July 2005.  *See* Hilltop AR 6 Seventh Supp. Response at Ex. 1 (**JA0003625-3682**).  Thus, there is no plausible link between these historical shipments and the unreported affiliation with Ocean King.  Furthermore, all the internal correspondence that Commerce claims "suggests" that there was transshipment or circumvention in ARs 1 and 2 mention Vietnam and not China. *See* 1st Remand at 9-10, notes 45 and 49, and 42. (**JA0003810-3811, 3843**) Commerce has failed to explain how a speculative theory regarding transshipment from Vietnam in ARs 1 and 2 can be the lawful basis for an AFA determination in a *China proceeding* in AR 5.

**NON-CONFIDENTIAL VERSION**

> *at issue* is insufficient to impugn the behavior of importers
> generally or the reliability of the data.

*Id.* at 1352 (emphasis in original).  As discussed above, it is undisputed that there

were no entries of Cambodian shrimp at all into the US during either AR 4 or AR

5.  Thus, even if one accepts, *arguendo*, Commerce's speculative theory regarding

transshipment through Cambodia in AR 1 or AR 2, this fact would not be a

sufficient basis to impugn the reliability of Hilltop's data in AR 5.  *Id*.

Furthermore, Commerce's argument regarding "potential flaws" in the AR 1

deposit rate affecting the credibility of Hilltop's current sales database is specious.

*See* 1st Remand at 13-14 (**JA0003814-15**).  As this Court knows, deposit rates are

not used in the calculation of a respondent's dumping margin.  Deposit rates are

merely *estimates* of the ultimate antidumping duty liability based on prior results,

while the ultimate assessment rate for a review is based upon the respondent's

sales practices during the current period of review.  *See, e.g.*, *Decca Hospitality*

*Furnishings, LLC v. United States*, 30 C.I.T. 357, 358-59 (2006).

In sum, the record fails to show that the omitted affiliation was "core"

information, and there is no support for Commerce's claim that this unreported

affiliation with a company not involved with the production and sale of subject

merchandise in AR 5 "impugn{s}the overall credibility of information supplied by

Hilltop officials."  1st Remand at 30 (**JA0003831**).  Consequently, Commerce's

decision to apply total adverse facts available to Hilltop is unsupported by record

NON-CONFIDENTIAL VERSION

evidence.  Commerce's argument is essentially an attempt to circumvent the
restrictions imposed by the statute and the courts on the proper use of adverse
inferences.  Having failed to establish that the information regarding the Ocean
King affiliation was necessary to the AR 5 dumping calculation, Commerce seeks
to reject *all necessary information* under the theory that Hilltop's failure to provide
unnecessary information about Ocean King "undermines the credibility and
reliability of Hilltop's data overall for POR 5."  *Id*. at 21 (**JA0003822**).  Under
Commerce's theory, any omission by a respondent - regardless of the significance
of the information - provides Commerce the authority to reject all of the
respondent's data and apply total AFA.  This theory is directly contrary to the plain
language of the section 1677e, which limits the use of facts available and adverse
inferences to the specific information found missing or unusable, and to the court
precedent discussed above limiting the use of total AFA to situations where "core"
data is unusable.

### C. IT WAS IMPROPER FOR COMMERCE TO CONSIDER TRANSSHIPMENT OR CIRCUMVENTION ALLEGATIONS WITHIN ITS AR 5 PROCEEDING

Even if the record herein did contain substantial evidence to support
allegations of transshipment or circumvention, it would be improper to address
such allegations in the context of the AR 5 proceeding.  Administrative reviews of
dumping orders are governed by 19 U.S.C. § 1675(a).  An inquiry into the
circumvention of a dumping order is an entirely separate proceeding that is

**NON-CONFIDENTIAL VERSION**

governed by 19 U.S.C. § 1677j.  Circumvention inquiries have completely separate

procedures than Section 751 administrative reviews. When a circumvention

inquiry is properly requested, Commerce initiates a separate proceeding and issues

a separate final determination that is not associated with any administrative review

proceeding.  *See, e.g.*, *Laminated Woven Sacks From the People's Republic of*

*China: Negative Final Determination of Circumvention*, 78 Fed. Reg. 12,716

(February 25, 2013).   Thus, an administrative review and an anticircumvention

inquiry are required to be conducted as two separate and distinct proceedings.

Furthermore, Commerce has repeatedly stated that an administrative review

is *not* the forum in which to address circumvention claims, and it has stated that the

Department is not even the proper agency to address transshipment claims.  *See,*

*e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary*

*Results of the Third Antidumping Duty Administrative Review, and Preliminary*

*Rescission in Part,* 76 Fed. Reg. 23,978 (April 29, 2011) (stating that where a party

makes allegations regarding transshipment "a scope or anti-circumvention inquiry

is the proper venue and we will not consider it within the context of an

administrative review" and further stating that allegations of circumvention with

no third country processing "should be directed to CBP, which is the proper

authority to investigate claims of mislabeling country-of-origin"); *Certain Kitchen*

*Appliance Shelving and Racks From the People's Republic of China: Final Results*

*and Partial Rescission of First Antidumping Duty Administrative Review*, 77 Fed.

Reg. 21,734 (April 11, 2012) (declining to initiate AD reviews when the only

reason offered for the request was an allegation of transshipment).

In *Globe Metallurgical Inc. v. United States*, 722 F. Supp. 2d 1372 (Ct. Int'l

Trade 2010), the CIT considered a remand redetermination in which Commerce

declined to consider allegations of transshipment on the basis that it *lacked*

*statutory authority* to make such an investigation without some third country

processing:

> {W}e emphasize that the Department's statutory authority to investigate circumvention of an order is limited to circumstances where some further processing is performed on the product in the third country before exportation to the United States . . . Allegations that concern transshipment, without any further processing of subject merchandise in a third country are better addressed under CBP's authority to impose monetary penalties pursuant to fraud, gross negligence, and negligence. See 19 USC 1592. . . . Specifically, the Department's authority to address such scenarios is constrained by the requirement that there must be some processing taking place in the third country (i.e., Canada) for the Department to determine whether the merchandise is subject to the order. The governing statute expressly links the Department's authority to the question of whether there is third-country processing taking place. For example, 19 USC 1677j, which concerns the Department's authority to prevent the circumvention of AD/CVD orders through the importation of merchandise completed or assembled in other foreign countries, sets forth that the Department must examine processing of the merchandise in the third-country. See 19 USC 1677j(b)(1). Indeed, the overall approach of 19 USC 1677j instructs the Department to evaluate third-country processing in its analyses. See generally 19 USC 1677j.

**NON-CONFIDENTIAL VERSION**

*Globe Metallurgical Inc.*, 722 F. Supp. 2d at 1378-79.  The court sustained Commerce's refusal on remand to consider the transshipment allegation as "a cogent, complete, and reasonable explanation for Commerce's handling of Globe's standalone transshipment allegation against Ferro-Alliages." *Id.* at 1382.

Having repeatedly confirmed that it does not have the authority to investigate transshipment (or, at least, that transshipment must be investigated pursuant to a circumvention inquiry under 19 U.S.C § 1677j), Commerce seems to believe that it can *assume* that transshipment has occurred without the benefit of any such finding by Commerce or any other agency.  Commerce recognizes that no transshipment or circumvention inquiry was ever initiated with respect to these allegations about Cambodian shrimp.  Nonetheless, a number of Commerce's arguments in the 1st Remand are predicated on the view that there has been a valid finding of transshipment already.  *See, e.g.*, 1st  Remand at 10 (**JA0003811**) ("The true country-of-origin of these imports is necessarily in question and internal communications suggest that at least some imports came from Vietnam."); *id.* at 16 (**JA0003817**) ("We find that Hilltop . . . repeatedly withheld information regarding alleged transshipment activities."); *id.* at 42 (**JA0003843**) ("the Department is inclined to accept this evidence at face value which indicates that Hilltop and Ocean Duke were engaged in transshipping shrimp through Cambodia"). This assumption of transshipment or circumvention without any underlying proceeding

**NON-CONFIDENTIAL VERSION**

or finding violates basic tenets of administrative procedure and constitutes clear

error by Commerce. *See, e.g., Mitsubishi Elec. Corp. v. United States*, 16 CIT 730,

739 (1992) ("The Court notes that if Commerce is concerned about the possibility

of circumvention, the appropriate method to resolve such concern would appear to

be proceedings under the provisions specifically designed to prevent

circumvention."); *see also Laminated Woven Sacks Comm. v. United States*, 716 F.

Supp. 2d 1316, 1328 (Ct. Int'l Trade 2010) (explaining that the Department may

not address anticircumvention claims in the context of a normal scope ruling

proceeding because an "anticircumvention inquiry is a specific type of scope

inquiry governed by its own statutory provision, 19 U.S.C. § 1677j(d), which

codifies Commerce's administrative practice. See 19 C.F.R. § 351.225(j).").

Administrative reviews have a very clear and express purpose: to determine

the amount of antidumping duties applicable for the specific period under review.

19 U.S.C. § 1675(a). Administrative reviews are not a platform for the Department

to make general inquiries into alleged import wrongdoing, and any such findings or

allegations cannot serve as the basis for an adverse finding within an

administrative review. Moreover, it is well settled that antidumping duties are

designed to be remedial relief and not a punitive measure. *See, e.g., NTN Bearing

Corp. v. United States*, 73 F.3d 1204, 1208 (Fed. Cir. 1995). In this instance, the

punitive nature of the Department's actions could not be more evident. The

NON-CONFIDENTIAL VERSION

Department has speculated that Hilltop engaged in transshipment *years earlier* and is punishing the company now for that alleged action despite no rational connection between that alleged incidents and this AR 5 proceeding.  This overreaching of its authority and the failure to follow its self-acknowledged limitations regarding transshipment allegations and inquiries is a plain abuse of the agency's authority to apply AFA in the context of an administrative review.

### III. IT WAS IMPROPER TO TREAT HILLTOP AS PART OF THE PRC-WIDE ENTITY BECAUSE INDEPENDENT RECORD EVIDENCE CONFIRMS HILLTOP IS A HONG KONG EXPORTER EXEMPT FROM THE SEPARATE RATE TEST

The discussions above show that Commerce had no valid basis to reject all of Hilltop's reported data and apply total AFA.  Furthermore, even if the circumstances did support this severe action, it was still improper to consider Hilltop part of the PRC-wide entity because Commerce has repeatedly confirmed that exporters located in Hong Kong and other market economy locations are exempt from the separate rate test and are automatically granted separate rate status.

In antidumping duty cases involving non-market economy ("NME") countries, Commerce has a rebuttable presumption that all exporters within the NME country are subject to government control and should be assigned a single country-wide rate.  The separate rate analysis is a test Commerce utilizes in NME

48

**NON-CONFIDENTIAL VERSION**

cases to determine if an exporter has both *de jure* and *de facto* autonomy from the government in its export operations and thus is eligible to receive an independent dumping rate rather than the country-wide rate.[12]   Notably, Commerce has plainly stated, and the courts have confirmed, that the separate rate test focuses on the activities and situation of the _exporter_ rather than the producer (if these are two different entities).  *See Advanced Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343, 1349 (Ct. Int'l Trade 2012) ("There is no dispute that the focus of the separate rates test here is the AT&M entity's export operations, that Commerce's test applies only to exporters"); *Luoyang Bearing Corp. v. United States*, 29 CIT 24, 31 (2005) ("a separate rate analysis is used to determine whether the exporter, not the producer of the subject merchandise, is an autonomous market participant").

Commerce has also repeatedly stated that certain exporters in NME cases are exempt from the separate rate analysis.  Specifically, Commerce's established policy is that exporters who are 100% foreign-owned and/or exporters who are located in a market economy country are not subject to the separate rate analysis

---

[12] The separate rate test is discussed at length in the often referenced *Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China,* 56 Fed. Reg. 20588 (May 6, 1991) (" *Sparklers"*), and was further developed in *Final Determination of Sales at Less Than Fair Value: Silicon  Carbide from the People's Republic of China,* 59 Fed. Reg. 22585 (May 2, 1994) (" *Silicon Carbide"*).

**NON-CONFIDENTIAL VERSION**

and receive separate rate status automatically. *See, e.g., Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 24,892, 24,900 (May 6, 2010) ("As information on the record demonstrates that GEHK is located in Hong Kong, consistent with our practice, we have not conducted a separate rate analysis of GEHK."); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Review and Intent To Revoke Antidumping Duty Order in Part*, 61 Fed. Reg. 40,610, 40,611 (August 5, 1996) ("Finally, with respect to Premier, no separate rates analysis is required because this company is a privately owned trading company located in Hong Kong"); *Fresh Garlic From the People's Republic of China: Preliminary Results of New Shipper Review of Shijiazhuang Goodman Trading Co.,* Ltd., 78 Fed. Reg. 67,112 (November 8, 2013), and accompanying Preliminary Decision Memo at "Separate Rates" ( "if the Department determines that a company is wholly foreign-owned **or located in a market economy** ("ME"), then a separate rate analysis is not necessary to determine whether it is independent from government control.") (emphasis added).[13]

---

[13] Although Hong Kong has been a Special Administrative Region of the People's Republic of China since 1997, the Department of Commerce continues to treat Hong Kong as a separate and autonomous region that is afforded market economy

NON-CONFIDENTIAL VERSION

In a July 2013, Federal Register notice regarding changes to its separate rate policy, Commerce once again plainly confirmed that exporters located in market economy countries are exempt from the separate rate test. In the introduction to its notice, Commerce provided the following background to its separate rate test:

> It has been the Department's practice to assign all exporters of merchandise subject to an antidumping investigation or review from an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent of the government in its export activities, on both a *de jure* and *de facto* basis, so as to be entitled to a separate rate. … **However, if the Department determined that an exporter of NME-produced merchandise is wholly foreign-owned or located in a market economy ("ME") country, the exporter has not been subject to the separate rates test.**

*De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries*, 78 Fed. Reg. 40,430, 40,430-31 (July 5, 2013) (emphasis added). In this same Federal Register notice, Commerce addressed a comment suggesting that it should revise its policy of automatically granting separate rate status to companies with an export office located in a market economy country:

> C. Do Not Automatically Grant Separate Rates to Firms With Trading Arms and/or Producers Located in Market Economies
>
> One commenter suggested that **the Department should end its practice of automatically granting separate rates to companies with export offices in ME countries** because the

---

status. *See Application of U.S. Antidumping and Countervailing Duty Laws to Hong Kong*, 62 Fed. Reg. 42965 (Dep't of Commerce Aug. 11, 1997).

NON-CONFIDENTIAL VERSION

respondent can simply set up a shell company in an ME to avoid a separate rate analysis. We agree that there is a legitimate concern that NME producers under government control selling through affiliated third-country resellers may, in fact, control that reseller and, in such cases, the reseller's exporting activities would also be under government control. However, **we do not consider that the potential for this scenario warrants a wholesale change in practice**. Rather, in cases where a respondent has a producing entity in the PRC and an affiliated reseller in an ME country, we will endeavor to examine, on a case-by-case basis, whether any supplemental information is required to determine if the affiliated reseller is under government control through the producer located in the NME country.

*Id*. at 40,432 (emphasis added). As these citations confirm, at the time Commerce conducted its AR 5 review it was well-established practice that exporters located in market economy countries (such as Hong Kong) were exempt from the separate rate test and were <u>automatically granted separate rate status</u>. *Id*.

The record in this case contains very clear proof that Hilltop is located in Hong Kong. Exhibit A-5 of Hilltop's Section A Response contains Hilltop's "Form 2 Business Registration Certificate" (Hong Kong Business License), and Exhibit A-6 contains Hilltop's "Form 1c Business Registration Application" (Hong Kong Business Registration Form). (**JA0000101-104, 136-139**). Both of these documents confirm that Hilltop is located in Hong Kong, and the Business Registration Form confirms that Hilltop is 100% market economy owned.[14]

---

[14] As plainly stated in the Preliminary Results, Commerce's policy only requires proof that the exporter is **<u>located</u>** in Hong Kong. However, Hilltop notes that the

NON-CONFIDENTIAL VERSION

Based upon this uncontroverted information, Commerce noted in the

Preliminary Results of AR 5 that (in accordance with its established policy) Hilltop

was exempt from the separate rate test and would be granted separate rate status

because it is located in Hong Kong:

> It is the Department's policy to assign all exporters of the merchandise subject to review in NME countries a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (de jure) and in fact (de facto), with respect to exports. To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, the Department analyzes each exporting entity in an NME country under the test established in Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China, 56 FR 20588 (May 6, 1991), as amplified by Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China, 59 FR 22585 (May 2, 1994). **However, if the Department determines that a company is wholly foreign-owned or located in a market economy, then a separate rate analysis is not necessary to determine whether it is independent from government control**. See, e.g., Final Results of Antidumping Duty Administrative Review: Petroleum Wax Candles From the People's Republic of China, 72 FR 52355, 52356 (September 13, 2007). … **Hilltop has reported that it is a Hong Kong based exporter of subject merchandise** . . . **Consequently, we preliminarily determine that Hilltop . . . met the criteria for a separate rate.**

*Preliminary Results*, 76 Fed. Reg. at 8340-41 (emphasis added) (**JA0000205-206**).

---

record does establish both that Hilltop is a Hong Kong based exporter and that it is owned by individuals who do not reside in mainland China.  *See* Hilltop Section A Response at Ex. A-5, A-6 (**JA0000101-104, 136-139**).

The Final Results made no change to this preliminary finding. *See Final Results*, 76 Fed. Reg. at 51,942 (**JA0000230**). Notwithstanding the findings and statements made during the actual AR 5 review, Commerce determined in its 1st Remand that it was appropriate to consider Hilltop part of the China-wide entity. While Hilltop argued that such a finding was improper because Commerce had specifically confirmed that Hilltop was exempt from the separate rate test, Commerce rejected this argument in its 1st Remand:

> Although Hilltop claims that it is a Hong Kong-based exporter and therefore placement in the PRC-wide Entity is inappropriate, the undisclosed affiliation and unreliability of information on the record prevent us from determining with certainty the ownership and/or control of Hilltop. Because of the lack of reliable information relating to affiliation and Hilltop's previously granted separate rate, we cannot conclude that its purported location indicates that it is not controlled by the PRC government.

1st Remand at 36 (**JA0003837**). The trial court adopted similar reasoning to sustain Commerce's decision to deny Hilltop separate rate status:

> Because Hilltop "reported that it is a Hong Kong based exporter of subject merchandise," Commerce concluded that "a separate rate analysis [was] not necessary to determine whether [Hilltop] is independent from government control." … As discussed above, however, on remand Commerce determined that Hilltop provided false and incomplete information in this review regarding its corporate structure and, given the nature and timing of Hilltop's omissions and misrepresentations in this regard, Commerce decided that none of Hilltop's submissions, including statements used to support Hilltop's separate rate status, could be relied upon to provide accurate information.

*Ad Hoc I*, 925 F. Supp. 2d at 1320-21 (**JA0000029-30**).

However, the reasoning offered by Commerce and the trial court on this issue is flawed.  As demonstrated above, Commerce's well-established policy exempts exporters located in Hong Kong from the separate rate test and automatically grants them separate rate status.  Even if Commerce alleges that all statements made by Hilltop are unreliable, this conclusion could have no impact on Hilltop's separate rate status because the finding that Hilltop is located in Hong Kong was not based upon "statements" by Hilltop, or on the ownership status of any of its mainland China or third-country affiliates.  As discussed above, the record contains independent and objective documentation in the form of Hilltop's Hong Kong Business License and its Hong Kong Business Registration that establish that Hilltop is located in Hong Kong.   These are official documents issued by the government of Hong Kong, and they constitute independent proof that Hilltop is a Hong Kong-based exporter.   Commerce could have verified the accuracy of these documents without reliance on any statements by Hilltop officials.

Moreover, the record contains proof that Commerce has previously conducted an on-site verification at Hilltop's offices in Hong Kong.  One of the documents added to the record by petitioner in this review was Commerce's verification report from the first review of Hilltop's predecessor company, HK

NON-CONFIDENTIAL VERSION

Yelin.  The POR 1 verification of Hilltop's predecessor company, HK Yelin, took place in Hong Kong on January 22-23, 2007.  Since HK Yelin became Hilltop in late 2006, this verification actually took place in Hilltop's office.  The verification report also confirms that Commerce verifiers examined Hilltop's Hong Kong business registration.  *See* Petitioner's AR 6 Submission of Factual Information to Rebut, Clarify or Correct at  Attachment 3, page 5 February 27, 2007 Verification Report of Yelin Enterprises Hong Kong (April 19, 2012) ("We reviewed HK Yelin's original 2004-2005 and 2005-2006 business licenses, and Hilltop International's 2006-2007 business license, which are renewable every year. We also reviewed HK Yelin's business registration documents, and amendment history, as well as Hilltop International's business registration documents.") (**JA0001164**).

Based on the above, Commerce's refusal to consider Hilltop's Hong Kong Business License and Business Registration to confirm that Hilltop is located in Hong Kong violates 19 U.S.C. § 1677m(e), which *prohibits* Commerce from declining to consider information that satisfies the provision's enumerated requirements.  Specifically, the submitted Hong Kong business license and registration for Hilltop satisfy the requirements of 1677m(e) because:

- this information was submitted in a timely manner as part of Hilltop's Section A  Response (1677m(e)(1));

- this information could be independently verified if Commerce elected to verify it[15] (§ 1677m(e)(2));

- this information is complete enough to confirm independently that Hilltop is a Hong Kong-based exporter (§ 1677m(e)(3));

- Hilltop acted to the best of its ability to demonstrate that it is a Hong Kong-based exporter by providing these documents (§ 1677m(e)(4)); and

- this information can be used to confirm that Hilltop is a Hong Kong-based exporter without any difficulties since this is the exact information Commerce relied upon in its Preliminary Results to find Hilltop located in Hong Kong (§ 1677m(e)(5)).

For these reasons, Commerce's determination that Hilltop should be considered part of the PRC-wide entity was unsupported by record evidence and contrary to law. Commerce's stated policy is to give separate rate treatment to exporters located in Hong Kong, and the record contains independent documentation confirming the fact that Hilltop is a Hong Kong-based exporter. Commerce's refusal to consider this information (even if its decision to reject all of Hilltop's other data is valid) violates Section 1677m(e).[16]

---

[15] *See China Kingdom Import & Exp. Co. v. United States*, 31 CIT 1329, 1349 n.7 (2007) (stating that a "refusal to subject certain factual information to a verification procedure is not the equivalent of a valid finding that, for purposes of §1677e(a)(2)(D), such information 'cannot be verified'"). Furthermore, as noted above, Commerce has previously reviewed Hilltop's Hong Kong business license during on-site verification.

[16] In comparison, in *AMS Assocs. v. United States*, 719 F.3d 1376 (Fed. Cir 2013), the court found that Commerce's treatment of Zibo Aifudi as part of the China-wide entity did not violate Section 1677m(e) because Aifudi was a Chinese company subject to the separate rate test and it had withdrawn from the record

NON-CONFIDENTIAL VERSION

## IV.    THE DEPARTMENT'S CORROBORATION OF THE AFA RATE APPLIED TO HILLTOP AS PART OF THE PRC-WIDE ENTITY WAS UNSUPPORTED BY SUBANTIAL EVIDENCE AND CONTRARY TO LAW

### A.    THE CORROBORATION FRAMEWORK

The statute permits Commerce to rely upon "secondary information" when making an adverse inference, but it also contains an express requirement that Commerce shall, to the extent practicable, "corroborate that information from independent sources." 19 U.S.C. § 1677e(c). While the statute does not provide a definition of "secondary information," the SAA notes that secondary information is information "derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise." SAA at 870. A similar definition is also contained in Commerce's regulations. 19 C.F.R. § 351.308(c)(1).

The regulations and SAA define "corroboration" as an examination of whether "the secondary information to be used has *probative value*." SAA at 870 (emphasis added). This corroboration requirement is necessary as "secondary information may not be entirely reliable because, for example, as in the case of the

---

submissions containing the necessary information for the *de facto* separate rate analysis. *Id*. at 1379-80. In this case, in contrast, the only information necessary to establish Hilltop's entitlement to a separate rate is the information confirming its location as a Hong Kong-based exporter, and the information necessary to confirm Hilltop's location is on the record and satisfies all the criteria of 1677m(e).

NON-CONFIDENTIAL VERSION

petition, it is based on unverified allegations, or as in the case of information from prior section 751(a) reviews, it concerns a different time frame than the one issued." *Id.*; *see also Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 991 F. Supp. 2d 1322, 1328 (Ct. Int'l Trade 2014) ("In creating this {corroboration} requirement, Congress expressly intended to check the Department's ability to select potentially suspect secondary information when drawing adverse inferences.").

The CIT has noted that "{i}n order to comply with the statute and the {SAA}'s statement that corroborated information is probative information, Commerce must assure itself that the margin it applies is relevant, and not outdated, or lacking a rational relationship to {the respondent}." *Ferro Union, Inc. v. United States*, 23 CIT 178, 205 (1999). This Court distilled this premise more recently in *Gallant Ocean (Thail.) Co.*, explaining that Commerce must select a rate using reliable facts with "some grounding in commercial reality." *Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1323-1324 (Fed. Cir. 2010); *see also F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United State*s, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (explaining that Congress' inclusion of the corroboration requirement in the statute was "done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block

NON-CONFIDENTIAL VERSION

any temptation by Commerce to overreach reality in seeking to maximize deterrence.").

While there is no threshold amount of information that is required to corroborate a particular rate, the CIT has stated that as the selected rate reaches "multiples of 100%, one might assume that a bit more corroboration or record support is warranted." *Qingdao Taifa Group Co. v. United States*, 760 F. Supp. 2d 1379, 1386 (Ct. Int'l Trade 2010); *Lifestyle Enterprise, Inc. v. United States*, 768 F. Supp. 2d 1286, 1298 (2011) (holding unreasonable Commerce's corroboration of 216.01% total AFA rate: "As the rate becomes larger and greatly exceeds the rates of cooperating respondents, Commerce must provide a clearer explanation for its choice and ample record support for its determination.").   Ultimately, in corroborating an AFA rate, the Department must select a rate by balancing the statutory objectives of finding an accurate dumping margin and inducing compliance, rather than creating an overly punitive result." *Timken Co. v. United States,* 354 F.3d 1334, 1345 (Fed. Cir. 2004).

### B.   THE DEPARTMENT FAILED TO OFFER ADEQUATE AND LAWFUL CORROBORATION FOR THE 112.81% PETITION RATE ASSIGNED TO THE PRC-WIDE ENTITY

As detailed below, Commerce failed to follow the statutory and court imposed guidelines for corroborating the AFA rate applied to the PRC-wide entity in this case.  The record shows that neither the AFA rate from the petition nor the

NON-CONFIDENTIAL VERSION

information Commerce used for its corroboration were probative of the commercial reality during AR 5.  Furthermore, Commerce disregarded record evidence demonstrating the unreliability of the small group of sales data from the original investigation used for its corroboration.

> **1.     The AFA Rate and Corroboration Information Commerce Used Are Outdated and Not Relevant to the Current Review Proceeding**

In its remand instructions directing Commerce to reconsider its initial corroboration of the AFA rate of 112.81% taken from the original petition, the trial court explicitly instructed Commerce to determine a PRC-wide rate for shrimp that 'is relevant, and *not outdated*." *Ad Hoc I.,* 925 F. Supp. 2d at 1326 (emphasis added) (**JA0000041-42**)  This instruction echoed one of the concerns expressed in the SAA regarding the reliance upon secondary information, stating that "{s}econdary information may not be entirely reliable because … it concerns a different time frame than the one at issue."  SAA at 870; s*ee also Ferro Union,* 23 CIT at 205 (emphasizing the importance of selecting an AFA rate that is current, relevant and bearing a rational relationship to the respondent).

The concern over the use of outdated information is well founded because the commercial reality for any industry never remains static.  Thus, even if certain information reflected the commercial reality for an industry at one point in time,

NON-CONFIDENTIAL VERSION

there is no guarantee that it will continue to reflect commercial reality in the future. *Id*.

Notwithstanding the trial court's clear instruction to avoid outdated information, and the well-founded reasons for considering outdated information to be of questionable reliability, Commerce continues to use a margin contained in the 2003 petition for its AFA rate within this AR 5 proceeding.   To compound the problem, Commerce also seeks to corroborate this AFA margin from the petition with selected sales data from the original investigation.  In the context of AR 5, both the AFA rate from the petition and the Red Garden sales data from the investigation meet the definition of "secondary information" contained in both the SAA and Commerce's regulations since the Red Garden sales data is derived from a prior segment of the case conducted many years earlier.  Thus, Commerce seeks to corroborate a form of secondary information (which the SAA notes may not be reliable) with another form of secondary information that is equally outdated and equally unreliable absent its own corroboration.

Put simply, this exercise defeats the plain intent of the statute's corroboration requirement.  *See* SAA at 870.  Commerce and the trial court have failed to explain how outdated information from the petition can be shown to be probative and relevant to the commercial reality of the PRC shrimp industry within AR 5 by reference to other outdated information from the original investigation.  If

NON-CONFIDENTIAL VERSION

this were an appeal of the first AR or the original investigation, a time in which Commerce possessed far less information about calculated margin results, then Commerce's corroboration analysis would have more legitimacy. However, as discussed below, Commerce possessed a wealth of information from more recent reviews (as well as recalculated margin results from the original investigation) demonstrating that the 112.81% margin rate was not commercially reasonable. In light of the availability of this more recent information, Commerce's reliance upon outdated information from the original investigation was unreasonable and improper. *See, e.g.*, *Lifestyle Enter. v. United States*, 768 F. Supp. 2d 1286, 1298 (Ct. Int'l Trade 2011), reversed on other grounds by *Lifestyle Enter. v. United States*, 751 F.3d 1371 (Fed. Cir. 2014) ("indications that a rate may not reflect commercial reality include significantly lower rates for cooperating respondents and the presence of more recent, conflicting data.").

## 2. Commerce Improperly Ignored the Record Evidence of All Calculated Margins That Confirmed the 112.81% AFA Rate Was Aberrational

Commerce's assertion that the outdated AFA margin from the petition is corroborated by the equally outdated Red Garden sales data from the investigation is further undermined by the unbroken history of calculated margins that are, at best, a mere fraction of the 112.81% petition rate. Having completed its recalculation of the margins from the original investigation pursuant to the Section

**NON-CONFIDENTIAL VERSION**

129 Determination all mandatory respondents from the original investigation now have a calculated margin of zero or *de minimis*. *Section 129 Determination*, 78 Fed. Reg. at 18,959. Likewise, every mandatory respondent in ARs 1 through AR 5 that received a calculated rate received either a zero or *de minimis* margin, with the exception of one mandatory respondent in AR 3 who received a calculated margin of 9.08%.[17] Thus, from the final investigation through AR 5, the highest dumping margin ever calculated by Commerce in this AD Order (and the _only_ calculated margin above *de minimis*) has been **9.08%**. Given this history of extremely low margin results extending over multiple years, it is plainly evident that the 112.81% rate from the petition does not reflect commercial reality and is punitively high.

In *Gallant Ocean*, this Court rejected a similar attempt by Commerce to apply an AFA rate based on a petition margin of 57.64% when all margins calculated by Commerce in the investigation and subsequent reviews demonstrated that such a high rate was not commercially reasonable:

> The fact that Commerce ultimately imposed dumping margins between 5.91% and 6.82% for the same products after its initial investigation shows the possession of better information and shows that the adjusted petition rate was aberrational. Cooperating respondents' actual dumping margins during the administrative review period--ranging from 2.58% to 10.75%--

---

[17] *Third Administrative Review of Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg. 46,565, 46,568 (September 10, 2009).

**NON-CONFIDENTIAL VERSION**

> further call into question the credibility of the adjusted petition rate. The 57.64% adjusted petition rate is more than ten times higher than the average dumping margin for cooperating respondents. This high rate is also more than five times higher than the highest rate applied to a cooperating respondent. … Instead, the AFA rate is "punitive, aberrational, or uncorroborated," id., and excessive in view of the cooperative respondents' dumping rates. **This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter Gallant and other uncooperative respondents from future non-compliance.**

*Gallant Ocean, 602 F.3d.* at 1323-24 (emphasis added).  Thus, in *Gallant Ocean* (a case involving the same warmwater frozen shrimp that are subject to this appeal), this Court expressly found that an AFA rate over <u>five times</u> the highest rate imposed on similar products was excessive and punitive.  Yet, in this case, Commerce is applying an AFA rate based on outdated and cherry-picked data that is over <u>*twelve times*</u> higher than the highest rate ever calculated for a cooperative respondent.  Application of such an AFA rate would directly conflict with the Court's holding in *Gallant Ocean*.  *Id*.

Moreover, the fact that Commerce has calculated so many dumping margins well below the 112.81% petition rate demonstrates that Commerce was in possession of better information to derive a reasonable AFA rate.  *Id*.; *see also Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (stating that an adverse rate may be considered "punitive" if Commerce "had to reject low margin information in favor of high margin information that was demonstrably less

**NON-CONFIDENTIAL VERSION**

probative of current conditions"). Commerce's choice of an AFA rate must be supported by substantial evidence, and substantiality of the evidence must consider information that both supports and contradicts Commerce's choice. *See Gallant Ocean*, 602 F.3d at 1325 (requiring Commerce to provide substantial evidence demonstrating a rational relationship between the AFA rate selected and a reasonably accurate estimate of the respondent's actual rate). Commerce's choice of an AFA rate must be supported by substantial evidence, and substantiality of the evidence must consider information that both supports and contradicts Commerce's choice. *See, e.g., Gerald Metals,* 132 F.3d at 720. Commerce cannot simply ignore more recent and probative information indicating that its selected AFA rate is unreasonable and punitive. *Rhone Poulenc,* 899 F.2d at 1190.

### 3. The Small Percentage of Sales Data Used by Commerce Cannot Corroborate the Excessively High AFA Margin

Commerce's attempt to corroborate the petition AFA rate should also be rejected given the very small percentage of sales data used in its corroboration. In this instance, there is a very troubling disconnect between the reasoning offered by Commerce and the trial court and the record evidence underlying Commerce's corroboration analysis. Both Commerce and the trial court repeatedly note that the CONNUM-specific margins utilized for the corroboration were for the "largest exporter of subject merchandise during the POI." *Ad Hoc II*, Slip Op 14-55 at 23 (**JA0000069**); 2nd Remand Results at 5-6 (**JA0004267-68**). These discussions

minimize the fact that the CONNUM-specific margins relied upon comprise **only**

**[    ] of Red Garden's sales data**.  *See* Red Garden Memo at 2 (**JA0004269**).

Moreover, both Commerce and the trial court make scant mention of the fact that

Red Garden's overall margin from the Section 129 Determination was *zero*.

*Section 129 Determination*, 78 Fed. Reg. at 18,959.  Thus, while Commerce claims

that the selected sales data is probative of the pricing behavior and commercial

reality for the PRC-wide entity, it does not even reflect the commercial reality of

the company from which it was derived.  To the contrary, this limited segment of

sales data is *directly misleading* with respect to the actual dumping margin

assigned to Red Garden in the proceeding from which it was taken.

While both Commerce and the trial court cite cases in which a limited

number of sales were accepted as corroboration for an AFA rate, the circumstances

in the instant case do not support the use of such limited and cherry-picked data.

First, this Court noted in *Gallant Ocean* that a small percentage of transactions can

only corroborate an AFA rate if the record shows that these transactions

"represented a reasonably accurate estimate" of the actual dumping margin.

*Gallant Ocean*, 602 F.3d at 1325.  A small percentage of sales cannot be adequate

corroboration if Commerce does not show a reasonable "relationship between the

small number of unusually high dumping transaction" and the actual rate the

respondent might receive.  *Id*. at 1324.  Given the outdated nature of the Red

**NON-CONFIDENTIAL VERSION**

Garden transactions Commerce has used for its corroboration, and the unbroken string of vastly lower margins calculated by Commerce in the investigation and all subsequent reviews, Commerce has failed to show that this small number if high margin transactions has any reasonable relationship with the commercial reality of AR 5.  *Id.*, *see also Dongguan Sunrise Furniture Co., Ltd. v. United States*, 904 F. Supp. 2d 1359, 1364 (Ct. Int'l Trade 2013) (stating that "{c}herry-picking the highest possible margins {above a certain percentage} does not satisfy Commerce's burden").

Furthermore, the CIT has noted that it is reasonable to assume that higher AFA margins warrant a higher level of corroboration.  *See Dongguan Sunrise Furniture Co., Ltd.*, 904 F. Supp. 2d at 1364 (stating that "a larger percentage of a party's sales is needed to support a very high margin in order for Commerce to be able to demonstrate that the sales relied on are representative of the respondent's commercial reality"); *see also Qingdao Taifa*, 760 F. Supp. 2d at 1386 (presuming that a higher level of corroboration is warranted when the AFA rate reflects "multiples of 100%").  In this instance, Commerce has attempted to corroborate a petition rate of 112.81% using a mere [     ] of outdated sales data from the original investigation for a company that actually received a 0.00% rate.

Ultimately, in this case, the extremely limited sales data Commerce has cherry-picked is not probative of Red Garden's actual dumping margin in 2003,

and is not probative of any other margin ever calculated in this case.  Under these

circumstances, these transactions and the petition rate cannot be probative of, or

used as a reasonably accurate estimate for, the PRC-wide entity's sales activity in

2009.

### C.    THE TRIAL COURT ERRED IN CONCLUDING THAT PREVIOUS CALCULATED RATES ARE IRRELEVANT TO THE CORROBORATION REQUIREMENT IN THIS CASE

In response to Hilltop's arguments that the 112.81% petition rate is outdated

and inconsistent with the history of calculated rates over the life of this

antidumping order, the trial court advanced a theory that the obligation to have

AFA rates reflect commercial reality is not applicable when the AFA rate is

applied to a country-wide entity:

> "But where (as here) the non-cooperating respondent is a NME
> countrywide entity – definitionally presumed to set prices
> without regard to market conditions - the actual pricing behavior
> of the cooperative respondents that have demonstrated eligibility
> for a separate rate . . .  does not bear upon the credibility of the
> dumping allegations against the NME countrywide entity in the
> way that pricing behavior of cooperative market economy
> respondents reelects on the credibility of dumping allegations
> against their similarly-situated market participates. … For while
> the pricing behavior of the cooperative respondents may be
> relevant to the commercial reality of non-cooperating exporters
> from a market economy . . . no analog exists in the NME context,
> where the countrywide government entity is presumed to act
> unimpeded by such forces. … In the NME context, therefore, the
> inference that the countrywide entity as a whole may be dumping
> at margins significantly above the cooperating separate rate
> market participants is not unreasonable

NON-CONFIDENTIAL VERSION

*Ad Hoc II*, Slip Op 14-55 at 29-30 (**JA0000075-76**).

However, there is no statutory language or case law to support this view that a separate (and more lenient) corroboration standard can be applied to a country-wide entity.  To the contrary, a country-wide entity is a respondent entitled to the same treatment as any other respondent in the proceeding.  There is no separate statutory authority for assigning an AFA rate to a country-wide entity.  When Commerce applies an adverse inference rate to the country-wide entity, it cites to section 1677e as it would in any other circumstance.  Consequently, the corroboration requirements of section 1677e(c) remain applicable when Commerce relies upon secondary information for its adverse inference.

While the courts have stated that an adverse country-wide rate does not need to be corroborated with respect to each particular respondent, these cases do not stand for the proposition that the corroboration requirement should be disregarded or reduced when applied to a country-wide entity.  *See, e.g.*, *Peer Bearing Co. v. United States*, 587 F. Supp. 2d 1319, 1327 (Ct. Int'l Trade 2008) (stating that the PRC-wide rate "must be corroborated according to its reliability and relevance to the countrywide entity as a whole"); *Lifestyle Enter. v. United States*, 768 F. Supp. 2d at 1298, quoting *Qingdao Taifa Group Co. v. United States*, 760 F. Supp. 2d 1379 (Ct. Int'l Trade 2010) (stating that the dramatic increase of Orient's rate from 7.28% to the PRC-wide rate of 216.01% "raises the concern that '[t]here is little

**NON-CONFIDENTIAL VERSION**

likelihood that in any real world this could be an approximation of an actual rate'"

and requiring Commerce "to present substantial evidence that the new rate reflects

commercial reality"); *Shandong Mach. Imp. & Exp. Co. v. United States*, 33 C.I.T.

810, 816 (2009), quoting Peer Bearing, 587 F. Supp. 2d at 1327 (finding that

Commerce failed to comply with the corroboration requirements of section

1677e(c) when taking a PRC-wide rate from the petition and directing Commerce

on remand "to assign a different rate to hammers/sledges that has been

'corroborated according to its reliability and relevance to the country-wide entity

as a whole'").

Accordingly, it is improper to dismiss the relevance of all rates assigned to

respondents throughout the history of the PRC Shrimp Order because these rates

are, collectively, the best indication of the commercial reality of the industry as a

whole. In this instance, the massive discrepancy between the 112.81% rate and all

the individual rates ever calculated by Commerce is a clear indication that the

112.81% rate derived from the petition does <u>not</u> reflect commercial reality and is

an impermissibly punitive rate.  *Gallant Ocean*, 602 F.3d at 1323-34.

### D. COMMERCE UNREASONABLY DENIED ACCESS TO INFORMATION DEMONSTRATING THE ABBERATIONAL NATURE OF THE CHERRY-PICKED RED GARDEN DATA

Finally, both the trial court and Commerce claim that the corroboration was

reasonable, in part, because no party submitted evidence rebutting the

reasonableness of the rate to this review.  Specifically, the trial court asserted that "Hilltop has presented no new evidence to suggest that the Petition-based countrywide rate, as corroborated using (appropriately recalculated) contemporaneous[18] data from the largest cooperating respondent during the POI, has lost its probative value."  *Ad Hoc II*, Slip Op. 14-55 at 35 (**JA0000081**). Further, the trial court noted that "neither the PRC-wide entity nor any other respondent has come forward with any more accurate information" suggesting that this rate is not reflective of the commercial reality of the PRC-wide entity.  *Id*. The placement of the burden to produce corroborating evidence on Hilltop and other parties is improper and should be rejected.

The statutory requirement that the Department must corroborate secondary sources using "independent information" demonstrates that "the Department is not excused from its obligation to corroborate secondary information used to draw an adverse inference simply because the interested parties have placed no corroborative information on the record."  *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 991 F. Supp. 2d 1322, 1329 (Ct. Int'l Trade 2014); *see also Washington Int'l Ins. Co. v. United States*, 2010 Ct. Intl. Trade LEXIS 13,

---

[18] The trial court's use of the term "contemporaneous" in this context is somewhat confusing here.  The Red Garden data was contemporaneous to the original investigation and to 2003 sales; it is not contemporaneous to sales made in 2009, the period of review that is the subject of this appeal.

**NON-CONFIDENTIAL VERSION**

*8, Slip Op. 10-16, at 5 n.3 (2010) (noting that "it may be opined that Congress intended Commerce to exert its utmost to remove doubt as to the reliability of any secondary information it would rely upon.").

In this case, Commerce selected an AFA rate from secondary information – the petition. Having made the choice to rely upon secondary information, the burden fell upon Commerce to corroborate this rate. *See Foshan Shunde*, 991 F. Supp. 2d at 1329 (stating that "Congress placed the obligation to corroborate secondary information using independent sources on the Department, not on the interested parties who are normally responsible for generating the administrative record"). Rather than corroborate this information from "independent sources" as defined by its regulations,[19] Commerce attempted to corroborate that rate using other secondary information from a proceeding (*i.e.*, the original investigation) other than the current review.

Hilltop expressed a number of concerns regarding the outdated secondary information used by Commerce in its corroboration, but Commerce discounted these concerns because Hilltop did not submit any information on the record. In response to Hilltop's concern that the extremely wide range of CONNUM-specific margins for Red Garden indicates that its sales experience may not be typical,

---

[19] 19 C.F.R. § 351.308(d).

NON-CONFIDENTIAL VERSION

Commerce argues that "Hilltop has failed to provide any indication that a wide range of margins is atypical … nothing on the record of this review suggests that a wide range of margins would somehow be unusual." 2nd Remand at 16 (**JA0004278**).  However, the reason why the record does not contain any additional information showing that Red Garden's wide range of margins is atypical is because Commerce refused Hilltop's request to provide additional margin data from other respondents. *See* Memo to File, Placing Section 129 Documents on the Record of the Fifth Administrative Review (Aug. 14, 2014) (**JA0004193-4194**). This information constitutes business proprietary data from an earlier proceeding, so Hilltop had no independent ability to place this BPI data on the record.

For the reasons outlined above, Commerce's revised attempt to corroborate the 112.81% petition rate fails to establish that it is a rate that reflects commercial reality in the current review.  To the contrary, record evidence demonstrates that the 112.81% AFA rate is aberrational and punitive.

**NON-CONFIDENTIAL VERSION**

# CONCLUSION

For the reasons discussed above, Hilltop respectfully requests that the

decision of the Court of International Trade be vacated with respect to the issues

addressed herein and that the case be remanded to the Department of Commerce

with instructions to implement the necessary corrections for these issues

Respectfully submitted,

_/s/ Mark E. Pardo_

Mark E. Pardo
Andrew T. Schutz

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

120 New York Ave., NW, Suite 650
Washington, DC 20005
202-783-6881

Dated:  September 22, 2014

**NON-CONFIDENTIAL VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2014, a copy of the foregoing **CORRECTED BRIEF OF PLAINTIFF-APPELLANT HILLTOP INTERNATIONAL (Non-confidential version ),** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic-filing system. Parties may access this filing through the Court's system.

/s/Mark E. Pardo
Mark E. Pardo
*Counsel for Hilltop*

**NON-CONFIDENTIAL VERSION**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28.1(e)(2) and 32(a)(7)(B).

This brief contains 17,736 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally spaced type face using Word 2010 in Times New Roman 14 point font.

/s/Mark E. Pardo
Mark E. Pardo
*Counsel for Hilltop*

9075469_1

Slip Op. 14 - 55

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌─────────────────────────────────────────┐
│ AD HOC SHRIMP TRADE ACTION               │
│ COMMITTEE,                               │
│                                          │
│         Plaintiff,                       │
│                                          │
│              v.                          │
│                                          │
│ UNITED STATES,                           │
│                                          │
│         Defendant,                       │
│                                          │
│              and                         │
│                                          │
│ HILLTOP INTERNATIONAL and OCEAN          │
│ DUKE CORP.,                              │
│                                          │
│         Defendant-Intervenors.           │
└─────────────────────────────────────────┘
```

**PUBLIC VERSION**

Before: Donald C. Pogue,
        Chief Judge

Court No. 10-00275
Court No. 11-00335

OPINION

[affirming two remand redeterminations]

Dated: May 20, 2014

Andrew W. Kentz, Jordan Charles Kahn, Nathaniel
Maandig Rickard and Nathan W. Cunningham, Picard Kentz & Rowe
LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice,
of Washington, DC, for the Defendant.  With him on the briefs
were Stuart Delery, Assistant Attorney General, Jeanne E.
Davidson, Director, and Patricia M. McCarthy, Assistant
Director.  Of counsel on the briefs was Melissa M. Brewer,
Attorney, Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington, DC.

Mark E. Pardo and Andrew T. Schutz, Grunfeld,
Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington,
DC, for the Defendant-Intervenors.

**Pogue, Chief Judge:**  This opinion addresses litigation

arising out of the fourth and fifth administrative reviews of an

antidumping duty order covering certain warmwater shrimp from

the People's Republic of China ("PRC" or "China").  During the

subsequent sixth administrative review of this order, Commerce

found that respondent Hilltop International ("Hilltop") had made

material misrepresentations regarding its affiliations and

corporate structure throughout the entire history of the order.[1]

At the time of this finding, liquidation of entries covered by

the fourth and fifth administrative reviews remained enjoined

pending the final outcome of judicial review.[2]  Concluding that

the evidence of Hilltop's misconduct was equally applicable to

the fourth and fifth reviews, Commerce requested and was granted

permission to reopen the records of those reviews in order to

consider the effect of this new evidence on Hilltop's calculated

dumping margins.[3]  Hilltop now challenges the results of

---

[1] See Issues & Decision Mem., A-570-893, ARP 10-11 (Aug. 27, 2012) accompanying Certain Frozen Warmwater Shrimp from the People's Republic of China, 77 Fed. Reg. 53,856 (Dep't Commerce Sept. 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ("AR6 I & D Mem.") cmt. 1 at 12-17.

[2] See Order Granting Consent Mot. Prelim. Inj., Ct. No. 10-00275, ECF No. 11; Order Granting Consent Mot. Prelim. Inj., Ct. No. 11-00335, ECF No. 10.

[3] See Order Remanding Certain Frozen Warmwater Shrimp from the People's Republic of China, 75 Fed. Reg. 49,460 (Dep't Commerce
(footnote continued)

Commerce's redeterminations.[4]

        The court has jurisdiction pursuant to

Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[5] and 28 U.S.C.

§ 1581(c) (2006).

        As explained below, Commerce's reasonable

determination not to rely on Hilltop's representations, and to

therefore treat Hilltop as part of the PRC-wide entity in the

fourth review, is sustained on the same grounds as those

supporting the affirmance of Commerce's essentially identical

---

Aug. 13, 2010) (final results and partial rescission of
antidumping duty administrative review) ("AR4 Final Results")
and accompanying Issues & Decision Mem., A-570-893, ARP 08-09
(Aug. 9, 2010) ("AR4 I & D Mem."), Ct. No. 10-00275, ECF No. 71;
Order Granting Mot. Expand Scope of Remand of Certain Frozen
Warmwater Shrimp from the People's Republic of China, 76 Fed.
Reg. 51,940 (Dep't Commerce Aug. 19, 2011) (final results and
partial rescission of antidumping duty administrative review)
("AR5 Final Results") and accompanying Issues & Decision Mem.,
A-570-893, ARP 09-10 (Aug. 12, 2011) ("AR5 I & D Mem."),
Ct. No. 11-00335, ECF No. 70.

[4] Because Hilltop's challenges to the (revisited) fourth and
fifth reviews present identical legal issues, as applied to
essentially identical facts, this single opinion is addressed to
both legal actions.  A third action, challenging essentially
identical determinations in the sixth administrative review, has
been stayed pending the final outcome of any appeals from this
decision. See Order Apr. 23, 2014, Ct. No. 12-00289, ECF No. 80.

[5] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code,
2006 edition.

determination in the (revisited) fifth review.[6]  In addition,
Commerce's corroboration analysis, supporting the use of the
112.81 percent countrywide rate in the revised results of the
fourth and fifth reviews, is also sustained.

## PROCEDURAL BACKGROUND

Because the results of the fifth review were already
being reconsidered pursuant to remand at the time that new
evidence of Hilltop's misconduct came to light during the sixth
review, Commerce's decision regarding the effect of this new
evidence on Hilltop's margin calculations came to court first on
the (reopened) record of the fifth review.  Reexamining this
supplemented record, Commerce determined that Hilltop had
misrepresented information regarding the scope of its affiliates
and corporate structure, and moreover that the circumstances of
these misrepresentations – in particular Hilltop's failure to
provide a persuasive explanation for the material errors, as
well as its refusal to answer Commerce's follow-up questions
regarding potential as-yet undisclosed affiliates – were such
that Hilltop's remaining representations regarding corporate
ownership and control were not reliable.[7]  Because Commerce had

---

[6] See Ad Hoc Shrimp Trade Action Committee v. United States,
__ CIT __, 925 F. Supp. 2d 1315, 1319-24 (2013) ("Ad Hoc II").

[7] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19
                                        (footnote continued)

initially granted Hilltop separate rate status based solely on these no longer reliable representations, it accordingly determined that Hilltop had failed to submit reliable evidence to rebut the presumption of government control attaching to all exporters covered by this antidumping duty order.[8]  Commerce consequently assigned to Hilltop the 112.81 percent countrywide rate, which was derived from the petition to initiate these proceedings (the "Petition") and last corroborated during Commerce's initial investigation into unfair pricing (the less than fair value or "LTFV" investigation).[9]

Commerce's unreliability determination and decision in the fifth review to assign the PRC-wide rate to Hilltop were affirmed on judicial review.[10]  However, Commerce's (re-

---

(discussing Final Results of Redetermination Pursuant to Court Remand, Ct. No. 11-00335, ECF No. 74 ("AR5 1st Remand Results")).

[8] Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19, 1322-24. Commerce presumes that all exporters from non-market economy ("NME") countries like China operate under government control and hence requires respondents to submit reliable evidence to the contrary in order to receive an antidumping duty rate that is separate from the countrywide entity ("separate rate status"). Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002) (citing Sigma Corp. v. United States, 117 F.3d 1401 (Fed. Cir. 1997) (affirming this practice)).

[9] Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19, 1324-25.

[10] Id. at 1324 (sustaining Commerce's determination to deny separate rate status to Hilltop in the fifth review).

determined) results of the fifth review were remanded for
reconsideration of the corroboration analysis Commerce used to
satisfy itself that the countrywide rate derived from the
Petition had probative value with respect to the likely pricing
behavior of the non-cooperating PRC-wide entity.[11]  Commerce then
revisited its corroboration analysis, the results of which are
one of the matters now before the court.[12]

     Meanwhile, the (revisited) results of the fourth
review – wherein Commerce made essentially identical findings
and conclusions with respect to Hilltop, based on identical
evidence, as it did in the (revisited) fifth review – are also
before the court.[13]  In its redetermination of Hilltop's
antidumping duty assessment rate in the fourth review, Commerce
also revisited its corroboration of the countrywide rate, which

---

[11] Id. at 1326-27. See 19 U.S.C. 1677e(c) (requiring Commerce to
"corroborate" "secondary information," defined as "information
[other than that] obtained in the course of an investigation or
review"); Statement of Administrative Action accompanying the
Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994)
("SAA") at 870 (explaining that "secondary information" includes
"information derived from the petition that gave rise to the
[LTFV] investigation or [subsequent administrative] review," and
further explaining that "corroboration" within the meaning of
Section 1677e(c) requires that Commerce satisfy itself of the
information's "probative value").

[12] See Results of Redetermination Pursuant to Court Remand,
Ct. No. 11-00335, ECF No. 106-1 ("AR5 2d Remand Results").

[13] See Final Results of Redetermination Pursuant to Court Remand,
Ct. No. 10-00275, ECF No. 77-1 ("AR4 Remand Results").

it assigned to Hilltop also in that revisited review.  This
corroboration analysis (as well as the countrywide rate itself)
is identical to that employed pursuant to remand of the results
of the fifth review.[14]  Hilltop now challenges Commerce's
unreliability determination and decision to assign to Hilltop
the PRC-wide rate in the fourth review, as well as Commerce's
corroboration analysis for the countrywide rate in both the
(revisited) fourth and fifth reviews.[15]

### STANDARD OF REVIEW

The court will sustain Commerce's antidumping
determinations, including redeterminations made pursuant to
remand, so long as such determinations are supported by
substantial evidence, are otherwise in accordance with law and,
in the case of redeterminations, are consistent with the court's
remand order. See 19 U.S.C. § 1516a(b)(1)(B)(i); Trust Chem Co.
v. United States, __ CIT __, 819 F. Supp. 2d 1373, 1378 (2012).
Substantial evidence refers to "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion," SKF USA, Inc. v. United States, 537 F.3d 1373, 1378

---

[14] Compare AR4 Remand Results at 29-34, with AR5 2d Remand
Results at 3-7.

[15] Def.-Intervenors' Comments in Opp'n to Final Remand Results,
Ct. No. 10-00275, ECF No. 83 ("Hilltop's AR4 Br."); Def.-
Intervenors' Comments in Opp'n to Final Remand Results,
Ct. No. 11-00335, ECF No. 110 ("Hilltop's AR5 Br.").

(Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197, 229 (1938) (defining "substantial evidence")), and the

substantial evidence standard of review can be roughly

translated to mean "is the determination unreasonable?" Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1351

(Fed. Cir. 2006) (internal quotation and alteration marks and

citation omitted).  "The specific determination we make is

whether the evidence and reasonable inferences from the record

support" Commerce's findings. Daewoo Elecs. Co. v. United

States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation

marks and citation omitted).

**DISCUSSION**

I. Context

In initiating each of these reviews, Commerce

reiterated its policy of assigning to all exporters and

producers from NME countries – including China – a single

countrywide antidumping duty rate unless respondents qualify for

"separate rate status" by affirmatively demonstrating freedom

from government control over export activities.[16]  Also in each

---

[16] See Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China, 74 Fed.
Reg. 13,178, 13,178-79 (Dep't Commerce Mar. 26, 2009) (notice of
initiation of administrative reviews and requests for revocation
in part); Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China, 75 Fed.
(footnote continued)

review, Commerce preliminarily granted Hilltop separate rate
status based on Hilltop's representations that it is located in
Hong Kong (which is treated as a market economy) and that
neither it nor any of its Chinese affiliates are controlled by
any government entity.[17]

Subsequently, however, in the course of the sixth
administrative review, Commerce discovered that Hilltop's part
owner and general manager (To Kam Keung or "Mr. To") had
incorporated, invested significant funds in, and served on the
board of an undisclosed Cambodian affiliate (Ocean King
(Cambodia) Company Limited or "Ocean King").  Hilltop had
repeatedly certified the contrary to Commerce throughout the
prior history of this antidumping duty order.  Not only did
Hilltop fail to disclose this affiliation in its initial
responses to Commerce's inquiries in all segments of this
antidumping proceeding, but Hilltop then also explicitly denied

---

Reg. 18,154, 18,154-55 (Dep't Commerce Apr. 9, 2010) (notice of
initiation of administrative reviews and requests for revocation
in part). See also supra note 8.

[17] See Certain Frozen Warmwater Shrimp from the People's Republic
of China, 75 Fed. Reg. 11,855, 11,858-59 (Dep't Commerce
Mar. 12, 2010) (preliminary results, preliminary partial
rescission of antidumping duty administrative review and intent
to revoke, in part) ("AR4 Prelim. Results"); Certain Frozen
Warmwater Shrimp from the People's Republic of China, 76 Fed.
Reg. 8338, 8341 (Dep't Commerce Feb. 14, 2011) (preliminary
results and preliminary partial rescission of fifth antidumping
duty administrative review) ("AR5 Prelim. Results").

the affiliation's existence when questioned specifically about
Ocean King on multiple occasions.  Only after Commerce obtained
and placed on the record public registration documents showing
Mr. To to have incorporated and invested large sums in Ocean
King did Hilltop concede that, contrary to Mr. To's repeated
affirmations denying any knowledge of an affiliation with or
investment in Ocean King, Hilltop was in fact affiliated with
Ocean King throughout the history of this order.[18]

Hilltop provided no explanation of its failure to
disclose and subsequent repeated denial of its affiliation with
Ocean King beyond a vague statement that the error may have been
due to Mr. To's lack of personal involvement with Ocean King
(despite unequivocal record evidence of his personal involvement
and substantial investment during Ocean King's incorporation),
"or for whatever reason."[19]  Moreover, beyond admitting that

---

[18] See AR6 I & D Mem. at 3-6; AR5 1st Remand Results at 11-13
(relying on Hilltop's representations during the fifth review
and the new evidence from the sixth review); AR4 Remand Results
at 11-13 (relying on Hilltop's representations during the fourth
review and the new evidence from the sixth review). See also Ad
Hoc II, __ CIT __, 925 F. Supp. 2d at 1318, 1321-24 (discussing
the evidence, first placed on record during the sixth review,
that was subsequently added to the record of the fifth (as well
as the fourth) review).

[19] See AR6 I & D Mem. cmt. 1 at 16 (quoting Hilltop's
representation during the sixth review); AR5 1st Remand Results
at 19 (same); AR4 Remand Results at 20 (same). See also Ad Hoc
II, __ CIT __, 925 F. Supp. 2d at 1323 (discussing this
evidence).

which was irrefutably demonstrated by the record evidence,

Hilltop refused to respond to Commerce's follow-up inquiries

regarding possible additional undisclosed affiliations.[20]

In all three administrative review proceedings,

Commerce determined that the circumstances of Hilltop's non-

disclosure, outright denial, and ultimate admission to an

undisclosed affiliation with Ocean King were such that the

agency could no longer rely on Hilltop's prior representations

regarding its corporate structure and freedom from government

control, the accuracy of which had been certified by the same

Mr. To whose credibility was impeached when the record revealed

his personal involvement with Ocean King despite having

repeatedly sworn the contrary to Commerce.[21]  Having found the

representations that had formed the basis for Hilltop's separate

rate status to be undermined, Commerce decided that Hilltop had

failed to affirmatively demonstrate its eligibility for a

separate rate and therefore assigned to Hilltop the countrywide

rate in each of these proceedings. Id.

---

[20] See AR6 I & D Mem. cmt. 1 at 17 & n.80, 18 & n.85; AR5 Remand
Results at 8, 21 & n.83, 44-47; AR4 Remand Results at 8, 21-24.
See also Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1323 & n.35
(discussing the evidence).

[21] See AR6 I & D Mem. cmt. 1 at 16-17; AR5 1st Remand Results
at 17-22 (relying on the new evidence from the sixth review);
AR4 Remand Results at 17-26 (same).

II.  <u>Commerce's Determination to Assign to Hilltop the
     Countrywide Rate in the Fourth and Fifth Reviews</u>

      Commerce may disregard deficient submissions and "use

the facts otherwise available" when a respondent withholds

requested information or otherwise significantly impedes the

administrative review and fails to either explain or adequately

remedy the deficiency. 19 U.S.C. §§ 1677e(a)(2), 1677m(d);

<u>Jiangsu Changbao Steel Tube Co. v. United States</u>, __ CIT __,

884 F. Supp. 2d 1295, 1302 (2012).  Here, Commerce found that

Hilltop's representations regarding its corporate structure,

ownership, and control were deficient because they contained

false information, which Hilltop repeatedly refused to correct

until faced with irrefutable evidence to the contrary.[22]  Because

Hilltop failed to persuasively explain the circumstances

surrounding, or its motivation for, withholding not only that

information to which it was ultimately forced to admit but also

additional requested information regarding its corporate

structure and ownership, Commerce determined to disregard

Hilltop's remaining representations concerning its ownership and

control as unreliable.  <u>Id.</u>

      In the absence of a reliable affirmative demonstration

of freedom from government control through Hilltop's disclosed

_____

[22] <u>See</u> <i>supra</i> note 18. <u>See also</u> <u>AR6 I & D Mem.</u> cmt. 1 at 12-17;
<u>AR5 Remand Results</u> at 16-22; <u>AR4 Remand Results</u> at 16-26.

and possibly additional undisclosed Chinese affiliates,[23]
Commerce presumed – as it does with respect to all NME
respondents who fail to demonstrate freedom from government
control[24] – that Hilltop was part of the countrywide entity.[25]

In its challenge, Hilltop argues, first, that Commerce
improperly disregarded those of Hilltop's representations that
formed the basis for its separate rate status in the fourth
review[26] because Hilltop's non-disclosure of an affiliation with
Ocean King was immaterial, asserting that Ocean King was not
involved in the production of subject merchandise during the
POR.[27]  Although record evidence indicates that Ocean King was
likely involved in the repackaging and re-export of shrimp
subject to U.S. antidumping duties,[28] suggesting at least the

---

[23] See *supra* note 20 (citing to Commerce's discussion of
Hilltop's refusal to respond to the agency's follow-up inquiries
regarding possible additional undisclosed affiliations).

[24] See *supra* note 8.

[25] See *supra* note 21.

[26] Note that Commerce's decision to disregard the representations
that had formed the basis for Hilltop's separate rate status in
the fifth review was sustained in Ad Hoc II, __ CIT __,
925 F. Supp. 2d at 1324.

[27] See Hilltop's AR4 Br. at 7-20.

[28] See, e.g., Ex. 1 to Ad Hoc Shrimp Trade Action Committee's
Comments on [Commerce's] Preliminary Determination to Grant
Hilltop's Request for Company-Specific Revocation Pursuant to
19 C.F.R. 351.222(b)(2) and Comments in Anticipation of
Hilltop's Forthcoming Verification, A-570-893, ARP 10-11
                                        (footnote continued)

possibility of additional undisclosed involvement in the

production and sale of subject merchandise, Commerce did not

make (and need not have made) a finding that Ocean King was in

fact so involved.  Contrary to Hilltop's characterizations,

Commerce's decision to invalidate Hilltop's separate rate

representations as unreliable was not based on a definitive

finding of transshipment, but rather on the impeachment of

Hilltop's credibility as a consequence of evidence reasonably

indicating that Hilltop deliberately withheld and misrepresented

information requested of it, which misrepresentation may

reasonably be inferred to pervade the data in the record beyond

that which Commerce has positively confirmed as misrepresented.[29]

        Thus the material information that Commerce ultimately

found to be missing from the record was a reliably accurate

---

(Mar. 12, 2012), reproduced in, e.g., App. of Docs. Supporting
Def.'s Resp. Comments Regarding Remand Results,
Ct. No. 10-00275, ECF No. 110-4 at Tab 9, at Attachs. 14
(internal emails discussing whether shrimp sent to Ocean King
from the Socialist Republic of Vietnam (which, like the subject
merchandise from China, were also subject to U.S. antidumping
proceedings) should "reuse all white cartons of Vietnam and
stick MC labels in Cambodia" or instead "print new master
cartons for Cambodia origin products" rather than "sticker[ing]
over Product of Vietnam cartons"), 19 (internal email in which
Mr. To discusses Ocean King's establishment) and 20 (internal
email cautioning Mr. To that Hilltop's predecessor-in-interest
"cannot have any Involve [sic] or any paper related! [to Ocean
King]").

[29] See supra note 18.

representation of Hilltop's corporate structure and the extent

of government control potentially exercised through its Chinese

affiliates.[30]  Because the accuracy of all representations in

this regard was certified by Mr. To, who also certified the

accuracy of repeated false statements in response to direct

inquiries regarding Ocean King, Commerce reasonably discredited

these representations as unreliable.[31]  Commerce repeatedly

requested Hilltop to provide information specifically about its

affiliation with Ocean King, which Hilltop repeatedly falsely

---

[30] See *supra* note 22.

[31] See AR6 I & D Mem. cmt. 1 at 12. ("Because Hilltop repeatedly
made material misrepresentations with regard to its
affiliations, while certifying to the accuracy of such false
information, and because Hilltop refused our repeated requests
for information that was relevant to our analysis, we find that
we cannot rely on any of the information submitted by Hilltop in
this review."); AR5 1st Remand Results at 23-24 (same);
AR4 Remand Results at 28 (same). Cf. Changbao, __ CIT at __,
884 F. Supp. 2d at 1309 (holding that, to the extent that a
respondent's submissions contain solely representations made by
that respondent, the conclusion that such representations are
unreliable follows logically from Commerce's finding that the
company officer(s) who certified the accuracy of such
representations were themselves unreliable sources of truthful
and accurate information).
     While Hilltop emphasizes independent record evidence that
it is registered in Hong Kong, see, e.g., Hilltop's AR4 Br.
at 24-33 (relying on evidence of Hilltop's Hong Kong Business
License and Hilltop's Hong Kong Business Registration Form),
Hilltop's registration in Hong Kong is not in itself dispositive
because it does not address the potential for government control
through Hilltop's disclosed and possibly additional undisclosed
PRC affiliates. Ad Hoc II __ CIT at __, 925 F. Supp. 2d at 1324
n.39.

denied.[32]  The material information that was withheld, therefore,

is not merely the undisclosed affiliation with Ocean King, but

also all other complete and accurate information which Hilltop

failed to provide in response to Commerce's repeated attempts at

clarification until Hilltop finally was faced with irrefutable

evidence to the contrary.[33]

Similarly, Hilltop also argues that Commerce

improperly discredited the totality of Hilltop's representations

regarding corporate ownership and government control based on

Hilltop's concealment of an affiliation with Ocean King because

this affiliation did not concern a "core," rather than purely

"tangential," area of Commerce's antidumping analysis.[34]  But

---

[32] See AR6 I & D Mem. at 3-4; see also supra note 18.

[33] Cf. Changbao, ___ CIT at ___, 884 F. Supp. 2d at 1306 ("It is reasonable for Commerce to infer that a respondent who admits to having intentionally deceived Commerce officials, and does so only after Commerce itself supplies contradictory evidence, exhibits behavior suggestive of a general willingness and ability to deceive and cover up the deception until exposure becomes absolutely necessary. . . .  [I]n the absence of additional reassurance or an explanation sufficient to rehabilitate [the respondent]'s damaged credibility, Commerce ha[s] no way of knowing whether or not [the respondent] may have been less than straightforward with regard also to its remaining submissions and representations . . . .").

[34] Hilltop's AR4 Br. at 20-24 (relying on Shanghai Taoen Int'l Trading Co. v. United States, 29 CIT 189, 199 n.13, 360 F. Supp. 2d 1339, 1348 n.13 (2005); Foshan Shunde Yongjian Housewares & Hardware Co. v. United States, No. 10-00059, 2011 WL 4829947 (CIT Oct. 12, 2011)). See Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13 (holding that where Commerce finds

(footnote continued)

again, this is not a case of inadvertent omission of tangential

information.  Hilltop did not merely omit an affiliation in its

initial accounting to Commerce.  First, Hilltop misrepresented

its corporate structure – stating that none of its managers held

any positions or investments in any undisclosed firm when its

part owner and general manager was in fact a board member and

shareholder at Ocean King, an undisclosed affiliate.[35]  And then

Hilltop additionally and explicitly denied numerous subsequent

inquiries regarding this undisclosed affiliation, repeatedly

certifying to Commerce that it had no additional affiliations,

and even specifically stating that "Hilltop is not affiliated

with Ocean King" and that "neither the company, nor its owners

or officers, invested any funds in Ocean King."[36]  In reality, as

---

a respondent to be not credible with regard to "core, not
tangential" information, the agency may reasonably disregard the
totality of information submitted by the discredited respondent
because "there is little room for substitution of partial
facts"); Foshan, 2011 WL 4829947 at *14 (holding that Commerce
reasonably determined to disregard the entirety of a
respondent's factors of production and sales information where
inaccuracies with respect to "core, not tangential" information
pervaded the respondent's responses to Commerce's inquiries)
(quoting Since Hardware (Guangzhou) Co. v. United States,
No. 09-00123, 2010 WL 3982277, at *7 (CIT Sept. 27, 2010)
(quoting Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d at
1348 n.13)).

[35] See *supra* note 18.

[36] Hilltop's Reply to Pet'rs' Resp. to CBP Import Data,
A-570-893, ARP 10-11 (May 31, 2012) at 6, reproduced in, e.g.,
Public App. to Pl. Ad Hoc Shrimp Trade Action Committee's Reply
                                            (footnote continued)

Hilltop was eventually forced to admit, Hilltop's part owner and
general manager – the same person who certified the accuracy of
all of Hilltop's submissions in these reviews[37] – was both a
board member and substantial shareholder in Ocean King during
all three periods of review.[38]

        Also contrary to Hilltop's contentions, the Cambodian
location of Ocean King and Commerce's silence regarding whether
there were any entries of shrimp from Cambodia during the
relevant time periods do not make Hilltop's false statements
"tangential" rather than "core."  What places Hilltop's false
statements at the core of Commerce's analysis is that Mr. To
repeatedly certified the accuracy of Hilltop's representations
regarding its corporate structure while either knowing that
these representations were false or else exhibiting gross
negligence in failing to keep himself informed as to the nature
and extent of his company's affiliations.  Whether through
fraudulent concealment of the truth or through negligent
inability to be informed of the relevant facts, Mr. To's
certifications regarding the accuracy of the corporate structure

---

to Comments on Final Results of Redetermination Pursuant to Ct.
Remand, Ct. No. 10-00275, ECF No. 108-1 at Tab 12.

[37] See AR6 I & D Mem. cmt. 1 at 16; AR5 1st Remand Results at 19-
20; AR4 Remand Results at 20.

[38] See supra note 18.

represented in the submissions whose accuracy he certified are
no longer reliable.  Rather than reflecting a tangential matter,
these circumstances clearly concern the core of the accuracy and
reliability of Hilltop's remaining statements to Commerce
regarding its corporate structure, which had formed the basis
for Commerce's preliminary separate rate determinations.[39]
Having discredited these statements as unreliable, Commerce
reasonably concluded that the record presented no reliable
evidence of Hilltop's freedom from presumed government control
and therefore reasonably assigned Hilltop the countrywide rate.
See Transcom, 294 F.3d at 1373; Changbao, __ CIT at __,
884 F. Supp. 2d at 1309-12.

        Accordingly, Commerce's determination to assign to
Hilltop the PRC-wide antidumping duty assessment rate in the
fourth review is sustained on the same grounds as those
supporting the court's affirmance of Commerce's identical
determination in the revised results of the fifth review. See Ad
Hoc II, __ CIT __, 925 F. Supp. 2d at 1319-24.

III. Corroboration of the PRC-wide Rate Assigned to Hilltop in
     the Fourth and Fifth Reviews

     A. AR5 Remand Order

        Although the court sustained Commerce's decision to

---

[39] See supra note 17.

apply the countrywide rate to Hilltop in the fifth review,

Commerce's corroboration of this PRC-wide rate – which had

initially been based on data from the LTFV investigation and, in

the absence of evidence rebutting the presumption of continued

validity, see KYD, Inc. v. United States, 607 F.3d 760, 767

(Fed. Cir. 2010)[40], carried over into every subsequent review –

was remanded because the margin calculations on which Commerce's

original corroboration was based were subsequently altered

pursuant to judicial review, ultimately reducing the comparison

margins. See Ad Hoc II, __ CIT at __, 925 F. Supp. 2d at 1325-

27.  The court required that, "[o]n remand, Commerce must either

adequately corroborate the 112.81 percent rate and explain how

---

[40] (discussing "[t]he presumption that a prior dumping margin
imposed against an exporter in an earlier administrative review
continues to be valid if the exporter fails to cooperate in a
subsequent administrative review"); see also id. at 766
("Commerce is permitted to use a 'common sense inference that
the highest prior margin is the most probative evidence of
current margins because, if it were not so, the importer,
knowing of the rule, would have produced current information
showing the margin to be less.'") (quoting Rhone Poulenc, Inc.
v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (emphasis
in original)) (also quoting Ta Chen Stainless Steel Pipe, Inc.
v. United States, 298 F.3d 1330, 1339 (Fed. Cir. 2002) ("In
cases in which the respondent fails to provide Commerce with the
most recent pricing data, it is within Commerce's discretion to
presume that the highest prior margin reflects the current
margins.")); AR4 Prelim. Results, 75 Fed. Reg. at 11,859 ("For
the China-wide entity, we have assigned the entity's current
rate and the only rate ever determined for the entity in this
proceeding.") (unchanged in AR4 Final Results, 75 Fed. Reg. at
49,463); AR5 Prelim. Results, 76 Fed. Reg. at 8342 (same)
(unchanged in AR5 Final Results, 76 Fed. Reg. at 51,942).

its corroboration satisfies the requirements of 19 U.S.C.

1677e(c), or else calculate or choose a different countrywide

rate that better reflects commercial reality, as supported by a

reasonable reading of the record evidence." Id. at 1327.

> B. *The Corroboration Analysis in the* AR5 2d Remand
> Results *and* AR4 Remand Results

In its remand proceedings concerning the fourth and

fifth reviews, Commerce revisited its corroboration of the PRC-

wide rate. Acknowledging that the margins used to initially

corroborate this rate in the LTFV investigation (which

corroboration analysis was then relied upon in all subsequent

reviews) were altered following judicial review, Commerce

employed record data that were recalculated to reflect any

changes that were made pursuant to litigation. AR5 2d Remand

Results at 8; AR4 Remand Results at 35.[41] Specifically, Commerce

employed a file that was created in connection with a recent

Section 129 proceeding,[42] implementing the outcome of dispute

---

[41] The data were also recalculated "to allow offsets for non-
dumped sales," pursuant to the outcome of dispute settlement
before the World Trade Organization's ("WTO") Dispute Settlement
Body ("DSB"). Id.

[42] "Section 129" refers to proceedings undertaken in response to
a decision by the WTO's DSB that some particular determination
by a U.S. trade agency was not consistent with the United
States' obligations as a Member of the WTO's Antidumping and/or
Subsidies and Countervailing Measures Agreements. See 19 U.S.C.
§ 3538(b); see generally Andaman Seafood Co. v. United States,
__ CIT __, 675 F. Supp. 2d 1363, 1370-72 (2010) (discussing the
(footnote continued)

settlement proceedings at the WTO.  This file (the "Red Garden

Margin File") lists every CONNUM-specific margin[43] calculated for

Shantou Red Garden Foodstuff Company ("Red Garden"), who was a

mandatory respondent in the LTFV investigation and sold the

highest volume of sales during the period of investigation

("POI").[44]  But while the Red Garden Margin File was created

using the data submitted by Red Garden in the LTFV

investigation, the CONNUM-specific margin calculations reflect

the adjustments necessitated by judicial review.[45]

 Analyzing these CONNUM-specific margins for the

---

mechanism and legal effect of Section 129 proceedings).

[43] In antidumping proceedings, different control numbers
("CONNUMs") are used "to identify the individual models of
products for matching purposes." AR5 2d Remand Results at 5
n.18.  "Identical products are assigned the same CONNUM in both
the comparison market sales database (or in a non-market economy
context, the factors of production database) and U.S. sales
database." Id. (citing Ch. 4 of the Antidumping Manual
(Oct. 13, 2009) at 10).  "CONNUM-specific margins result in
calculated margins that represent the pricing behavior related
to groups of sales," grouped by model type. Id. at 13.

[44] Although Commerce had previously stated that a different
respondent had sold the highest volume of subject merchandise
during the POI, Commerce has revisited the evidence and
determined that in fact Red Garden had the highest volume of
sales during the POI. AR5 2d Remand Results at 6 n.22.  No party
challenges this determination.

[45] See AR5 2d Remand Results at 8; AR4 Remand Results at 35;
Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1326 (discussing the
legal actions that ultimately resulted in revisions to the
dumping margins initially calculated by Commerce in the LTFV
investigation).

largest exporter of subject merchandise during the POI,[46]
Commerce found that, "despite the reduction of calculated
weighted-average margins subsequent to litigation, a significant
quantity and value of CONNUM-specific margins higher than
[112.81 percent] remain for at least one respondent [i.e., Red
Garden]." AR5 2d Remand Results at 13; AR4 Remand Results at 40.
Specifically, Commerce found that "more than half of the CONNUMs
examined in Red Garden's margin calculation had positive margins
[and,] [o]f those CONNUMs with positive margins, . . . the
percentage with dumping margins exceeding 112.81 percent[[47]] is
sufficient to demonstrate the probative value of the lowest
Petition margin of 112.81 percent." AR5 2d Remand Results
at 6-7; AR4 Remand Results at 34.  In addition, Commerce found
that, by quantity, "CONNUMs accounting for a significant volume
of merchandise under consideration were sold at prices that

----

[46] In addition to being the largest exporter of subject
merchandise by volume during the POI, Commerce found that "Red
Garden's margins are relevant for purposes of corroboration of a
margin based on information from the Petition" because "Red
Garden produced merchandise under consideration using all
[factors of production ("FOPs")] described in the Petition and
under the same production standards as the Petition." AR5 2d
Remand Results at 6; see also AR4 Remand Results at 33-34
(same).

[47] [[    ]] percent. See Attach. 1 to AR4 Remand Results
(Business Proprietary Mem. for Red Garden, A-570-893, ARP 08-09
(Sept. 26, 2013), ("Red Garden BPI Mem.")), Ct. No. 10-00275,
ECF No. 78-1, at 2; Attach. I to AR5 2d Remand Results,
Ct. No. 11-00335, ECF No. 107-1 (same).

resulted in margins which exceeded 112.81 percent." <u>AR5 2d</u>
<u>Remand Results</u> at 7; <u>AR4 Remand Results</u> at 34.[48]

      Based on these findings, Commerce concluded that "the
Petition rate continues to be relevant to this investigation,
even after taking into account subsequent changes to the
original calculations pursuant to remand redetermination, and
the rate to be corroborated [in] this [proceeding]." <u>Id.</u>
Accordingly, finding "no other information that would call into
question the reliability of that [Petition-based] rate," <u>AR5 2d</u>
<u>Remand Results</u> at 14; <u>AR4 Remand Results</u> at 41,[49] Commerce
concluded that "the commercial reality" – i.e., that a
significant quantity and value of CONNUMs were sold by a

---

[48] Specifically, Commerce found that CONNUMs accounting for
[[      ]]kg of subject merchandise were sold at prices that
resulted in margins exceeding 112.81 percent. <u>Red Garden BPI</u>
<u>Mem.</u> at 2.  In concluding that this amount accounted for a
significant volume of merchandise under consideration, Commerce
noted that a total sales volume reflecting this amount "would
have ranked Red Garden ahead of [[  ]] other companies at the
respondent selection phase of this investigation." <u>Id.</u>;
<u>see also</u> <u>LTFV Final Results</u>, 69 Fed. Reg. at 70,998 (referring
to a total of 58 respondents in the LTFV investigation – four
mandatory respondents, 53 respondents who requested a separate
rate, and the composite PRC-wide entity).

[49] Commerce also noted that Hilltop, who objects to the agency's
corroboration analysis in the <u>AR5 2d Remand Results</u> and the <u>AR4</u>
<u>Remand Results</u> (as discussed below) has offered no new credible
information that would rebut the presumption that a reliable
rate from a prior segment retains its reliability in subsequent
segments, absent rebutting evidence. <u>Id.</u>; <u>cf.</u> <u>KYD</u>, 607 F.3d
at 767 (discussing this presumption).

cooperating separate rate respondent at prices that resulted in

antidumping margins exceeding 112.81 percent – confirmed "the

continued reliability of the 112.81 percent rate and relevance

to the PRC-wide entity as a whole." Id.[50]  On the basis of this

analysis, Commerce concluded that the 112.81 percent PRC-wide

rate "has probative value." AR5 2d Remand Results at 7;

AR4 Remand Results at 34; cf. SAA at 870 (linking

"corroboration" to an evaluation of "probative value").

     *C. Discussion*

          Hilltop challenges Commerce's corroboration of the

112.81 percent PRC-wide rate assigned to it in the fourth and

fifth reviews.[51]  Specifically, Hilltop challenges the

_____

[50] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1325 ("Commerce
correctly posits that the PRC-wide rate need not be corroborated
with respect to each particular respondent who, like Hilltop, is
found to form a part of the PRC-wide entity and thus to be
subject to the PRC-wide rate.") (citing Peer Bearing Co. –
Changshan v. United States, 32 CIT 1307, 1313, 587 F. Supp. 2d
1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide
entity rate . . . relate specifically to the individual company.
. . . [This] rate must be corroborated according to its
reliability and relevance to the countrywide entity as a
whole.") (citation omitted); Shandong Mach. Imp. & Exp. Co. v.
United States, 33 CIT 810, 816 (2009) (not reported in the
Federal Supplement) (explaining that Commerce has no obligation
to corroborate the PRC-wide rate as to an individual party where
that party has failed to qualify for a separate rate)).

[51] Hilltop's AR4 Br. at 47-55; Hilltop's AR5 Br. at 3-12.  The
like domestic industry's party to this proceeding – the Ad Hoc
Shrimp Trade Action Committee – does not object to the agency's
corroboration analysis. See, e.g., [AHSTAC]'s Reply to Comments
on Final Results of Determination Pursuant to Court Remand, Ct.
(footnote continued)

methodology Commerce employed to corroborate the country-wide

rate, arguing that 1) Commerce's reliance on sales data from a

single respondent, without comparing such data to the documented

pricing behavior of other respondents, was unreasonable[52];

2) Commerce's reliance on a single respondent's subset of

CONNUM-specific margins (those at or exceeding 112.81 percent)

unreasonably cherry picks only those transactions that support

an affirmative corroboration, while ignoring the remaining

transactions that do not[53]; and 3) Commerce's reliance on data

from the LTFV investigation to corroborate the countrywide rate

applied in the fourth and fifth administrative reviews

unreasonably presumes that pricing data from the LTFV

investigation remain probative with respect to the later review

---

No. 11-00335, ECF No. 118, at 4-19 (arguing in support of
Commerce's corroboration analysis).

[52] See Hilltop's AR4 Br. at 49 (emphasizing the documented
pricing behavior of cooperative separate rate respondents
throughout the history of this antidumping duty order);
Hilltop's AR5 Br. at 6 (same); see also Hilltop's AR4 Br. at 51
(arguing that Commerce should have compared Red Garden's data to
"additional margin data from other respondents"); Hilltop's
AR5 Br. at 8 (same).

[53] See Hilltop's AR4 Br. at 49-50 (arguing that the quantity,
value, and volume of POI sales made at or exceeding a
112.81 percent dumping margin were not sufficiently significant
to support an inference of commercial reality for the
countrywide entity); Hilltop's AR5 Br. at 6-7 (same). Cf. *supra*
note 48 (discussing the volume of subject merchandise sold by
Red Garden at or exceeding a 112.81 percent dumping margin).

periods.[54]

> 1. Commerce's Decision to Rely Solely on Red Garden's Data

As explained above, Commerce examined all CONNUM-specific margins calculated for the largest exporter of subject merchandise by volume during the POI.  These CONNUM-specific margin calculations do not suffer from the defects previously identified by the court with regard to the comparison data initially used by the agency to corroborate the countrywide rate in the LTFV investigation and in every segment of this antidumping proceeding thereafter.[55]  Hilltop argues that Commerce unreasonably looked solely at Red Garden's data, without comparing such data to the pricing behavior of other respondents.[56]  In response, Commerce argues that the analysis it employed to corroborate the probative value of the lowest Petition-based rate for the PRC-wide entity "was the same well-established methodology employed in the original investigation and many other proceedings." AR5 2d Remand Results at 13; AR4 Remand Results at 40.[57]

---

[54] See Hilltop's AR4 Br. at 48; Hilltop's AR5 Br. at 5.

[55] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1326.

[56] See Hilltop's AR4 Br. at 51; Hilltop's AR5 Br. at 8.

[57] See also AR5 2d Remand Results at 4-5 (describing the identical methodology initially used to corroborate the countrywide Petition-based rate in the LTFV investigation,

(footnote continued)

To "corroborate" "secondary information" (including, as here, information derived from the Petition), Commerce must satisfy itself that the information has "probative value." See SAA at 870.  The corroboration requirement ensures that antidumping duty rates calculated for non-cooperative respondents present "a reasonably accurate estimate of the respondent's actual [dumping] rate, albeit with some built-in increase intended as a deterrent to non-compliance."[58]  In particular, while "the statute explicitly allows for use of the 'the petition' to determine relevant facts when a respondent does not cooperate," De Cecco, 216 F.3d at 1032 (quoting 19 U.S.C. § 1677e(b)), "Commerce may not use the petition rate to establish the dumping margin when its own investigation reveal[s] that the petition rate was not credible." Gallant, 602 F.3d at 1323 (relying on De Cecco, 216 F.3d at 1033).

In reviewing the results of LTFV investigations involving merchandise from market economies, for example, the courts have rejected Commerce's use of the petition rate for

---

although the agency initially used data from a different respondent, who at the time had been (erroneously) deemed to be the largest exporter by volume, see id. at 6 n.22); AR4 Remand Results at 31-32 (same).

[58] Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (quoting F.lli De Cecco Di Filippo Fara S. Martino, S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

non-cooperating respondents when the dumping margins actually
calculated for similarly-situated cooperating respondents are
much lower than the margins alleged in the petition.[59]  But where
(as here) the non-cooperating respondent is a NME countrywide
entity – definitionally presumed to set prices without regard to
market conditions[60] – the actual pricing behavior of the
cooperative respondents that have demonstrated eligibility for a
separate rate (precisely because they have differentiated
themselves from the countrywide entity) does not bear upon the
credibility of dumping allegations against the NME countrywide
entity in the way that the pricing behavior of cooperative
market economy respondents reflects on the credibility of
dumping allegations against their similarly-situated market

---

[59] See Gallant, 602 F.3d at 1323-24 ("Commerce calculated the
[57.64 percent non-cooperative respondent's] rate based on the
highest dumping margin alleged in the petition.  The fact that
Commerce ultimately imposed dumping margins between 5.91 percent
and 6.82 percent for the same products after its initial
investigation shows the possession of better information and
shows that the adjusted petition rate was aberrational.");
De Cecco, 216 F.3d at 1032-34 (affirming the Court of
International Trade's holding that Commerce may not rely on a
46.67 percent petition-based rate for a non-cooperating
respondent because Commerce's investigation had ultimately
resulted in dumping margins ranging from 0.67 percent to 2.80
percent for similarly situated respondents).

[60] See 19 U.S.C. § 1677(18)(A) ("The term 'nonmarket economy
country' means any foreign country that [Commerce] determines
does not operate on market principles of cost or pricing
structures . . . .").

participants.  Simply put, the NME countrywide entity is, by
definition, not similarly-situated to the cooperative separate
rate respondents.[61]  For while the pricing behavior of the
cooperative respondents may be relevant to the commercial
reality of non-cooperating exporters from a *market* economy –
constrained as such exporters are by the market forces of
competition – no analog exists in the NME context, where the
countrywide government entity is presumed to act unimpeded by
such forces.  In the NME context, therefore, the inference that
the countrywide entity as a whole may be dumping at margins
significantly above the cooperating separate rate market
participants is not unreasonable.[62]

     Another critical aspect of the evidentiary record
presented here is that the countrywide rate at issue was not
only the rate applied to the PRC-wide entity in the initial LTFV
investigation, but has also been the rate applied to that entity
in at least five subsequent administrative reviews.  Cf. KYD,

---

[61] See, e.g., AR5 Prelim. Results, 76 Fed. Reg. at 8342 ("We
consider the influence that the government has been found to
have over the economy to warrant determining a rate for the
entity that is distinct from the rates found for companies that
have provided sufficient evidence to establish that they operate
freely with respect to their export activities.").

[62] Cf. Hilltop's AR4 Br. at 48-50 (comparing the countrywide rate
to rates calculated for cooperative separate rate respondents
throughout the history of this antidumping duty order);
Hilltop's AR5 Br. at 5-7 (same).

607 F.3d at 767 (distinguishing <u>Gallant</u> and, by analogy,
<u>De Cecco</u>, because "the presumption that a prior dumping margin
imposed against an exporter in an earlier administrative review
continues to be valid if the exporter fails to cooperate in a
subsequent review" was not at play in those cases).  As the
Court of Appeals for the Federal Circuit explained, "it [is]
reasonable for Commerce to conclude, given [a respondent's]
refusal to cooperate in the [subsequent] administrative review
[or, as here, in the next *five* such reviews], that [such
respondent] had not altered its past pricing practices and that
its previous rate is reflective of its current pricing
practices." <u>Id.</u> at 764 (internal quotation marks omitted).

Here, as in <u>KYD</u>, the PRC-wide entity's failure to
cooperate in these reviews "deprived Commerce of the most direct
evidence of [the PRC-wide entity's] actual dumping margin."
<u>See</u> <u>KYD</u>, 607 F.3d at 767.  But also as in <u>KYD</u>, "Commerce was
able to fill that evidentiary gap by looking to high-volume
[CONNUM]-specific margins for [a] cooperative compan[y] that
were higher than and close to the [112.81] rate, from which
Commerce concluded that that [this] margin does not lie outside
the realm of actual selling practices." <u>Id.</u> (internal quotation
marks omitted).[63]  Commerce reasoned that if a significant

---

[63] <u>See</u> *supra* note 48 (discussing the volume of subject
(footnote continued)

percentage of the largest cooperating respondent's sales, by both quantity and volume, were sold at or above the 112.81 percent dumping rate, then it is reasonable to conclude "that a non-responsive, or uncooperative, respondent could have made all of its sales at the same rate." AR5 2d Remand Results at 14; AR4 Remand Results at 41.  This is a reasonable approach that, by its terms, does not require any analysis of data beyond that of the largest cooperative respondent.  Hilltop has not submitted any data or analysis that refutes the inferences Commerce draws from this data.  Accordingly, Commerce did not act unreasonably when it determined to limit the data used in its corroboration analysis to that contained in the Red Garden Margin File.[64]

> 2. Commerce's Determination that the Evidence
>    Sufficiently Corroborates the Countrywide Rate from
>    the LTFV Investigation

Next, Hilltop challenges Commerce's corroboration methodology in so far as it relies on CONNUM-specific margins, arguing that doing so permits the agency to cherry pick the

---

merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

[64] Cf. KYD, 607 F.3d at 764-68 (affirming corroboration of 122.88 percent Petition-based rate, despite the low margins (ranging from 0.80 percent to 1.87 percent) calculated for other respondents, because that rate was supported by 1) evidence submitted with the petition; 2) high-volume transaction-specific margins for cooperative companies at or above that rate; and 3) "the presumption that an exporter's prior margin continues to be valid if the exporter fails to cooperate in a subsequent proceeding").

transactions that support affirmative corroboration, while ignoring those that do not. But as Commerce explains, "CONNUM-specific [i.e., model-specific] margins result in calculated margins that represent the pricing behavior related to groups of sales, rather than individual sales, and, consequently, do not result from cherry picking of individual transactions." AR5 2d Remand Results at 13; AR4 Remand Results at 40.[65] Moreover, the percentage of Red Garden's sales made at prices resulting in dumping margins at or exceeding 112.81 percent covered a volume of subject merchandise sufficiently significant to support a reasonable inference that this rate is probative of the non-cooperating countrywide entity's actual pricing behavior.[66]

> 3. Commerce's Determination that the LTFV
>    Investigation's Countrywide Rate Remains Probative
>    for the Fourth and Fifth Reviews

Finally, Hilltop argues that Commerce's corroboration analysis is flawed because it relies on data from the LTFV investigation to corroborate a rate applied in later review periods. But Hilltop ignores judicial precedent holding that the continued reliability and relevance of data from prior segments of an antidumping proceeding is presumed absent

---

[65] See also supra note 43 (explaining CONNUM-specific margins).

[66] See supra note 48 (discussing the volume of subject merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

rebutting evidence. KYD, 607 F.3d at 764-68 (discussing cases).

        The rate applied to the PRC-wide entity throughout the
history of this antidumping duty order was calculated in the
underlying LTFV investigation.[67]  It was the lowest of a range of
rates calculated using information derived from the Petition.[68]
To satisfy itself that this rate had probative value regarding
the non-cooperating PRC-entity's actual pricing behavior,
Commerce evaluated the supporting evidence and also compared
this rate to the model-specific dumping margins calculated for a
cooperating respondent who produced its merchandise using all of
the same factors of production and under the same production
standards as the Petition.[69]  Based on this analysis, Commerce
concluded that, because a significant percentage of the quantity
and value of this cooperating respondent's sales represented
prices at or above the lowest Petition dumping margin of 112.81

---

[67] See Certain Frozen and Canned Warmwater Shrimp from the
People's Republic of China, 69 Fed. Reg. 70,997, 71,003 (Dep't
Commerce Dec. 8, 2004) (notice of final determination of sales
at less than fair value) ("LTFV Final Results") (assigning
112.81 percent as the PRC-wide rate).

[68] Certain Frozen and Canned Warmwater Shrimp from the People's
Republic of China, 69 Fed. Reg. 42,654, 42,662 (Dep't Commerce
July 16, 2004) (notice of preliminary determination of sales at
less than fair value) (unchanged in the final determination,
69 Fed. Reg. at 71,003).

[69] See, e.g., AR4 Remand Results at 31-32 (describing the initial
corroboration of the PRC-wide rate during the LTFV
investigation).

percent, that margin had probative value regarding the likely

pricing behavior of the non-cooperating PRC-wide entity as a

whole.  Now, having revisited its calculations to implement the

outcome of judicial review, Commerce continues to draw the same

reasonable conclusions from the (revised) evidence.[70]

Hilltop has presented no new evidence to suggest that

the Petition-based countrywide rate, as corroborated using

(appropriately recalculated) contemporaneous data from the

largest cooperating respondent during the POI, has lost its

probative value. See AR5 Remand Results at 14 (citing KYD, 607

F.3d at 767); AR4 Remand Results at 41 (same); see also SAA

at 870 (linking "corroboration" to "probative value").  While

Commerce has assigned this rate to the PRC-wide entity

throughout the entire history of this antidumping duty order –

including in three prior reviews before the two reviews now at

issue – neither the PRC-wide entity nor any other respondent has

come forward with any more accurate information.  Accordingly,

in addition to corroborating the probative value of this rate by

examining the evidence submitted along with the Petition from

which it is derived and the pricing behavior of the largest

cooperating exporter during the POI, Commerce reasonably

inferred that the PRC-wide margin assigned in the prior segments

---

[70] See *supra* notes 46-48.

of this antidumping proceeding "is the most probative evidence

of current margins because, if it were not so, the importer,

knowing of the rule, would have produced *current* information

showing the margin to be less." <u>KYD</u>, 607 F.3d at 766 (emphasis

in original) (internal quotation marks and citation omitted).[71]

### CONCLUSION

For all of the foregoing reasons, Commerce's <u>AR5 2d</u>

<u>Remand Results</u> and the <u>AR4 Remand Results</u> are each sustained.

Judgments will issue accordingly.

                                    /s/ Donald C. Pogue
                                    Donald C. Pogue, Chief Judge

Dated: May 20, 2014
       New York, NY

---

[71] <u>See also</u> *supra* note 64 (noting the similarity of this case to
the facts in <u>KYD</u>).

Slip Op. 13 - 93

UNITED STATES COURT OF INTERNATIONAL TRADE

```
+---------------------------------------+
| AD HOC SHRIMP TRADE ACTION            |
| COMMITTEE,                            |
|                                       |
|         Plaintiff,                    |
|                                       |
|             v.                        |
|                                       |
| UNITED STATES,                        |
|                                       |
|         Defendant,                    |
|                                       |
|             and                       |
|                                       |
| HILLTOP INTERNATIONAL and OCEAN       |
| DUKE CORP.,                           |
|                                       |
|         Defendant-Intervenors.        |
+---------------------------------------+
```

Before: Donald C. Pogue,
Chief Judge

Court No. 11-00335

OPINION

[final results of redetermination on remand affirmed in part and remanded in part]

Dated: July 23, 2013

Andrew W. Kentz, Jordan C. Kahn, Nathaniel Maandig Rickard and Nathan W. Cunningham, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. With him on the brief were Stuart Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Melissa M. Brewer, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Mark E. Pardo and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for the Defendant-Intervenors.

   **Pogue, Chief Judge:**  This action arises from the fifth
administrative review of the antidumping duty order covering
certain frozen warmwater shrimp from the People's Republic of
China ("China" or the "PRC").[1]  In prior proceedings, the court
remanded certain aspects of the agency decision in this review
for further consideration.[2]  While remand was pending, the United
States Department of Commerce ("Commerce"), by motion, sought
permission to reopen the administrative record to consider new
evidence suggesting that the antidumping duty assessment rate
calculated in this review for respondent Hilltop International
("Hilltop") – a Defendant-Intervenor in this action – may have
been based on information that was false or incomplete.[3]  Because
Commerce's request to expand the scope of remand was based on a
substantial and legitimate concern, the motion was granted.[4]

---

[1] See Certain Frozen Warmwater Shrimp from the People's Republic
of China, 76 Fed. Reg. 51,940 (Dep't Commerce Aug. 19, 2011)
(final results and partial rescission of antidumping duty
administrative review) ("Final Results") and accompanying Issues
& Decision Mem., A-570-893, ARP 09-10 (Aug. 12, 2011).

[2] Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __,
882 F. Supp. 2d 1366 (2012).

[3] Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __,
882 F. Supp. 2d 1377, 1379 (2013).

[4] Id. at 1381-82 (relying on SKF USA Inc. v. United States,
254 F.3d 1022, 1029 (Fed. Cir. 2001); Shakeproof Assembly
Components Div. of Ill. Tool Works, Inc. v. United States,
29 CIT 1516, 1522-26, 412 F. Supp. 2d 1330, 1336-39 (2005)).

Upon consideration of the new evidence, Commerce concluded that Hilltop had significantly impeded this proceeding by submitting information containing material misrepresentations and inaccuracies.[5] Moreover, Commerce determined that the nature of Hilltop's misrepresentations and the circumstances of their eventual disclosure "call[ed] into question Hilltop's ownership structure as reported in [this review], and, consequently, its eligibility for a separate rate [from the PRC-wide entity]."[6] Accordingly, because the record contained no reliable evidence to rebut the presumption of government control attaching to Hilltop as an exporter of subject merchandise from China,[7] Commerce determined that Hilltop failed to demonstrate eligibility for a rate separate from the PRC-wide entity, and therefore assigned to Hilltop the antidumping duty assessment

---

[5] Final Results of Redetermination Pursuant to Court Remand, A-570-893, ARP 09-10 (Apr. 1, 2013), ECF No. 74 ("Remand Results") at 17.

[6] Id. at 24.

[7] See Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002) (explaining that Commerce treats exporters "from countries with nonmarket economies ('NMEs') such as China" as "subject to a single, countrywide antidumping duty rate unless they [can] demonstrate legal, financial, and economic independence from the Chinese government," and noting that the Court of Appeals for the Federal Circuit has "upheld the application of this 'NME presumption'") (citing Sigma Corp. v. United States, 117 F.3d 1401 (Fed. Cir. 1997)).

rate applied to that countrywide entity.[8]  Hilltop now challenges
Commerce's redetermination on remand as not supported by
substantial evidence.[9]

        The court has jurisdiction pursuant to Section
516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended,
19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[10] and 28 U.S.C. § 1581(c)
(2006).

        For the reasons set forth below, Commerce's
determination to apply the PRC-wide antidumping duty assessment
rate to Hilltop is sustained.  However, Commerce's choice of an
appropriate assessment rate for the PRC-wide entity (including
Hilltop) is remanded for further consideration and/or additional
explanation concerning the chosen rate's compliance with the
antidumping statute's corroboration requirement.[11]

                            **BACKGROUND**

        On remand, Commerce accepted into the record of this
(fifth) review evidence submitted by Plaintiff Ad Hoc Shrimp

---

[8] Remand Results at 15.

[9] See Def.-Intervenors' Comments in Opp'n to Final Remand
Results, ECF No. 76 ("Hilltop's Br.").

[10] Further citations to the Tariff Act of 1930, as amended, are
to the relevant provisions of Title 19 of the U.S. Code,
2006 edition.

[11] See 19 U.S.C. § 1677e(c).

Trade Action Committee ("AHSTAC") — a petitioner for the
underlying antidumping duty order — in the course of the
subsequent (sixth) review of the order.[12]  This new evidence
showed that, contrary to Hilltop's representations in this
review, Hilltop was affiliated with an undisclosed Cambodian
shrimp exporter during the relevant time period.[13]  Commerce

---

[12] Remand Results at 2, 5 (citing Placing Public Documents on the
Record of the Fifth Administrative Review, A-570-893, ARP 09-10
(Feb. 14, 2013), Remand Admin. R. Pub. Docs. 1-38 ("Docs. from
AR6"), [AHSTAC's] Comments on the Dep't's Preliminary
Determination to Grant Hilltop's Request for Company-Specific
Revocation Pursuant to 19 C.F.R. 351.222(b)(2) & Comments in
Anticipation of Hilltop's Forthcoming Verification, A-570-893,
ARP 10-11 (Mar. 12, 2012), reproduced in Hilltop's Br. con.
app., ECF No. 79-1, at ex. 6).  All relevant portions of the
administrative record relied on in this opinion are reproduced
within the public and confidential appendices to the parties'
court filings, ECF Nos. 79-80, 94-95.  Hereinafter, all
citations to documents from the sixth review that have been
placed on the record of this (fifth) review include the label
Docs. from AR6.

[13] Compare Resp. of Hilltop Int'l & Affiliates to Antidumping
Questionnaire Section A, A-570-893, ARP 10-11 (June 15, 2010),
Admin. R. Con. Doc. 6 [Pub. Doc. 36], reproduced in Def.'s Resp.
Comments Regarding Remand Results ("Def.'s Resp.") con. app.,
ECF No. 94-5, at tab 19 ("Hilltop's AR5 Sec. A Resp.") at 4-5
(representing that Exhibits A-2 and A-3 to Hilltop's AR5 Section
A Response contain an exhaustive list of Hilltop's
affiliations), and id. at Exs. A-2 & A-3 (making no mention of
Ocean King (Cambodia) Co., Ltd. ("Ocean King")), with Docs. from
AR6, Hilltop's 7th Supp. Questionnaire Resp., A-570-893,
ARP 10-11 (June 27, 2012), reproduced in Def.'s Resp. con. app.
at tab 24 ("Hilltop's AR6 7th Supp. Questionnaire Resp.") at 2
(acknowledging that "an affiliation within the statutory
definition of 19 U.S.C. § 1677(33) existed between the Hilltop
Group and Ocean King until September 28, 2010"). See Final
Results, 76 Fed. Reg. at 51,940 (noting that the period of
(footnote continued)

concluded that the circumstances of Hilltop's eventual admission

to this previously undisclosed affiliation impeached Hilltop's

credibility with regard to its remaining representations in this

review. See Remand Results at 16 ("Because Hilltop submitted

material misrepresentations with regard to its affiliations, and

certified the accuracy of such false information, we find that

we cannot rely on any of the information submitted by Hilltop in

this review."). Specifically, Commerce credited evidence that

Hilltop did not disclose this affiliation until faced with clear

evidence thereof[14]; that Hilltop failed to provide a satisfactory

explanation for its omissions and misrepresentations in

reporting its corporate structure – claiming only that the

misrepresentations "may have been in error . . . for whatever

reason"[15]; and that Hilltop continues to withhold information

---

review for this proceeding was February 1, 2009, through January
31, 2010).

[14] See Docs. from AR6, Hilltop's AR6 7th Supp. Questionnaire
Resp. at 2 (admitting that this affiliation was not disclosed
until Commerce placed on record public registration documents
for Ocean King showing affiliation with Hilltop).

[15] See Remand Results at 19 (quoting Docs. from AR6, Hilltop-
Specific Issues Rebuttal Br., A-570-893, ARP 10-11 (July 23,
2012), reproduced in Def.'s Resp. pub. app., ECF No. 95-4, at
tab 18 ("Hilltop's AR6 Rebuttal Br.") at 9).

that Commerce requested regarding potential additional
undisclosed affiliates.[16]

Commerce's determination that Hilltop is not a
reliable source of complete and accurate information implicated
Hilltop's representations in this review that neither it nor any
of its PRC affiliates with potential for price manipulation were
under the control of the Chinese government. See Hilltop's AR5
Sec. A Resp. at 3-5; Remand Results at 15. Because Commerce's
decision to assign to Hilltop a separate rate from the PRC-wide
entity in this review had been based on these representations,[17]
which Commerce now found to be unreliable,[18] the agency
determined that the basis for Hilltop's separate rate status had
been invalidated. Remand Results at 15. Finding no valid
evidence to rebut the presumption of government control applied
to exporters of subject merchandise from China,[19] Commerce
decided to no longer treat Hilltop as separate from the PRC-wide
entity. Id. Accordingly, Commerce assigned to Hilltop the

---

[16] See id. at 21 n.83, 23.

[17] Certain Frozen Warmwater Shrimp from the People's Republic of
China, 76 Fed. Reg. 8338, 8340 (Dep't Commerce Feb. 14, 2011)
(preliminary results and preliminary partial rescission of fifth
antidumping duty administrative review) ("Preliminary Results")
(unchanged in the Final Results, 76 Fed. Reg. at 51,942).

[18] Remand Results at 15.

[19] See supra note 7.

112.81 percent antidumping duty assessment rate applied to the

PRC-wide entity in this review. Id. at 2.

        Hilltop challenges Commerce's redetermination on

remand, arguing that it should be assessed an antidumping duty

rate based at least in part on its own information. Hilltop's

Br. at 3-24.  In the alternative, Hilltop challenges the rate

assessed for the PRC-wide entity (including Hilltop) in this

review as not supported by substantial evidence. Id. at 24-37.

### STANDARD OF REVIEW

        The court will sustain Commerce's redetermination on

remand so long as it is supported by substantial evidence and is

otherwise in accordance with law. See 19 U.S.C.

§ 1516a(b)(1)(B)(i); Pakfood Pub. Co. v. United States,

__ CIT __, 753 F. Supp. 2d 1334, 1341 (2011).  Substantial

evidence refers to "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion," SKF USA, Inc.

v. United States, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (defining

"substantial evidence")), and the substantial evidence standard

of review can be roughly translated to mean "is the

determination unreasonable?" Nippon Steel Corp. v. United

States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation

and alteration marks and citation omitted).

## DISCUSSION

A. Commerce's Decision to Deny Hilltop Separate Rate Status in This Review Is Sustained.

The first question before the court is whether Commerce's decision to deny Hilltop separate rate status in this review is supported by substantial evidence. See Remand Results at 2 (finding that "Hilltop has failed to rebut the presumption that it is part of the [PRC]-wide entity"); Hilltop Br. at 18-24 (arguing that Commerce's decision to treat Hilltop as part of the PRC-wide entity is not supported by substantial evidence). For the reasons below, Commerce's decision to apply the PRC-wide antidumping duty assessment rate to Hilltop is supported by substantial evidence and is therefore sustained.

When dealing with merchandise from China, which Commerce treats as a nonmarket economy ("NME"),[20] Commerce

---

[20] A "nonmarket economy" is defined as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." Shanghai Foreign Trade Enters. Co. v. United States, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004). See also 19 U.S.C. § 1677b(c) (providing special rules governing Commerce's calculation of normal value for merchandise from nonmarket economy countries); Preliminary Results, 76 Fed. Reg. at 8340 ("In every case conducted by [Commerce] involving the PRC, the PRC has been treated as an NME country. In accordance
(footnote continued)

"presumes that all companies within [China] are subject to

governmental control and should be assigned a single antidumping

duty rate unless an exporter demonstrates the absence of both *de

jure* and *de facto* governmental control over its export

activities" and thus obtains "separate rate status".[21]  Where

---

with [19 U.S.C. § 1677(18)(C)(i)], any determination that a
foreign country is an NME country shall remain in effect until
revoked by [Commerce].  None of the parties to this proceeding
has contested such treatment.  Accordingly, we calculated
[normal value] in accordance with [19 U.S.C. § 1677b(c)], which
applies to NME countries.") (additional citation omitted)
(unchanged in the Final Results or Remand Results).

[21] Import Administration, U.S. Dep't Commerce, Separate-Rates
Practice & Application of Combination Rates in Antidumping
Investigations Involving Non-Market Economy Countries, Policy
Bulletin No. 05.1 (Apr. 5, 2005) ("ITA Policy Bulletin 05.1")
at 1 (citation omitted); Preliminary Results, 76 Fed. Reg. at
8340.  Generally, Commerce evaluates "whether a firm is
sufficiently independent from governmental control in its export
activities to be eligible for separate rate status" on the basis
of three criteria for demonstrating the absence of *de jure*
government control and four criteria for demonstrating the
absence of *de facto* government control. ITA Policy Bulletin 05.1
at 2.  The *de jure* freedom from government control criteria are
"1) an absence of restrictive stipulations associated with an
individual exporter's business and export licenses; 2) any
legislative enactments decentralizing control of companies; and
3) any other formal measures by the government decentralizing
control of companies." Id.  The *de facto* freedom from government
control criteria are "1) whether the export prices are set by,
or subject to the approval of, a governmental authority;
2) whether the respondent has authority to negotiate and sign
contracts and other agreements; 3) whether the respondent has
autonomy from the central, provincial and local governments in
making decisions regarding the selection of its management; and
4) whether the respondent retains the proceeds of its export
sales and makes independent decisions regarding disposition of
profits or financing of losses." Id.

record evidence supports a respondent's eligibility for separate

rate status, Commerce must treat the respondent as separate from

the countrywide entity unless the agency makes a specific

finding, supported by substantial evidence, that the evidence

regarding separate rate eligibility is deficient or otherwise

unreliable. See Jiangsu Changbao Steel Tube Co. v. United

States, __ CIT __, 884 F. Supp. 2d 1295, 1309-10 (2012).[22]

    Hilltop's separate rate status in this review was

based on representations contained in its responses to

Commerce's information requests. Preliminary Results,

76 Fed. Reg. at 8340-41 (unchanged in the Final Results,

76 Fed. Reg. at 51,942). Because Hilltop "reported that it is a

Hong Kong based exporter of subject merchandise," Commerce

concluded that "a separate rate analysis [was] not necessary to

determine whether [Hilltop] is independent from government

control." Id. at 8341 (citations omitted).[23] Although Hilltop

---

[22] (discussing Gerber Food (Yunnan) Co. v. United States, 29 CIT
753, 387 F. Supp. 2d 1270 (2005); Shandong Huarong Gen. Grp.
Corp. v. United States, 27 CIT 1568 (2003) (not reported in the
Federal Supplement); Foshan Shunde Yongjian Housewares &
Hardware Co. v. United States, No. 10-00059, 2011 WL 4829947
(CIT Oct. 12, 2011); Since Hardware (Guangzhou) Co. v. United
States, No. 09-00123, 2010 WL 3982277 (CIT Sept. 27, 2010)).

[23] See id. at 8340 ("[I]f [Commerce] determines that a company is
wholly foreign-owned or located in a market economy, then a
separate rate analysis is not necessary to determine whether it
is independent from government control.") (citing Petroleum Wax
Candles from the People's Republic of China, 72 Fed. Reg.
(footnote continued)

had disclosed a number of affiliations with companies located in

China that were at least partially owned by Chinese persons or

entities, it represented that "[t]here is no control over any of

the Hilltop Group companies by any local or national government

entity." Hilltop's AR5 Sec. A Resp. at 3-4.  Based on this

information, Commerce determined that "there is no PRC ownership

of Hilltop" and, notwithstanding Hilltop's affiliation with

Chinese companies, the record presented "no evidence indicating

that [any] of these companies are under the control of the PRC."

Preliminary Results, 76 Fed. Reg. at 8341 (unchanged in the

Final Results, 76 Fed. Reg. at 51,942).

       As discussed above, however, on remand Commerce

determined that Hilltop provided false and incomplete

information in this review regarding its corporate structure

and, given the nature and timing of Hilltop's omissions and

misrepresentations in this regard, Commerce decided that none of

Hilltop's submissions, including the statements used to support

---

52,355, 52,356 (Dep't Commerce Sept. 13, 2007) (final results of
antidumping duty administrative review)); see also, e.g., Wooden
Bedroom Furniture from the People's Republic of China, 69 Fed.
Reg. 35,312, 35,320 (Dep't Commerce June 24, 2004) (notice of
preliminary determination of sales at less than fair value and
postponement of final determination) ("It is [Commerce]'s policy
to treat Hong Kong companies as market-economy companies.")
(citing Application of U.S. Antidumping and Countervailing Duty
Laws to Hong Kong, 62 Fed. Reg. 42,965 (Dep't Commerce Aug. 11,
1997) (explaining that "Hong Kong [is] considered a separate
Customs territory within the PRC" subsequent to the PRC's
resumed exercise of sovereignty over its territory)).

Hilltop's separate rate status, could be relied on to provide accurate information. <u>See</u> <u>Remand Results</u> at 2, 15.  This conclusion "was based on the finding that Hilltop had a Cambodian affiliate, Ocean King, from [the first period of administrative review of this antidumping duty order] through most of [the sixth period of review], which Hilltop repeatedly failed to disclose to [Commerce]." <u>Id.</u> at 6.

Commerce's finding that Hilltop repeatedly withheld and misrepresented material information regarding its affiliation with Ocean King is supported by a reasonable reading of the record here.  Specifically, record evidence shows that, although Hilltop's general manager and part owner was a board member and 35 percent shareholder in Ocean King during the period of review,[24] Hilltop nevertheless misrepresented to Commerce that "[n]one of the Hilltop Group companies or their

_____

[24] <u>See</u> <u>Remand Results</u> at 8 ("[Commerce] released public registration documents for Ocean King that identified To Kam Keung, Hilltop's general manager and part owner, as a board member and 35 percent shareholder beginning in July 2005 and ending in September 2010.") (citing <u>Docs. from AR6</u>, <u>Public Registration Docs. for Ocean King (Cambodia) Co., Ltd.</u>, A-570-893, ARP 10-11 (June 19, 2012), <u>reproduced in</u> Def.'s Resp. pub. app. at tab 17); <u>Docs. from AR6</u>, <u>Hilltop's AR6 7th Supp. Questionnaire Resp.</u> at 2 (acknowledging that "an affiliation within the statutory definition of 19 U.S.C. § 1677(33) existed between the Hilltop Group and Ocean King until September 28, 2010"); <u>Final Results</u>, 76 Fed. Reg. at 51,940 (noting that the period of review for this proceeding was February 1, 2009, through January 31, 2010).

individual owners own 5 percent or more in stock in any third

parties,"[25] and that none of Hilltop's managers "held positions

with any other firm, government entity, or industry organization

during the [period of review]."[26]  The evidence also shows that

Hilltop subsequently denied and concealed its affiliation with

and investment in Ocean King until confronted with public

registration documents contradicting its misrepresentations.[27]

This is sufficient to reasonably support Commerce's conclusion

that Hilltop withheld information requested of it in this review

---

[25] See Remand Results at 12 (quoting Ex. A-2 to Hilltop's AR5 Sec. A Resp.).

[26] See id. at 13 n.65 (quoting Hilltop Int'l & Affiliates Supp. Section A Questionnaire Resp., A-570-893, ARP 09-10 (July 29, 2010), Admin. R. Con. Doc. 12 [Pub. Doc. 58], reproduced in Def.'s Resp. con. app. at tab 20, at 6).

[27] Compare Docs. from AR6, Hilltop's Resp. to CBP Import Data, A-570-893, ARP 10-11 (May 24, 2012), reproduced in Def.'s Resp. con. app. at tab 23, at 2 n.1 (claiming that Hilltop is not affiliated with any of the Cambodian shrimp manufacturers identified in Docs. from AR6, Customs Data of U.S. Imports of Certain Frozen Warmwater Shrimp from Cambodia, A-570-893, ARP 10-11 (May 17, 2012), reproduced in Def.'s Resp. con. app. at tab 25, which included Ocean King), and Docs. from AR6, Hilltop's Reply to Pet'rs' Resp. to CBP Import Data, A-570-893, ARP 10-11 (May 31, 2012), reproduced in Def.'s Resp. con. app. at tab 23, at 6 ("Hilltop is not affiliated with Ocean King. . . . Hilltop confirms that neither the company, nor its owners or officers, invested any funds in Ocean King."), with Docs. from AR6, Hilltop's AR6 7th Supp. Questionnaire Resp. at 2 (admitting to Hilltop's affiliation with Ocean King for the first time in response to Commerce's request to reconcile Hilltop's prior representations with the public registration documents for Ocean King).

and significantly impeded this proceeding by submitting

information containing material misrepresentations and

inaccuracies. See Remand Results at 15, 17.

When a respondent fails to comply with Commerce's

requests by withholding or failing to timely provide requested

information, submitting information that cannot be verified, or

otherwise significantly impeding an antidumping proceeding,

Commerce may disregard all or part of the deficient submission

if the respondent fails to timely and adequately remedy or

explain the deficiency after receiving notice from the agency.

19 U.S.C. at §§ 1677e(a)(2), 1677m(d).[28]  Here Commerce

---

[28] Where the deficiency identified in a respondent's submissions
affects an isolated issue or data set, Commerce uses facts
otherwise available solely to fill the evidentiary gap, while
continuing to rely on the remainder of the respondent's non-
deficient submissions. E.g., Am. Silicon Techs. v. United
States, 24 CIT 612, 620 n.6, 110 F. Supp. 2d 992, 999 n.6 (2000)
(citing Statement of Administrative Action accompanying the
Uruguay Round Agreements Act, H.R. Rep. No. 103-826 (1994)
("SAA") at 656, 869).  Where, however, the deficiency affects
information that is "core, not tangential, and there is little
room for substitution of partial facts," Commerce may disregard
the totality of the respondent's submitted information and reach
its determination based on "total facts available." Shanghai
Taoen Int'l Trading Co. v. United States, 29 CIT 189, 199 n.13,
360 F. Supp. 2d 1339, 1348 n.13 (2005).  Where resort to the use
of facts otherwise available is warranted, Commerce may employ
an adverse inference when selecting among the facts available if
it further determines that the respondent failed to cooperate by
not acting to the best of its ability to comply with Commerce's
requests for information. 19 U.S.C. § 1677e(b).  But "[a]lthough
separate determinations are required for application of facts
otherwise available under § 1677e(a), and adverse inferences
under § 1677e(b), both standards are met where a respondent
(footnote continued)

determined that Hilltop's conduct implicated the overall
credibility of its representations in this review.[29]  In
particular, Commerce concluded that the credibility of Hilltop's
statements regarding its affiliations, corporate structure, and
ownership – which had formed the basis for Hilltop's separate
rate status in this review – was undermined by Hilltop's
withholding of critical information and repeated
misrepresentation of the scope of its affiliates. Remand Results
at 14-15.  Specifically, Commerce could no longer rely on
Hilltop's declaration that none of the Chinese companies with
which it is affiliated – all of which possess "a significant
potential for manipulation of [the] price or production [of
subject merchandise]"[30] – was controlled by the PRC.[31]

---

purposefully withholds, and provides misleading, information."
Shanghai Taoen, 29 CIT at 195, 360 F. Supp. 2d at 1345.

[29] See Remand Results at 17; cf. Changbao, __ CIT at __,
884 F. Supp. 2d at 1306 ("It is reasonable for Commerce to infer
that a respondent who admits to having intentionally deceived
Commerce officials, and does so only after Commerce itself
supplies contradictory evidence, exhibits behavior suggestive of
a general willingness and ability to deceive and cover up the
deception until exposure becomes absolutely necessary.");
Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13
(explaining that a respondent's intentional deception of
Commerce may reasonably implicate the overall credibility of
that respondent).

[30] Preliminary Results, 76 Fed. Reg. at 8339.

[31] See Hilltop's AR5 Sec. A Resp. at 3-4; Remand Results at 15,
24 ("Hilltop's refusal in AR6 . . . to disclose its full
(footnote continued)

Although Hilltop was afforded an opportunity to
rehabilitate its impeached credibility by providing a reasonable
explanation for its non-disclosure and subsequent denial of any
affiliation with Ocean King, the evidence also supports
Commerce's conclusion that Hilltop's explanation was
unpersuasive.[32]  Far from providing a reasonable explanation,
Hilltop admitted only what was unequivocally evidenced by the
new documents,[33] trivialized its prior misrepresentation as
having been in error "for whatever reason,"[34] and continued to

---

universe of affiliated companies and provide information
regarding its affiliations with other persons/entities calls
into question Hilltop's ownership structure as reported in [this
review], and, consequently, its eligibility for a separate rate
in this review."), 30 ("[B]ecause the disclosure of Hilltop's
affiliation with Ocean King . . . reveals that substantial
portions of Hilltop's Section A response contain material
misrepresentations with regard to Hilltop's corporate structure
and affiliations, Hilltop's entire Section A response, which
details its eligibility for a separate rate and was submitted in
lieu of a separate-rate application, is now fatally undermined
and unusable for any purposes.") (citation omitted).

[32] See Remand Results at 32 ("Based on the record as a whole, we
determine that Hilltop has failed to present any evidence or
argument that explains its failure to disclose its dealings with
Ocean King or its trading activity with persons/entities
involved in its Cambodian enterprise.").

[33] Docs. from AR6, Hilltop's AR6 7th Supp. Questionnaire Resp.
at 2 (admitting to Hilltop's affiliation with Ocean King for the
first time in response to Commerce's request to reconcile
Hilltop's prior representations with the public registration
documents for Ocean King).

[34] Docs. from AR6, Hilltop's AR6 Rebuttal Br. at 9.

evade Commerce's requests for information regarding possible
additional undisclosed affiliates.[35]  Commerce inferred that
Hilltop's failure to disclose its affiliation with Ocean King
until faced with undeniable evidence thereof rendered its
representations regarding lack of PRC control over its Chinese
affiliates untrustworthy. Remand Results at 15, 21.  As this
Court has previously held, "the inference that a respondent's
failure to disclose willful deception until faced with
contradictory evidence implicates the reliability of that
respondent's remaining representations is reasonable." Changbao,
__ CIT at __, 884 F. Supp. 2d at 1306 (citing Shanghai Taoen,
29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13).  Here the
reasonableness of this inference is bolstered by evidence that
Hilltop may also have additional undisclosed affiliates, whose
roles in the production and pricing of subject merchandise
Hilltop continues to deny.[36]

---

[35] See Remand Results at 21 (noting Hilltop's "potential
affiliations with additional entities/persons") (citing Docs.
from AR6, Hilltop 6th Supp. Questionnaire, A-570-893, ARP 10-11
(June 1, 2012), reproduced in Def.'s Resp. pub. app. at tab 17,
at questions 5d, 5e, and 9a-c (requesting information regarding
Hilltop's affiliation with certain entities/persons referenced
in the record evidence) and noting that "Hilltop refused to
respond to these questions" in its subsequent responses).

[36] See supra note 35.

Under these circumstances, Commerce reasonably
determined to disregard the totality of Hilltop's
representations in this review – including those previously used
to support Hilltop's separate rate status – as inherently
unreliable because Hilltop's conduct "raises questions regarding
what other information is missing that could be relevant to
[Commerce]'s proceeding." Remand Results at 23; see 19 U.S.C.
at §§ 1677e(a)(2), 1677m(d). Hilltop's unexplained
contradictions in representing its corporate structure in this
review concern information that is core, not tangential, to
Commerce's analysis because it goes to the heart of Hilltop's
corporate ownership and control.[37] And as Hilltop continued to
misrepresent its corporate structure – including by explicitly
denying any affiliation with Ocean King or other undisclosed
entities – until forced to reconcile its misrepresentations with
contradictory evidence,[38] Commerce reasonably decided that
Hilltop's remaining representations regarding its structure and
ownership – particularly those concerning the role of PRC

---

[37] See Remand Results at 30 ("Hilltop's failure to disclose the
affiliation [with Ocean King] goes to the heart of its Section A
questionnaire response and the information that [Commerce]
relies on to make separate-rate status determinations.");
cf. Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d
at 1348 n.13.

[38] See supra note 27.

government control in its pricing decisions – may be similarly

incomplete and inaccurate. See Remand Results at 15, 23.

        Based on these findings, Commerce's conclusion that

Hilltop's representations regarding its corporate structure,

affiliations, and government control are not reliably accurate

and complete is reasonable.  Accordingly, because the record

contains no other reliable information to rebut the presumption

of government control,[39] Commerce's determination that Hilltop

failed to demonstrate eligibility for a separate rate from the

---

[39] While Hilltop emphasizes the record evidence that it is
registered in Hong Kong, see Hilltop's Br. at 18-24 (relying on
Exs. A-5 (Hilltop's Hong Kong Business License) & A-6 (Hilltop's
Hong Kong Business Registration Form) to Hilltop's AR5 Sec. A
Resp.), Hilltop's registration in Hong Kong does not address the
potential for government control through Hilltop's disclosed and
possibly additional undisclosed PRC affiliates. Compare Certain
Coated Paper Suitable for High-Quality Print Graphics Using
Sheet-Fed Presses from the People's Republic of China, 75 Fed.
Reg. 24,892, 24,900 (Dep't Commerce May 6, 2010) (notice of
preliminary determination of sales at less than fair value and
postponement of final determination) (finding that a separate
rate analysis was not required for a respondent located entirely
in Hong Kong) (unchanged in the final determination, 75 Fed.
Reg. 59,217 (Dep't Commerce Sept. 27, 2010)), with Certain Woven
Electric Blankets from the People's Republic of China, 75 Fed.
Reg. 5567, 5570 (Dep't Commerce Feb. 3, 2010) (preliminary
determination of sales at less than fair value and postponement
of final determination) (determining that a full seven factor
separate rate analysis was necessary for a "collapsed entity
[that was] a joint venture between a PRC and a foreign (i.e.,
Hong Kong) company" because the PRC government could exercise
control through the PRC affiliate) (unchanged in the final
determination, 75 Fed. Reg. 38,459 (Dep't Commerce July 2, 2010)
and the amended final determination, 75 Fed. Reg. 46,911 (Dep't
Commerce Aug. 4, 2010)).

PRC-wide entity is supported by substantial evidence and is
therefore sustained.

     B.     <u>The PRC-Wide Assessment Rate Applied in This Review Is
Remanded for Further Consideration and/or Additional
Explanation.</u>

     Next, Hilltop argues that the antidumping duty

assessment rate applied to the PRC-wide entity, including

Hilltop, was based on secondary information that was not

properly corroborated in accordance with 19 U.S.C. § 1677e(c).

Hilltop's Br. at 24-37.[40]  As explained below, remand is

necessary for further consideration and/or explanation of the

extent to which the PRC-wide rate applied in this review

satisfies the corroboration requirement.

     The rate applied to the PRC-wide entity in this review

was calculated in the unfair pricing investigation that led to

the issuance of this antidumping duty order, using information

derived from the original petition to initiate these antidumping

proceedings.[41]  In that proceeding, Commerce concluded that the

---

[40] <u>See</u> 19 U.S.C. § 1677e(c) ("When [Commerce] relies on secondary
information rather than on information obtained in the course of
an investigation or review, [Commerce] shall, to the extent
practicable, corroborate that information from independent
sources that are reasonably at [Commerce's] disposal.").

[41] <u>Preliminary Results</u>, 76 Fed. Reg. at 8342 (unchanged in the
<u>Final Results</u>, 76 Fed. Reg. at 51,942) (unchanged in the <u>Remand
Results</u> at 24-25); <u>see</u> <u>Certain Frozen and Canned Warmwater
Shrimp from the People's Republic of China</u>, 69 Fed. Reg. 70,997,
71,003 (Dep't Commerce Dec. 8, 2004) (notice of final
                                    (footnote continued)

"112.81 percent [PRC-wide rate] [was] corroborated within the

meaning of [19 U.S.C. § 1677e(c)]" because the agency had

"compared that margin to the margin [Commerce] found for the

largest exporting respondent" and "found that the margin of

112.81 percent ha[d] probative value."[42]  The PRC-wide entity was

then assigned this same rate in every subsequent administrative

review of this antidumping duty order, including the fifth

review at issue here, based on adverse inferences applied

because of the PRC's failure to respond to Commerce's

questionnaires and cooperate to the best of its ability.

See Preliminary Results, 76 Fed. Reg. at 8342 (discussing

history of the PRC-wide rate); cf. 19 U.S.C. § 1677e(b)(2)

(providing that adverse inferences "may include reliance on

---

determination of sales at less than fair value) ("Final LTFV
Determination") (assigning 112.81 percent as the PRC-wide rate).

[42] Certain Frozen and Canned Warmwater Shrimp from the People's
Republic of China, 69 Fed. Reg. 42,654, 42,662 (Dep't Commerce
July 16, 2004) (notice of preliminary determination of sales at
less than fair value, partial affirmative preliminary
determination of critical circumstances and postponement of
final determination) ("Preliminary LTFV Determination") (relying
on SAA at 870 ("Corroborate [within the meaning of 19 U.S.C.
§ 1677e(c)] means that [Commerce] will satisfy [itself] that the
secondary information to be used [(which includes information
derived from the petition)] has probative value.") and citing
Corroboration Memorandum, A-570-893, Investigation (July 2,
2004)) (unchanged in the final determination, 69 Fed. Reg. at
71,003).

information derived from . . . a final determination in the
[underlying unfair pricing] investigation").

      Commerce correctly posits that the PRC-wide rate need
not be corroborated with respect to each particular respondent
who, like Hilltop, is found to form a part of the PRC-wide
entity and thus to be subject to the PRC-wide rate.[43]
"Commerce's permissible determination that [a respondent] is
part of the PRC-wide entity means that inquiring into [that
respondent]'s separate sales behavior ceases to be meaningful."[44]
But Commerce *is* required to corroborate the PRC-wide rate with
respect to "its reliability and relevance to the countrywide
entity as a whole." Peer Bearing, 32 CIT at 1313, 587 F. Supp.
2d at 1327.

      To properly corroborate the PRC-wide rate, Commerce
must determine that this rate "is relevant, and not outdated, or

---

[43] Remand Results at 38; cf. Peer Bearing Co. – Changshan v.
United States, 32 CIT 1307, 1313, 587 F. Supp. 2d 1319, 1327
(2008) ("[T]here is no requirement that the PRC-wide entity rate
based on AFA relate specifically to the individual company.
. . . [This] rate must be corroborated according to its
reliability and relevance to the countrywide entity as a
whole.") (citation omitted); Shandong Mach. Imp. & Exp. Co. v.
United States, No. 07-00355, 2009 WL 2017042, at *8 (CIT June
24, 2009) (explaining that Commerce has no obligation to
corroborate the PRC-wide rate as to an individual party where
that party has failed to qualify for a separate rate).

[44] Watanabe Grp. v. United States, No. 09-00520, 2010 WL 5371606,
at *4 (CIT Dec. 22, 2010).

lacking a rational relationship to [the China-wide entity]."

Ferro Union, Inc. v. United States, 23 CIT 178, 205, 44 F. Supp.

2d 1310, 1335 (1999). Here, Commerce determined that the 112.81

percent PRC-wide rate was "corroborated, relevant, and reliable"

because this rate "was fully corroborated during the

investigation." Remand Results at 38.[45] During the

investigation, this rate was corroborated by comparison with the

rate determined for the largest exporting respondent,[46] which was

90.05 percent.[47] But as Hilltop emphasizes, this comparison rate

was later changed; it was reduced to 5.07 percent following

---

[45] See also Preliminary Results, 76 Fed. Reg. at 8342 (assigning
to the PRC-wide entity in this review the 112.81 percent rate as
"the only rate ever determined for the PRC-wide entity in this
proceeding," without additional corroboration) (unchanged in the
Final Results, 76 Fed. Reg. at 51,942).

[46] Preliminary LTFV Determination, 69 Fed. Reg. at 42,662 ("To
corroborate the [PRC-wide] margin of 112.81 percent, we compared
that margin to the margin we found for the largest exporting
respondent.") (unchanged in the Final LTFV Determination, 69
Fed. Reg. at 71,003).

[47] See Preliminary LTFV Determination, 69 Fed. Reg. at 42,660
(explaining that Commerce had limited its examination to "the
four exporters and producers accounting for the largest volume
of subject merchandise" and listing "Allied" as the largest of
the four); id. at 42,671 (assigning a 90.05 percent weighted-
average dumping margin to "Allied") (adjusted to 84.93 percent
in the Final LTFV Determination, 69 Fed. Reg. at 71,003)
(adjusted to 80.19 percent in Certain Frozen Warmwater Shrimp
from the People's Republic of China, 70 Fed. Reg. 5149, 5151
(Dep't Commerce Feb. 1, 2005) (notice of amended final
determination of sales at less than fair value and antidumping
duty order)).

judicial review. Hilltop's Br. at 32-33 (relying on <u>Allied Pac.
Food (Dalian) Co. v. United States</u>, __ CIT __, 716 F. Supp. 2d
1339 (2010)).  Moreover, the rates for the remaining two
mandatory respondents from the investigation who received rates
above *de minimis* were also reduced following judicial review.
<u>Id.</u> (relying on <u>Allied Pac. Food (Dalian)</u>, __ CIT __,
716 F. Supp. 2d 1339; <u>Shantou Red Garden Foodstuff Co. v. United
States</u>, __ CIT __, 880 F. Supp. 2d 1332 (2012)).  Thus the
final liquidation rates for the four mandatory respondents from
the investigation were *de minimis*, 5.07 percent, 7.20 percent,
and 8.45 percent.[48]  These numbers are significantly different
from the (subsequently invalidated) 90.05 percent comparison
rate that Commerce used to corroborate the 112.81 rate assigned
to the PRC-wide entity in the investigation and in every segment
of this proceeding thereafter.

As the comparison margin used to corroborate the PRC-
wide rate was subsequently shown not to reflect commercial

_____

[48] <u>Final LTFV Determination</u>, 69 Fed. Reg. at 70,998 (listing
"Zhanjian Goulian; Yelin; Allied; and Red Garden" as the four
mandatory respondents in the investigation); <u>id.</u> at 71,003
(listing a *de minimis* rate for "Zhanjian Goulian"); <u>Allied Pac.
Food (Dalian)</u>, __ CIT at __, 716 F. Supp. 2d at 1342, 1352
(affirming reduction of the rate for "Allied" to 5.07 percent);
<u>id.</u> (affirming reduction of the rate for "Yelin" to
8.45 percent); <u>Shantou Red Garden Foodstuff</u>, __ CIT at __,
880 F. Supp. 2d at 1334-35 (affirming reduction of the rate for
"Red Garden" to 7.20 percent).

reality,[49] Commerce may no longer rely on that comparison to satisfy itself that the PRC-wide rate assigned in this review has probative value. <u>Compare with</u> <u>Watanabe</u>, 2010 WL 5371606, at *4 (holding that Commerce may rely on a countrywide rate that was corroborated in an earlier segment of an antidumping proceeding if the record contains "no evidence questioning the prior corroboration") (citations omitted). Accordingly, Commerce has failed to establish that the 112.81 percent rate assigned to the PRC-wide entity (which includes Hilltop) in this review "is corroborated, relevant, and reliable." <u>See</u> <u>Remand Results</u> at 37-38. Remand is therefore necessary on the issue of proper corroboration of the secondary information used to calculate the PRC-wide rate in this review.[50] On remand, Commerce must either adequately corroborate the 112.81 percent rate and explain how its corroboration satisfies the requirements of 19 U.S.C. 1677e(c), or else calculate or choose a different countrywide rate that better reflects commercial

---

[49] <u>See</u> <u>Allied Pac. Food (Dalian) Co. v. United States</u>, 30 CIT 736, 435 F. Supp. 2d 1295 (2006) (remanding Commerce's calculation of Allied's rate during the investigation); <u>Allied Pac. Food (Dalian)</u>, __ CIT at __, 716 F. Supp. 2d at 1342, 1352 (affirming reduction of the rate for Allied to 5.07 percent).

[50] <u>See</u> 19 U.S.C. § 1677e(c) (requiring corroboration of "secondary information"); SAA at 870 (defining "secondary information" to include "information derived from the petition that gave rise to the investigation or review").

reality, as supported by a reasonable reading of the record
evidence.

### CONCLUSION

For all of the foregoing reasons, Commerce's
redetermination on remand is sustained except with regard to the
antidumping duty assessment rate applied to the PRC-wide entity,
which includes Hilltop.  On remand, Commerce must either
adequately corroborate the 112.81 percent PRC-wide rate and
explain how its corroboration satisfies the requirements of
19 U.S.C. 1677e(c), or calculate or choose a different
countrywide rate that better reflects commercial reality, as
supported by substantial evidence.  Commerce shall have until
September 9, 2013 to complete and file its remand determination.
Plaintiff and Defendant-Intervenors shall have until
September 23, 2013 to file comments.  Plaintiff, Defendant, and
Defendant-Intervenors shall have until October 9, 2013 to file
any reply.

It is SO ORDERED.

                                    /s/ Donald C. Pogue
                                  Donald C. Pogue, Chief Judge

Dated: July 23, 2013
       New York, NY